<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3   THE TRUSTEES OF PURDUE UNIVERSITY
                                    *      January 28, 2022
 4   VS.                           *
                                    * CIVIL ACTION NO. W-21-CV-727
 5   STMICROELECTRONICS N.V. ET AL*

 6              BEFORE THE HONORABLE ALAN D ALBRIGHT
                PROTECTIVE ORDER HEARING (via Zoom)
 7
     APPEARANCES:
 8
     For the Plaintiff:          Michael W. Shore, Esq.
 9                               Raphael Denis Philippe Chabaneix, Esq.
                                 Shore Chan DePumpo LLP
10                               901 Main Street, Suite 3300
                                 Dallas, TX 75202
11
                                 Mark D. Siegmund, Esq.
12                               Steckler Wayne Cochran Cherry, PLLC
                                 8416 Old McGregor Rd.
13                               Waco, TX 76712

14   For the Defendant:         Justin S. Cohen, Esq.
                                 Nadia Elena Haghighatian, Esq.
15                               Thompson & Knight, LLP
                                 1722 Routh Street, Suite 1500
16                               Dallas, TX 75201

17                               Massimo Ciccarelli, Esq.
                                 Ciccarelli Law Firm
18                               750 N. St. Paul St., Suite 200
                                 Dallas, TX 75201
19
     Court Reporter:            Kristie M. Davis, CRR, RMR
20                               PO Box 20994
                                 Waco, Texas 76702-0994
21                               (254) 340-6114

22        Proceedings recorded by mechanical stenography, transcript

23   produced by computer-aided transcription.

24

25
</pre>

1          (January 28, 2022, 9:30 a.m.)

2          DEPUTY CLERK:  Civil hearing regarding protective order in

3    Civil Action W-21-CV-727, styled The Trustees of Purdue

4    University versus STMicroelectronics NV and others.

5          THE COURT:  If I could have announcements from counsel,

6    please.

7          MR. SIEGMUND:  Good morning, Your Honor.  This is Mark

8    Siegmund for plaintiff Purdue University, also with Steckler

9    Wayne Cochran Cherry.  With me this morning are my co-counsel,

10   Michael Shore and Raphael Chabaneix from Shore Chan LLP.

11         And Mr. Shore's going to be the main speaker today, Your

12   Honor.

13         MR. COHEN:  Good morning, Your Honor.  Justin Cohen of

14   Holland & Knight for the defendants.  With me is Nadia

15   Haghighatian, also of Holland & Knight, and my co-counsel who

16   needs no introduction, Max Ciccarelli.

17         THE COURT:  Good morning all.

18         Happy to take -- I've been through and reviewed the

19   issues, and I'm happy to take them up.  Happy to hear from

20   counsel.

21         MR. COHEN:  Thank you, Your Honor.  We were thinking we'd

22   start with the source code provisions of the protective order,

23   then move to the acquisition bar, if that's okay with you.

24         THE COURT:  Fine with me.

25         MR. COHEN:  All right.  Well, Your Honor, I think this

1    dispute is somewhat straightforward.  The defendants here are

2    trying to protect our most-valued and important and sensitive

3    data.  These are the GDS files, process flows, recipes that are

4    used to manufacture both the accused products and prior art

5    products.  These truly are the crown jewel type of files of

6    STMicroelectronics, the most-closely guarded.

7         And what we've done is used the Court's standard source

8    code protective order and source code provisions and simply

9    asked to include these particular files under the same

10   protections.

11        Plaintiff Purdue doesn't think that these files are

12   deserving of source code protection because they are not

13   "source code," which I think puts form over substance because

14   there's plenty of source code that isn't deserving of real

15   strong protections.

16        But there's really no question in semiconductor cases that

17   these are the types of files that are deserving of the most

18   important protection, mostly because, you know, the inadvertent

19   disclosure means that someone could potentially figure out how

20   to manufacture ST's, you know, products.

21        And I'm happy to go through some of the language if you'd

22   like, Your Honor.

23        THE COURT:  Sure.  Please.

24        MR. COHEN:  Okay.  So what -- put up here.  I have just a

25   couple of slides.

4

1          And so what we've done here, Your Honor -- is that

2   visible, Your Honor?

3          THE COURT:  Yes, sir.

4          MR. COHEN:  Okay.  So this is the Court's standard source

5   code provision.  This is in Section 11.  And what we've done is

6   just modified it to not only include source code but to also

7   include GDS files, CAD CAE files, process flow simulation,

8   design files, microcode masks.  So that those files would be

9   designated as source code and protected as such.

10         You know, this is a provision, Your Honor, that we believe

11  is standard among semiconductor cases.  This Court's granted

12  similar protections for exactly these types of files, for

13  example, in the VLSI versus Intel case.  This is straight out

14  of the protective order from the VLSI Intel case giving source

15  code protections for design files, schematics, net lists,

16  representations of silicon masks, circuit design diagrams, you

17  know.

18         So we believe that there's really no question these are

19  the types of files that are deserving of source code

20  protection.  And, in fact, plaintiffs's firm in the past in a

21  separate case, CyWee v. HTC, also agreed to similar source code

22  protections for exactly these types of design files.

23         Putting in there that source code material would include

24  items that include the physical design files, formulas,

25  engineering specifications, recipes, schematics, things that

1   describe the algorithms or the structure of hardware which is

2   what we're talking about here.  The accused products are

3   semiconductor products, Your Honor.

4       And, again, plaintiff's law firm in that CyWee/HTC case

5   specifically said source code produced shall be made available

6   for inspection.  And that would include GDS files.  So to us,

7   Your Honor, there's really no question these are the types of

8   files that should be source code-level of protection.  And it's

9   been standard in the past.

10      THE COURT:  A response?

11      MR. SHORE:  Your Honor, if you -- first of all, they can't

12  point you to a single case where ST, in a piece of litigation,

13  has achieved this level of restriction, where ST has ever

14  gotten it.  I've litigated with ST.  In the case I litigated

15  with ST, they didn't ask for this and they didn't get it.

16      They have literally asked that every single document they

17  produce will have to be produced in the office of their counsel

18  so that counsel for Purdue and its experts, to review

19  everything, will have to go to the office of Thompson & Knight,

20  everything related to anything technical.  If you look at that

21  laundry list, it is everything that would ever come about.

22      So let's go back to exactly what process flows are.

23      When ST files for a patent, when Purdue filed for a

24  patent, the process by which you make the semiconductor is

25  disclosed in the patent.  It's disclosed in the specification.

1   For every process patent that you ever have in a semiconductor

2   case, to enable the patent, you have to disclose the process in

3   the specification.

4       The process in these patents even includes the time and

5   temperature, very detailed in many of these patents.  So this

6   is not the golden jewels of any company.

7       But anyway, they can mark it attorneys' eyes only.  They

8   can mark it confidential.  In my 30-year career no one in my

9   office or my firm has ever in any way, shape, form or fashion

10  been in any way violative of a protective order.

11      There -- also the other thing I think is interesting, they

12  bring up the Intel-VLSI case.  That was an agreed protective

13  order.  I'm certainly not -- and I have no idea why they agreed

14  to that, I have no idea what the status of VLSI and Intel are

15  as far as being competitors to one another or anything like

16  that.  No idea.

17      But I can tell you right now, Purdue does not own a

18  semiconductor process fab.  So it has no use for, you know, no

19  internal use.  Purdue has no products.  Purdue has no fab.

20  There is nothing Purdue can do with these materials.

21      And it is not source code.  In the HTC case he referenced,

22  that was a pure source code case.  It was 100 percent.  The

23  entire case rested on what the source code said and how the

24  source code operated.

25      You cannot take a process flow and put it into a computer

1   and run a process.  A process flow is a step-by-step

2   instructions on how to make a device.

3       I can print you off of the Internet process flows for

4   semiconductors.  They're claiming that the -- that their

5   processes predate the patent and that their processes are

6   well-known, and they produced prior art with processes

7   disclosed in the prior art.

8       So again, this is just an attempt by ST to add to the cost

9   of the litigation, to force us to put our experts in their

10  office to look at anything.

11      If it was source code, great.  They can designate it as

12  source code if it is executable source code, if it is source

13  code that could be copied and put into a -- some sort of a

14  device to help somebody make a product.

15      But Purdue's not a competitor.  Purdue doesn't have any

16  products.  Purdue doesn't even have the machines to make

17  products.  This is a university, a nonprofit, sovereign

18  university.  This is not a competitor.  So there's no reason

19  for this.

20      And in -- and I guess I've probably done in my career 50

21  semiconductor cases.  I've never seen anything like this.  I've

22  seen it attempted, but I've never seen any court enter an order

23  like this in a case like this.  These are MOSFETs or maybe

24  MOSFET combination, IGBT, depending on where they go off on the

25  branch.

1       But this is not a processor.  These are not processors

2   that are doing intricate calculations based upon software.

3   These are physical devices.  These are basically glorified

4   switches.  So there is --

5       And by the way, there are -- we have torn apart parts from

6   Toshiba, parts from ST, parts from Littlefuse, parts from Han.

7   We've torn apart all those parts.  They all look the same.

8   Their part isn't anything special compared to anybody else's

9   part.  They all pretty much look exactly the same, because

10  everybody's making them pretty much exactly the same way.

11      So they can market AEO, but this will add tremendously to

12  the cost to litigate this case, which is I think their only

13  purpose in doing this.  Because they can't really think that

14  Purdue is going to take their information and use it

15  competitively.  They can't really believe that Shore Chan is

16  going to take their information and use it competitively.

17      So this is much ado about nothing, other than driving up

18  costs, forcing our experts to go to their office to do basic

19  fundamental review.  And forcing us, I suppose, to go with the

20  experts because we ourselves need to be able to look at this.

21      The way it'll work with our experts is we'll have the

22  material in front of us at our desk, on the computer or in

23  paper.  And our expert will be hundreds of miles away.  And we

24  need to be able to talk to them with where we're located in our

25  office and they're located in their office.  And they can look

1  at the AEO, attorney's eyes only material.

2       But otherwise what they're saying is, we've got to get

3  together with our expert every time we want to talk to our

4  expert about any of this material.  And sit in Thompson or

5  Holland & Knight's offices every time we talk to an expert.

6  The burden on this is extreme.  The protection -- the added

7  protection is none.  There is no risk.  There's no risk of this

8  any more than there's risk of anything else.

9       Matter of fact, I think you would -- if they were honest,

10  they would tell you probably the most important information

11  that is going to be released in this case is pricing because

12  that's the information that their competitors are most wanting

13  to know about, is pricing, margins and things like that, so

14  they could go steal customers.  They're not even asking for

15  that to be AEO.

16       So again, I think this is purely to drive up costs, to

17  hinder our ability to prepare the case.  No other -- in the

18  other case involving right now with -- we have with Wolfspeed

19  and Cree in North Carolina, they didn't ask for any of this.

20  And Wolfspeed is the supplier to ST of the starting material

21  that -- for the parts that are involved in this case.

22       So if this is so industry standard and so normal,

23  Wolfspeed, the other current party in the case, has not asked

24  for this.  So I think that, in and of itself, reveals exactly

25  what's going on.

1      If the Court has any questions, I'm happy to answer them,

2   but this is a incredible overreach.

3      THE COURT:  A response?

4      MR. COHEN:  Thank you, Your Honor.

5      Well, I'm a little surprised to hear Mr. Shore's position,

6   because in their paper they literally offer modified source

7   code protections for at least some of our files, namely the GDS

8   files.  And so to say that there should be no source code

9   protection is actually contrary to what they submitted to the

10  Court.

11      But also Mr. Shore has agreed in the past in the CyWee

12  versus HTC case to protect as source code the same types of

13  files we're talking about here, the process flows.

14      But I think the important issue here, Your Honor, is we're

15  just asking for the Court's standard source code protection for

16  a very limited set of files.  And given plaintiff Purdue is

17  able to print and take and keep as AEO the prints of these

18  limited sets of files, this is really not a major burden --

19  we're, you know, down the street.  Our office is down the

20  street from Mr. Shore's -- to come here, to look at some of

21  these files, print them out.

22      It really is a small subset.  We're just talking about the

23  masks, the process flows, the recipes and the GDS files.  We've

24  already produced, you know, a lot of information.  We're not

25  produced -- we're not keeping as source code anything that's

1    publicly available or anything that's in a patent.

2         But in terms of manufacturing semiconductor products,

3    these are the crown jewels.  These are, you know, the secret

4    sauce, the recipes for how to make the products.  The risk is

5    inadvertent disclosure which is why we think they're deserving

6    of at least the standard source code provisions from Your

7    Honor's standard protective order.

8         MR. SHORE:  If I can briefly respond?

9         THE COURT:  Sure.

10        MR. SHORE:  It's kind of interesting that he tries -- we

11   offered them a compromise to avoid having the hearing.  And so

12   now they want to come to the hearing and they want to move the

13   goal post and say, oh, well, now that we've had the hearing and

14   we've refused their compromise, the Court should at last give

15   us the compromise that we refused.

16        There is no need, none, zero.  And what he -- and he

17   can't -- and I would love for him to tell you -- go back to

18   that list that he put up on the screen about what they want and

19   have him tell you what production files are not included,

20   because every single production file, every single piece of

21   production data would be covered by the list that he gave you.

22   And he can't identify one single production run-type document

23   that is not included.

24        I've never seen this in 30 years of doing this for

25   semiconductor cases.  Never.  Not once.  And the CyWee case is

1   completely inapplicable.  He totally misrepresented what that

2   case involved and what we agreed to.

3        But the key thing is, the other company, their competitor,

4   who I am suing in North Carolina, did not ask for this.  ST did

5   not ask for this when we sued them on MOSFETs 15 or 20 years

6   ago.

7        I've sued Infineon.  They didn't ask for this.  I've sued

8   Toshiba.  They didn't ask for this.  This is purely to force us

9   to walk down the street -- every time we want to talk to our

10  expert about a document, we'd have to walk down the street and

11  I guess fly our expert in from his location, fly our consulting

12  experts in and have a little, you know, conference in the

13  Thompson & Knight offices with them seeing exactly what we're

14  looking at on a computer, which is completely unworkable,

15  unnecessary.

16       And if his only concern is inadvertent disclosure, how in

17  the world does this address that if he's saying I can print out

18  the pages --

19       THE COURT:  Mr. Shore, you're a little bit repetitive.

20  But you're also enthusiastic as usual.  So, okay, give me a few

21  seconds and I'll be back.  Unless counsel for -- Mr. Cohen

22  wanted to say anything else, I'm happy to hear that.

23       MR. COHEN:  Just, Your Honor, in our materials we put in

24  the provisions that Mr. Shore agreed to in the past in the

25  CyWee case.  Which are essentially the same files we're looking

1  to protect as source code provisions from that case.  It's

2  almost an identical list.

3       That's all, Your Honor.

4       THE COURT:  Okay.  I'll be back in just a second.

5       (Pause in proceedings.)

6       THE COURT:  The Court is going to deny the request of the

7  defendant.

8       Let me turn to the other issue.  Give me one second,

9  please.

10      Let's see.  And the next -- what I have, the acquisition

11 bar.  I'm happy to take that issue up as well.

12      MR. COHEN:  Thank you, Your Honor.

13      Let me just put up the language.  So what we have

14 proposed, Your Honor, is again, what we consider to be a modest

15 addition to the Court's standard prosecution bar.

16      And if you can see the language here, what we've added to

17 the prosecution bar, Your Honor, is an acquisition bar just to

18 state that anyone that accesses the attorneys' eyes only, the

19 highly confidential material of ST, won't be engaged in

20 purchasing patent applications or patents relating to the

21 design or operation of MOSFET products -- those are the accused

22 products in the case -- for the duration of the case and one

23 year after.

24      And the reason, Your Honor, and as Mr. Shore already

25 alluded to, Mr. Shore has been a competitive decisionmaker for

1   acquiring and licensing patents for 20 years.  He was a part

2   owner in the Power MOSFET Technologies Company, PMT, that sued

3   ST 15 to 20 years ago over power MOSFETs, over the same

4   products.

5          There's been numerous cases, not only PMT but Third

6   Dimension, where courts have found Mr. Shore's been a

7   competitive decisionmaker in the space of acquiring and

8   licensing out semiconductor patents.

9          So what we're asking for, Your Honor, in exchange for

10  seeing the most highly confidential materials of ST, is some

11  limited protection to say those people, those individuals,

12  won't be engaged in patent prosecution, but also won't be out

13  there purchasing patents that they could be used to sue ST

14  again in the future.

15         And again, Your Honor, we think that's a very modest

16  proposal in exchange for seeing our highly confidential

17  information.  Not trying to exclude everyone, but we are trying

18  to protect ST from, you know, the risk of competitive

19  decisionmakers actually seeing, you know, under the hood of the

20  most secretive files that ST has, and then using that against

21  ST in later cases, whether it's for Purdue or for some other

22  semiconductor company or nonpracticing entity buying and

23  licensing patents.

24         THE COURT:  Mr. Shore?

25         MR. SHORE:  I am not, and it has not been alleged that I'm

1   a competitive decisionmaker for 20 years.  So I don't

2   understand where this is coming from.

3        There's also two different things here.  They're saying if

4   we see -- if someone sees their confidential information, that

5   person should not be able to be involved in purchasing patents.

6        An already existing patent can't take advantage of

7   their -- of their confidential information.  A patent that

8   already exists already exists.

9        So I don't -- there's no logical connection between a

10  patent acquisition bar and their confidential information;

11  because if their confidential information is already in the

12  patents, the patents that would be acquired already exist.

13  There's no risk of spillover.

14       On the prosecution bar -- I'm sorry --

15       THE COURT:  Mr. Shore, I don't know that I agree with

16  that.  I mean -- and I don't want to speak for Mr. Cohen, but

17  my guess, if I let him speak right now, he'd say, you know, the

18  point is that if you see what's in our stuff on this case and,

19  as you are acquiring -- it's like if you were suing Exxon and

20  you found out in this case that, trespass of title or

21  something, where else Exxon was looking to explore, you might

22  want to buy land there the next time you're buying land.

23       And so I get that the land is public and the patents

24  you're acquiring are public, but how the stuff works is not and

25  where Exxon's going to go explore is not.  So I don't think

1    that's quite accurate.

2         MR. SHORE:  All right.  Well, I -- I do think there's a

3    difference between patent prosecution and patent acquisition.

4         THE COURT:  Me too.  I do, absolutely.  I agree.

5         MR. SHORE:  Let me give you where the problem lies here.

6         The problem lies here is, I represent probably 20

7    universities.  And the only time patent acquisition has come up

8    recently, and I described this, is there was a -- a company

9    wanted to give a charitable donation to one of my clients,

10   charitable donation of patents, and they asked me to look over

11   the agreement.

12        You know, I didn't negotiate it or whatever, but they

13   asked me to look over the agreement and advise them on whether

14   or not this, you know, these were patents that they might want,

15   you know, to be -- because they'd have to pay the maintenance

16   fees, and, you know, taking on patents that don't have any

17   value is, you know, actually a liability.  It's not an asset.

18        So what they're doing is, that would prevent me from doing

19   that.  This acquisition bar or -- would -- anything to do with

20   the acquisition of patents, it would wipe me out.

21        I've never seen this before.  I've never seen it in any

22   case before.  It is obviously directed towards me personally

23   and trying to affect my career and how I work --

24        THE COURT:  Mr. Shore, what I was anticipating you

25   arguing -- and I've not ever been in your business and I have

1   no -- I'm not negative towards it at all, you know.  I -- but I

2   thought you were going to tell me about what other prophylactic

3   measures are already in place.  That might be a more helpful

4   direction to go to.

5        MR. SHORE:  Well, yes.  Well, let's talk about what the

6   protective order already says.

7        The protective order already says you cannot use any

8   information except for the litigation.  So there's already a

9   prohibition against doing anything with any information you

10  receive or anything other than use in this litigation.

11       Holland & Knight represents multiple semiconductor

12  companies, including ST's competitors.  And so I'm sitting here

13  trying to figure out why is my firm being singled out for this

14  when Holland & Knight and other firms that represent ST in

15  other litigation around the country, they do patent prosecution

16  for ST's competitors, that seems to be fine.  They do

17  litigation for ST's competitors, that seems to be fine.  They

18  do mergers and acquisitions related to ST competitors, that

19  seems to be fine.

20       So if we're talking about the use of confidential

21  information for other purposes, the protective order already

22  says you can't do that.  And any information used -- let's say

23  ST information used for patent prosecution would have to be

24  disclosed to the Patent Office as prior art under your -- in

25  your IDSs.  And if they disclose something to the Patent Office

1  that was used or relied upon, then obviously ST's going to look

2  at it and say, hey, that's our stuff.  No one's going to do

3  this.  This never happens.

4      But anyway, this is a -- this is a provision that is

5  completely unnecessary.  My firm has never been accused of

6  violating a protective order.  My firm's never been accused of

7  violating a nondisclosure agreement.  There's nothing in this

8  that is in any way, shape or form abnormal.

9      This is just a normal lawsuit.  There's nothing special

10  about this lawsuit compared to others.  And the idea that we

11  can't -- this is a trap, frankly.  And it's almost impossible,

12  it's so broad --

13      THE COURT:  Mr. Shore, let me help you out here, if I can.

14      What I'm not following from Mr. Cohen's arguments is this:

15  I understand you have specific concerns about Mr. Shore and --

16  not Mr. Shore maybe personally, but the lawyers whose part of

17  their practice is working for companies that acquire patents or

18  routinely are plaintiffs or whatever you want to say.

19      But what I'm not getting here is, it seems to me that my

20  standard protective order already takes care of your concern

21  for any lawyer.  I'm not picking on Mr. Shore.

22      I don't care who the -- my protective order was not

23  designed to deal with -- at least it was -- you know, it really

24  had nothing to do with Mr. Shore.  It was to deal with everyone

25  on both sides.

1       And so I'm not sure why my protective order doesn't have

2    sufficient teeth if Mr. Shore or anyone were to take the

3    information that they get during the process of litigating this

4    case or any case and misuse it under the terms of the

5    protective order.

6       MR. COHEN:  Well, I'm happy to take that up, Your Honor.

7    Thank you.

8       And there are wonderful prophylactic measures already in

9    the protective order.  The issue here is, typically, the most

10   confidential material outside counsel, you know, AEO material

11   is limited to outside counsel who are not the competitive

12   decisionmakers, who are not buying -- you know, looking and

13   buying applications and patents to assert and license later,

14   which is why this is a little bit of a special case given

15   Mr. Shore and his firm's company, it -- and his past.

16       It's not personal.  It's just a matter to protect ST.

17       And it's not that the prophylactic measures aren't enough.

18   The problem being, Your Honor, is that once an attorney sees

19   some of these materials, you see the structure of some of these

20   products, you learn the process flow or the recipe, you already

21   have in your mind information that you can then inadvertently

22   use when you're looking to buy a portfolio.  You say, you know

23   what, these patents might actually be pretty good to go assert

24   against ST.

25       And Mr. Shore has been in that position for 20 years.

1   He's very good and successful in it.  And we think this is a

2   pretty modest protection.

3        But, Your Honor, there's been two cases, the Fairchild

4   versus 3D case, that found Mr. Shore was a competitive

5   decisionmaker for semiconductor patents.  And the Boston

6   University patent cases, similar.

7        And in the Boston case, they did adopt acquisition bar

8   specifically because of this inadvertent disclosure issue for

9   competitive decisionmakers.  Because once it's in your brain,

10  you can't not use it.  You can't forget it when you're looking

11  at portfolios to buy.

12       But the prosecution -- I'm sorry.  The acquisition bar

13  that we are proposing, Your Honor, is very narrow.  It is only

14  limited to MOSFET products that are at issue in this case.

15       So we don't want to limit Mr. Shore from buying and

16  licensing out patents and all the other semiconductor fields or

17  other technologies or suing Google or anyone else.  But in

18  exchange for accessing our most-highly confidential material,

19  we think a modest acquisition bar, given the special

20  circumstances and the history between ST and Mr. Shore, is

21  appropriate.

22       MR. SHORE:  I'd only go to say they're talking about one

23  case that's 20 years ago.

24       THE COURT:  Mr. Shore, I don't know that I need to hear

25  anything else.  But if I do, I'll ask.  I'll be back in a

1   second.

2        (Pause in proceedings.)

3        THE COURT:  If we could go back on the record.

4        The Court is going to deny this relief as well.

5        Is there -- I think this protective order that we have

6   sufficiently takes care of the issues.

7        Mr. Shore, you're in my screen.  Because of that, I'm

8   going to ask you first, is there anything else that we need to

9   take up?

10        MR. SHORE:  Your Honor, the other issue to take up is the

11   third-party discovery issue, basically trying to determine who

12   is a third party under the Court's interpretation of when

13   discovery's allowed to open before or after Markman.

14        Where this issue's come up is there's two -- they served a

15   slew of subpoenas on the inventors, prosecution counsel and the

16   Purdue Research Foundation.  And the Purdue Research Foundation

17   is actually my client in this case.

18        The Purdue Research Foundation has three roles:  The

19   Purdue Research Foundation administers the endowment of -- the

20   research endowment for Purdue.  So whenever someone provides a

21   grant for something to Purdue to do a certain type of research,

22   the Purdue Research Foundation works with the faculty and

23   whatever school is involved to make sure that what is being

24   done is within the parameters of the grant, and then will also

25   release grant money to the laboratories, professors and school

1    pursuant to the rules of the grant or the endowment.

2        The second thing that they do is they represent inventors,

3    the professors and Ph.D. students and graduate students in

4    accepting invention disclosures.  There are lawyers at the

5    Purdue Research Foundation who do this.  They accept the

6    invention disclosures, they work with the professors to refine

7    them.  And then ultimately the Purdue Research Foundation hires

8    outside counsel to prosecute patents.  And it helps with the --

9    helps the professor and the outside counsel work through that

10   process.

11       And then the last thing the Purdue Research Foundation

12   does is maintain the patent portfolio, supervise licensing

13   activities, supervise any litigation activities.  And all this

14   is done as an arm of the University of Purdue.

15       So the University of Purdue does not maintain any records

16   of anything related to this lawsuit.  Every single piece of

17   paper that is going to be produced by Purdue University in this

18   case is going to come from the Purdue Research Foundation and

19   the inventors.

20       The inventors in this case are one who's one of founders

21   of one of the largest research labs that is still ongoing at

22   the university.  He still is active at that lab.  He is also a

23   professor emeritus and still listed as a faculty member.

24       All faculty at Purdue University operate under a

25   collective bargaining agreement.  Certain rights that they have

1 under the collective bargaining agreements survive their

2 departure from Purdue.

3     And some of those things are that they share in the

4 proceeds of licensing and litigation of their patents.  They

5 have a role to play in approving settlements.  Or at least they

6 don't have approval rights, but they certainly have input.

7     The two professors involved here are our clients.  They

8 have been working with us on this project at one of them for

9 more than a year.

10     And so these are, we believe, not third parties as

11 contemplated by the Court.  They have a financial interest in

12 the litigation.  They are completely subject to the control of

13 Purdue and the Purdue Research Foundation as -- under the

14 collective bargaining agreement that they are part of.  So, you

15 know, we do not think that they are third parties.

16     The Court may have a different view on the outside law

17 firm that prosecuted the case, that prosecuted the patents.

18 They could be, I suppose, considered a third party.

19     But there's nothing that they're going to be able to

20 produce that is relevant or germane to anything where it needs

21 to happen now.  I mean, if we -- we're happy to go through the

22 process for the law firm of providing a privilege log, but

23 there's literally nothing that's going to be produced by that

24 law firm, other than what's public, that's not privileged,

25 that's not privileged communications.

1          But the key thing here is, we have the Purdue Research

2     Foundation, which is running this litigation, they're

3     controlling the litigation.  They are the agent arm, whatever

4     you want to call it of Purdue University, the party plaintiff

5     who is running the case.  That is not a third party, I don't

6     believe, in any normal way to contemplate a third party.

7          The professors are the same way.  They are part of the

8     case.  They're our clients.  And we are happy to engage in --

9     and we've already told them that every single thing in the

10    possession of Purdue Research Foundation, everything in

11    possession of the professors is subject to the control of

12    Purdue.  Purdue can produce every single thing that's

13    responsive.

14         The big problem we have here is, when they went and they

15    filed what -- they served all these subpoenas, they did so

16    without consulting us.  Then when they served subpoenas, they

17    tried -- they did it in a way that violates the Court's OGP

18    order, demanding every e-mail related to everything without

19    search terms, without even talking to us about search terms.

20    So they violated the OGP, we believe.

21         And then when we asked them to please put these subpoenas

22    off until, you know, we could have this conversation with this

23    Court, they refused.

24         Not only did they refuse to put the subpoenas off, they

25    filed motions to compel in Indiana seeking sanctions against

1   the professors and the research foundation because they did not

2   immediately agree to produce everything and instead objected

3   and asked them to put this off.

4        One of the subpoena recipients, incredibly, Dr. Saha, is

5   actually stuck in India due to COVID.  So I asked them, I said,

6   look, we'll accept service for you to avoid you having to try

7   to serve her in India which they could not have even possibly

8   done.  But we said, okay, we'll accept service because she's

9   our client, and I'm not into making people do things that are

10  expensive and time-consuming and wasteful.  And so we accepted.

11       And then I said, well, can you wait until she gets back

12  from India so that she can -- to respond?  Because so we can

13  work with her on any objections or anything else.  And she's in

14  India, she doesn't have access to anything to search for you.

15  And they refused.  They would not even continue it until she

16  got back from India.

17       So we're sitting here, and what they're doing is they're

18  trying to bum rush us with a bunch of motions -- 100-page

19  motion to compels, and with exhibits.  And they're trying to

20  transfer all of the discovery that they're ever going to get

21  from us in this case to a court in Indiana.  Without granting

22  any extensions, without following the OGP.  This a complete

23  end-run around this Court and this Court's supervision of

24  discovery in the case.

25       Even so, we told them, if you want to do this, we'll let

1   you.  But since this is all the discovery you're ever going to

2   get in the case, if you want to do this, we should open up

3   party discovery for both sides.  Or but if we're not going to

4   open up party discovery for both sides, this should not be

5   discovery that you get before Markman, because these are

6   effectively our clients.

7        I mean, it -- the only reason why they're not named is

8   because of the Patent Act has a standing requirement that yet,

9   you know, the person who's named in a patent infringement is

10  the assignee.  If the Patent Act said everybody who got money

11  from the patent enforcement, all these people would be parties.

12  Because all of them have a financial interest, and all of them

13  have a controlling interest in what happens in the case.  And

14  when I say controlling, I mean they're directing the

15  litigation.

16       So what we're asking the Court to -- and by the way, we

17  have moved to transfer the ancillary proceedings they filed in

18  Indiana to you.  And all of the subpoena recipients have

19  consented to the transfer of the motions to compel and the

20  ancillary proceedings to you.

21       ST wouldn't agree to that.  For some reason they don't

22  want you deciding whether or not these subpoena requests are

23  acceptable, even though it's your case.

24       So we've moved to transfer.  We filed that yesterday.

25  We've asked them to postpone compliance.  They refused.  We've

1    asked them, you know -- so every single attempt at trying to

2    resolve this, short of having you come in and basically tell

3    them that they can't seek discovery from these people until

4    after Markman or, if they can seek it, that that opens up

5    discovery to everybody because otherwise it's a one-way

6    discovery.

7         And I can tell you right now, the discovery that they sent

8    in Indiana would take -- I'm not exaggerating -- probably 150

9    to 200 hours just to go through all of the privilege logs we

10   would have to produce.  Because they asked for every single

11   document between the inventors and the law firm, every document

12   between the law firm and Purdue, between the law firm and the

13   Purdue Research Foundation.  It is a massive task that they

14   have asked us to do and refused to give us any time to do it.

15        So we've come to the Court -- and I don't like having to

16   punch my frequent flyer card twice in two days.  I don't like

17   coming here.  I'd rather work things out and I tried to work

18   things out, but I think we're at the point where we need the

19   Court to give us a little bit of guidance on whether or not the

20   Purdue Research Foundation and the two inventors at the very

21   least are not, for the purposes of the Court's schedule, third

22   parties since they are receiving proceeds from the case,

23   they're clients and they are controlling the case as far as

24   controlling the conduct of the case and they are inextricably

25   intertwined both by contracts and by their founding documents,

1    in the case of PRF.  They are both inextricably intertwined

2    with Purdue and Purdue is, if anything, a titular plaintiff

3    simply because they hold the assignment.

4        MR. SIEGMUND:  Your Honor, before we switch over, could I

5    just put this into context, just real quick, of why third-party

6    discovery was even granted by Your Honor?

7        THE COURT:  Sure.

8        MR. SIEGMUND:  So because defendants operate as a

9    full-service semiconductor and they sell, you know, the accused

10   products to a bunch of third parties, you know, such as Apple

11   Tesla, Samsung, that was the whole reason we asked in the case

12   readiness status report to go ahead and start that process.

13   Because obviously that's going to be very relevant to that

14   case.  That is the third parties that we're talking about,

15   Apple, Samsung, and not this case.

16       And even before we got involved with this, defendants

17   served, I believe, their Freedom of information Act request on

18   actual Purdue University seeking discovery from our client.

19       The Court already ruled on that issue so it's no longer

20   before Your Honor.  But what it really seems to be like is an

21   end around -- around, you know, Your Honor's OGP, and what

22   we've kind of put forth in the case readiness status report,

23   which was the whole purpose of this from the beginning.

24       So I just wanted to give you some context to what we were

25   kind of seeking from the very beginning.  But that's all I

1  have.

2      THE COURT:  Okay.

3      MR. SHORE:  And we'd also note that when they sent the

4  Freedom of Information Act request, they didn't copy us, and

5  they did not send it from trial counsel.  It came -- it sort of

6  slid -- so it sort of slid into the office without any --

7  without telling us what they were doing, doing it with a

8  disguised lawyer who is not affiliated with -- who's not a

9  Holland & Knight lawyer who was on the case anyway.  And I

10  don't believe the request even revealed it came from Holland &

11  Knight.  It came from an individual.

12      So this is, again -- this is an attempt to end around and

13  to move discovery outside of the control of the Court and

14  outside, frankly, of even our knowledge that we would have any

15  ability to do it.

16      My client called me and said, hey, the university just

17  called me asking for documents for a Freedom of Information Act

18  request related to this case.  And I'm going, what do you mean?

19  What are you talking about?  That's the first I heard of it.

20      So this is Thompson & Knight going behind our back to try

21  to get information that they're not entitled to.  And we caught

22  them and we stopped them.  But this is what we're dealing with.

23      THE COURT:  Mr. Cohen?

24      MR. COHEN:  Your Honor, I completely disagree with the

25  characterization and the history.  But the fact is, if --

1    Purdue Research Foundation, they're a nonparty.  If they're

2    running and controlling the case, they could have been a

3    plaintiff.

4        What PRF and Mr. Shore and Purdue chose to do is to

5    transfer the patents from PRF to Purdue University for

6    sovereign immunity purposes.

7        Purdue, over ST's objection, then asked to open

8    third-party nonparty discovery.  We objected and said we're

9    fine waiting until discovery opens after Markman.

10       The Court opened nonparty discovery.  We pursued nonparty

11   discovery.  And, in fact, Your Honor, contrary to what

12   Mr. Shore said, we tried to work with Mr. Shore.

13       And I'll just show you the e-mail that Mr. Ciccarelli sent

14   to Mr. Shore's firm before we sent any of these third-party

15   subpoenas.  We specifically said:  We intend to serve

16   third-party subpoenas.  We intend to serve subpoenas on the

17   Purdue Research Foundation, Barnes & Thornburg, Mr. Barhet and

18   the inventors.

19       If Purdue intends to take the position that any of these

20   are not third parties, please let us know, and let us have a

21   meet-and-confer so that we could avoid this issue exactly.

22       No one from Mr. Shore's firm, no one representing Purdue

23   responded to us.  So nobody let us know they were representing

24   these people or that they were going to take the position that

25   they're not third parties.

1      We served subpoenas.  And again, Mr. Shore and his firm

2   remained silent.  And it wasn't until they served objections

3   that they said, we're representing these third parties.

4   They're not really third parties, they're closely related; and

5   therefore, we're not going to produce any information or any

6   documents whatsoever.  So we asked to start meeting and

7   conferring.

8      And Mr. Shore was quite explicit that he would absolutely

9   under no circumstances meet and confer and agree to produce any

10  information in response to these third-party subpoenas unless

11  party discovery was open.  You know, issues that we don't

12  believe are linked.

13     So the fundamental problem here, Your Honor, is, I

14  believe, Purdue wants to have the benefit of making PRF a third

15  party and having Purdue University as the plaintiff and getting

16  sovereign immunity.  They want to open third-party discovery,

17  but then they want to play like PRF is actually a party for the

18  benefit of avoiding discovery and putting it down the road.

19     If what Mr. Shore says is correct, that the university has

20  no relevant documents, then party discovery's kind of

21  irrelevant.  All the information relevant for the case is going

22  to come from PRF and the inventors.

23     Now, we had a call, a pretty long call, Tuesday afternoon

24  that tried to resolve all these issues.  I've been working with

25  ST as of yesterday afternoon to try to resolve it and come to a

1    compromise, but Mr. Shore wanted to bring this issue to the

2    Court today.

3        So we haven't taken a position on transferring the motions

4    to compel to this Court.  We haven't had a chance to respond to

5    most of the proposals Mr. Shore and I discussed Tuesday

6    afternoon.

7        But here we are, Your Honor.  ST believes we've followed

8    the -- both the letter and the spirit of the Court's order.

9    We've tried to --

10       THE COURT:  Mr. Cohen, based on that representation, I'm

11   going to give you all an opportunity to chat and discuss this.

12   And if you can't work it out, it seems to me -- without going

13   too far, it seems to me that if Mr. Shore and the plaintiff

14   will give you sort of an iron-clad commitment that your ability

15   to get discovery from these people who are -- I'm not calling

16   them quasi third party.  I mean, they're interested parties.

17   They -- they're not the party that's in the suit.

18       But if -- it seems to me, generally speaking, as I'm

19   listening to you all, that if Mr. Shore will give you a

20   commitment that you'll get whatever you need from them without

21   treating them like third parties, then it's better for both of

22   you.  It's certainly better for you to not have to go through

23   the third-party process.

24       On the other hand, sword and shield, if Mr. Shore can't

25   give you that kind of commitment that he has sufficient control

1   over these people to get you the information without making you

2   go through third-party discovery, then I might have a different

3   view of this.

4          So I'm going to let you all, with that just general

5   advice, go back and see what you can work out.

6          It certainly seems to me to make the most sense if

7   Mr. Shore has the -- and his firm has the control over these

8   folks to make it -- to obviate the need for third party that --

9   the wonder that is third-party discovery in federal court.

10  It's greatly to your advantage.

11         And I would strongly -- from the representation he just

12  made on the record --

13         Sorry to talk about you, Mr. Shore, in the third person.

14  I see you sitting there.

15         But having heard the representations Mr. Shore just made

16  to the Court that these really aren't full-blooded third

17  parties because, you know, they have an interest in the case, I

18  would anticipate he would be pretty agreeable to getting you

19  what he can.

20         And if for some reason down the road one of those third

21  parties decides that they're not really a party and that

22  they're not going to cooperate with Mr. Shore, and, you know,

23  you all can work that out and you can bring that back to my

24  attention if you need to.  But it sounds to me like Mr. Shore

25  can take care of any your concerns.

1    If I recall correctly, I think the reason I allowed

2   third-party discovery in this case was primarily to make sure

3   that we would get the -- keep the case on track.  We could get

4   that discovery started early.

5    And I thought I even -- I could be wrong.  I have other

6   cases too.  But I thought I had even stayed the production of

7   discovery until after the Markman, or I'd done something to

8   keep it as fair as I could.

9    But if -- so what I'm telling plaintiff is these people

10  are either going to be all in or all out.  If they don't -- if

11  Mr. Shore doesn't want them treated like third parties now for

12  purposes of discovery, he's going to need to commit to you that

13  he can provide to you whatever you need without the need for

14  the defendant to take third-party discovery.

15   If he can't, then I think the same thing would be true for

16  you all, that we want to get the third-party discovery started

17  now to make sure we can keep the case on track.

18   So you guys go back and see what you can work out.  And if

19  you can't work something out, let Regan know and we'll get back

20  together.

21   MR. SHORE:  Your Honor, one quick point.  We will

22  stipulate -- we're on the record -- we will stipulate that

23  Purdue University has full and complete control over all

24  documents and material and the ability to present for

25  deposition every single entity that is subject to the current

1  subpoenas, the law firm, the two professors, Purdue Research

2  Foundation.  They will be 100 percent under the control.  The

3  professors even have an obligation to cooperate in order to

4  receive the payments they receive under the collective

5  bargaining agreement.

6      So we have complete control, total control.  And we will

7  maintain that control throughout the litigation.

8      The only reason why we asked the Court to get involved now

9  as opposed to later is because there are deadlines looming in

10  Indiana to respond to 100-page motion to compels.  And that is

11  going to be a huge massive amount of work we're having to do

12  during Markman.

13      So that's the only reason why -- that's the only reason.

14  We didn't come here to interrupt a conference process.  We

15  conferenced with them for a week.  And last Tuesday is, you

16  know, several days ago.

17      But we need to get this resolved very quickly or otherwise

18  we're going to be kind of mooted in having to deal with it,

19  so -- because they refuse to grant us any extension of our

20  response dates to anything.  They're really trying to rush us

21  through the Indiana process.

22      And so that's why -- I can tell the Court right now and I

23  can tell ST right now, these witnesses, the inventors, the law

24  firm, PRF, 100 percent totally under the control of Purdue.

25  Everything that they have Purdue has access to and will produce

1  every single relevant document that is involved in the case.

2       THE COURT:  Okay.  Mr. Cohen, I would take that as a win.

3  Seems to me you're much better off right now than when we

4  started.

5       And I meant to say this to you yesterday, Mr. Shore, but

6  you gave me an opportunity to say it today.  I'm going to start

7  keeping a list of every time we're -- I've ruled in your favor

8  and you've gone ahead and decided you still needed to argue

9  something.  So I think the list will grow over my time on the

10  bench if I'm careful to keep it.

11       So, Mr. Shore, is there anything else that you'd like to

12  take up?

13       MR. SHORE:  The only thing is -- and again, I apologize

14  for continuing on this, but the timing is important.

15       So when you tell ST that they've got -- we've got to

16  agree, we need something from the Court so that we can go to

17  Indiana and say this issue is moot, you know, the -- this issue

18  is over.  These motions to compel are withdrawn.  The

19  subpoena --

20       THE COURT:  The way -- I don't have -- you know, I do not

21  know that I have the power to do anything with regard to that

22  other case.  But I will put on the record that based on the

23  representation that you just gave, I would deny the defendant

24  their third-party discovery now based on your representation

25  that you will be able to take it up in the ordinary course of

1    the way I handle my schedule in this case and that they're

2    going to be able to get all the discovery they need to you --

3    they need to get from you -- from you and in the same manner as

4    if those -- everyone that is -- they care about on the

5    third-party level is under your control.

6         So as far as I'm concerned, with regard to my court,

7    there's no need for the third-party discovery.

8         MR. SHORE:  That's all we need, Your Honor.  Thank you.

9         THE COURT:  Mr. Cohen, are you satisfied with that as

10   well?

11        MR. COHEN:  Yes, Your Honor.

12        THE COURT:  Okay.  Very good.

13        Anything else we need to take up?

14        MR. COHEN:  Nothing from defendants, Your Honor.

15        MR. SIEGMUND:  Nothing from us, Your Honor.

16        THE COURT:  I didn't see.  Is it Kristie or Lily who's

17   taking this?

18        THE REPORTER:  Kristie.

19        THE COURT:  Kristie, I would anticipate you getting an

20   emergency request for the transcript just as soon as we break

21   here.  So you may as well just go ahead and start --

22        THE REPORTER:  They're on it.

23        (Off-the-record discussion.)

24        (Hearing adjourned at 10:27 a.m.)

25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 29th day of January 2022.

12
                              /s/ Kristie M. Davis
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25