```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        WACO DIVISION

 3   THE TRUSTEES OF PURDUE    ) Docket No. WA 21-CA-727 ADA
     UNIVERSITY               )
 4                            )
     vs.                      ) Waco, Texas
 5                            )
     STMICROELECTRONICS N.V., )
 6   STMICROELECTRONICS, INC.,)
     STMICROELECTRONICS       )
 7   INTERNATIONAL N.V.       ) April 29, 2022

 8       TRANSCRIPT OF MARKMAN HEARING VIA VIDEOCONFERENCE
             BEFORE THE HONORABLE DEREK T. GILLILAND
 9

10   APPEARANCES:

11   For the Plaintiff:       Mr. Raphael D.P. Chabaneix
                              Mr. Alfonso Garcia Chan
12                            Ms. Halima Shukri Ndai
                              Mr. Chijioke E. Offor
13                            Mr. Michael W. Shore
                              Shore Chan DePumpo, LLP
14                            901 Main Street, Suite 3300
                              Dallas, Texas 75202
15
                              Mr. Craig D. Cherry
16                            Steckler, Wayne, Cherry
                              & Love, PLLC
17                            8416 Old McGregor Road
                              Waco, Texas 76712
18

19   For the Defendant:       Mr. Justin S. Cohen
                              Ms. Nadia E. Haghighatian
20                            Mr. Bruce S. Sostek
                              Holland & Knight, LLP
21                            1722 Routh Street, Suite 1500
                              Dallas, Texas 75201
22

23

24

25
```

1    **(Appearances Continued:)**

2    For the Defendant:          Mr. Massimo Ciccarelli
                                  Ciccarelli Law Firm
3                                 100 North 6th Street, Suite 502
                                  Waco, Texas 76701
4

5    Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                  501 West 5th Street, Suite 4153
6                                 Austin, Texas 78701
                                  (512)391-8792
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.

| | | |
|---|---|---|
| 09:00:34 | 1 | THE COURT:  Good morning, everybody.  Please be |
| 09:00:37 | 2 | seated. |
| 09:00:44 | 3 | We're here for a Markman hearing and I'm excited |
| 09:00:47 | 4 | to see all of -- everybody in person as well as all the |
| 09:00:50 | 5 | people by Zoom.  So we'll start by having Ms. Copp call |
| 09:00:54 | 6 | the case. |
| 09:00:54 | 7 | THE CLERK:  Yes, your Honor. |
| 09:00:55 | 8 | Calling Case No. WA-21-CV-727, styled, <u>The</u> |
| 09:01:01 | 9 | <u>Trustees of Purdue University vs. STMicroelectronics N.V.,</u> |
| 09:01:06 | 10 | et al.  Called for a Markman hearing. |
| 09:01:07 | 11 | THE COURT:  All right.  And if I could get |
| 09:01:09 | 12 | announcements from the parties.  I'll start with Mr. |
| 09:01:11 | 13 | Cherry, who I see standing up already. |
| 09:01:16 | 14 | MR. CHERRY:  Good morning, your Honor. |
| 09:01:17 | 15 | It is a privilege to be in your courtroom in |
| 09:01:19 | 16 | person for the first time with you since taking the bench. |
| 09:01:22 | 17 | I know I can speak on behalf of our local bar saying |
| 09:01:26 | 18 | congratulations again on your appointment and welcome |
| 09:01:27 | 19 | home. |
| 09:01:28 | 20 | THE COURT:  Thank you.  Thank you.  It's great to |
| 09:01:30 | 21 | be here and great to see everybody here. |
| 09:01:33 | 22 | MR. CHERRY:  Absolutely. |
| 09:01:33 | 23 | Today, your Honor, on behalf of Purdue |
| 09:01:36 | 24 | University, I want to introduce in person today is Michael |
| 09:01:39 | 25 | Shore. |

| | | |
|---|---|---|
| 09:01:39 | 1 | THE COURT:  Good morning, Mr. Shore. |
| 09:01:41 | 2 | MR. CHERRY:  Alfonso Chan, Mr. Chan, Ralphael |
| 09:01:45 | 3 | Chabaneix. |
| 09:01:46 | 4 | THE COURT:  Mr. Chabaneix. |
| 09:01:47 | 5 | MR. CHERRY:  And Chiji Offor. |
| 09:01:49 | 6 | THE COURT:  Mr. Offor.  It's good to see all of |
| 09:01:52 | 7 | you. |
| 09:01:52 | 8 | MR. CHERRY:  Mr. Offor and Mr. Shore will be |
| 09:01:53 | 9 | handling the arguments today on behalf of Purdue.  We also |
| 09:01:57 | 10 | have some attorneys from Shore Chan attending via Zoom, |
| 09:02:01 | 11 | I'd like to introduce them.  Will Ellerman. |
| 09:02:04 | 12 | THE COURT:  Mr. Ellerman, I've heard of him. |
| 09:02:06 | 13 | MR. CHERRY:  Chris Hsu, Halima Ndai and Ari |
| 09:02:11 | 14 | Rafilson.  And then, we also have several representatives |
| 09:02:13 | 15 | from Purdue University who are attending, also via Zoom, |
| 09:02:20 | 16 | I'd like to introduce them:  Mr. James Cooper, who's |
| 09:02:23 | 17 | professor emeritus at Purdue.  Ken Waite, chief patent |
| 09:02:26 | 18 | counsel at Purdue, Andrew Umlauf, the assistant director |
| 09:02:29 | 19 | of IP at Purdue, D.H.R. Sarma, the director of patent |
| 09:02:35 | 20 | process at Purdue, Matt Halladay, business development |
| 09:02:40 | 21 | manager at Purdue, Liang Yan, patent counsel at Purdue, |
| 09:02:45 | 22 | and Manjiri Gagare, patent agent Purdue.  And with that, |
| 09:02:49 | 23 | your Honor, that concludes our announcements. |
| 09:02:51 | 24 | THE COURT:  Very good.  Well, welcome to all the |
| 09:02:52 | 25 | counsel and especially welcome to all the client |

09:02:54  1  representatives and the people at Purdue that are

09:02:58  2  attending by Zoom.

09:02:58  3       Could I have announcements from the defendant,

09:03:02  4  please.

09:03:05  5       MR. SOSTEK:  Good morning, your Honor.

09:03:06  6       THE COURT:  Good morning, Mr. Sostek.  How are

09:03:07  7  you doing?

09:03:08  8       MR. SOSTEK:  I am well.  Bruce Sostek on behalf

09:03:10  9  Holland & Knight on behalf of STMicroelectronics.  Glad to

09:03:14  10 be here, also.

09:03:14  11      THE COURT:  Good.  Great to see you.

09:03:16  12      MR. COHEN:  Good morning, your Honor.

09:03:18  13      Justin Cohen of Holland & Knight, also on behalf

09:03:19  14 STMicroelectronics, Inc., and it's a pleasure to see you

09:03:22  15 up on the bench.

09:03:23  16      THE COURT:  Thank you.  It's good to see you,

09:03:25  17 again, as well, Mr. Cohen.

09:03:29  18      MR. CICCARELLI:  Your Honor, Max Ciccarelli for

09:03:31  19 STMicroelectronics.  Also on Zoom, we have a few

09:03:33  20 individuals.  We have Nadia Haghighatian, who is a partner

09:03:35  21 with the firm of Holland & Knight.  We also have two

09:03:38  22 client representatives, Andrew Mayo and Christopher

09:03:42  23 Ratway.  They are both inhouse counsel with ST.

09:03:45  24      THE COURT:  Excellent.  Well, welcome to all of

09:03:47  25 you in person and, also, the attendees by Zoom and

09:03:51  1   especially those with ST.  So I'm glad that everybody's

09:03:56  2   able to observe and watch.  We're here for -- I know we've

09:03:59  3   got a Markman and as well as a motion to strike the expert

09:04:04  4   report, I believe it was, or a Daubert-type motion.

09:04:13  5          Go ahead, Mr. Shore.

09:04:17  6          MR. SHORE:  For the court reporter, this is

09:04:18  7   Michael Shore.

09:04:19  8          We're not asking the Court in a non-jury

09:04:21  9   proceeding to strike the expert.  We're simply making the

09:04:23  10  objection so that when the report is considered, it's

09:04:27  11  considered in light of the objection.

09:04:28  12          THE COURT:  Okay.  Okay.  Understood.

09:04:31  13          Mr. Ciccarelli.

09:04:35  14          MR. CICCARELLI:  Thank you, your Honor.  This is

09:04:37  15  Max Ciccarelli.

09:04:38  16          In terms of their expert, we'll address that when

09:04:41  17  the time comes.  So in terms of our expert -- in terms of

09:04:43  18  their expert, their expert submitted a declaration with

09:04:46  19  the sur-reply, which usually we don't submit new evidence

09:04:50  20  with the last round of briefing.  At least that's my

09:04:52  21  practice.  I think it's the practice of many courts around

09:04:54  22  the country, and they did.  And we've not had an

09:04:57  23  opportunity to respond to that declaration.  So ST

09:05:02  24  believes that, likewise, that should be struck or at least

09:05:04  25  not considered for that reason just because it's -- we

| | | |
|---|---|---|
| 09:05:06 | 1 | have not had a chance to respond to it. |
| 09:05:08 | 2 | THE COURT:  Understood.  Thank you. |
| 09:05:12 | 3 | Well, why don't we then begin with the Markman |
| 09:05:14 | 4 | procedures.  And I think, let me find my notes, but I know |
| 09:05:20 | 5 | I saw Mr. Offor.  Are you going to be handling most of the |
| 09:05:23 | 6 | arguments and would you like to start?  I think -- well, |
| 09:05:27 | 7 | it may be ST that wants to start with argument since we're |
| 09:05:32 | 8 | -- I've got "second thicker oxide layer" is the first |
| 09:05:34 | 9 | term. |
| 09:05:37 | 10 | MR. CICCARELLI:  I apologize.  I thought we were |
| 09:05:38 | 11 | starting with that term and since ST was on the losing end |
| 09:05:39 | 12 | of the preliminaries, I thought you'd want to hear from us |
| 09:05:41 | 13 | first.  But if that's not the case, we can do it |
| 09:05:43 | 14 | differently. |
| 09:05:43 | 15 | THE COURT:  No, no.  That's exactly the case.  As |
| 09:05:45 | 16 | I was pulling out my cheat sheet, I remembered that I |
| 09:05:49 | 17 | think Purdue only wanted to address the one preamble term. |
| 09:05:53 | 18 | MR. SHORE:  We have one quick housecleaning -- |
| 09:05:58 | 19 | housekeeping matter, if you don't mind, your Honor. |
| 09:06:00 | 20 | THE COURT:  Sure.  Go ahead, Mr. Shore. |
| 09:06:03 | 21 | MR. SHORE:  When the Court produced its |
| 09:06:06 | 22 | preliminary constructions and it said that the preamble |
| 09:06:09 | 23 | was limiting, obviously neither party briefed anything |
| 09:06:13 | 24 | about what the limitations of the preamble would be or |
| 09:06:16 | 25 | what the definitions of any of the -- well, the single |

| | | |
|---|---|---|
| 09:06:19 | 1 | word or the single thing in the preamble.  And this |
| 09:06:23 | 2 | obviously to us was a little bit vexing or confusing |
| 09:06:26 | 3 | because we did not believe that whether or not the ST |
| 09:06:30 | 4 | parts were MOSFETs was at all an issue in the case.  And |
| 09:06:35 | 5 | the reason why obviously is that ST calls their accused |
| 09:06:41 | 6 | products MOSFETs or SiC MOSFETS on their website.  They |
| 09:06:45 | 7 | call the accused products MOSFETs on the data sheets for |
| 09:06:48 | 8 | products that they give to costumers.  They have white |
| 09:06:51 | 9 | papers where they refer to these parts as MOSFETs.  They |
| 09:06:53 | 10 | have an on-demand webinar on their website called SiC |
| 09:06:59 | 11 | MOSFETs for power conversion that talks about the accused |
| 09:06:59 | 12 | products. |
| 09:07:03 | 13 | So today, I asked opposing counsel:  Are you |
| 09:07:05 | 14 | contesting whether or not your parts are MOSFETs?  Because |
| 09:07:07 | 15 | if you're not contesting it, we don't need to construe the |
| 09:07:11 | 16 | preamble because we can just tell the jury it's conceded |
| 09:07:14 | 17 | that these parts are MOSFETs.  There's nothing to do. |
| 09:07:18 | 18 | They refused to do so.  They refused to concede that their |
| 09:07:22 | 19 | parts are MOSFETs.  So we believe, incredibly, that one of |
| 09:07:27 | 20 | the things we're going to need the Court to do is to |
| 09:07:29 | 21 | construe the term "MOSFET," and we're going to be prepared |
| 09:07:32 | 22 | to argue that term today, what MOSFET should mean. |
| 09:07:38 | 23 | So that is something that I wanted to alert the |
| 09:07:40 | 24 | Court to before we did it.  And again, we are pretty |
| 09:07:43 | 25 | shocked that they would deny their parts are MOSFETs when |

| | | |
|---|---|---|
| 09:07:46 | 1 | we count, so far, about 167 admissions that they are |
| 09:07:49 | 2 | MOSFETs on their own website, and data sheets, and white |
| 09:07:52 | 3 | papers. |
| 09:07:53 | 4 | But we think that -- we know what a MOSFET is, |
| 09:07:57 | 5 | they know what a MOSFET is, everyone, I think, almost in |
| 09:08:00 | 6 | this room knows what a MOSFET is, but the jury won't.  And |
| 09:08:03 | 7 | claims construction is for the jury, it's not for us. |
| 09:08:06 | 8 | THE COURT:  Okay.  Let me -- I'm going to stop |
| 09:08:08 | 9 | you there, and one, I'll say, you know, today's not about |
| 09:08:12 | 10 | infringement.  It's just about claim construction.  But |
| 09:08:15 | 11 | that sounds like it goes straight to the preamble |
| 09:08:18 | 12 | argument, so we'll address it when we get to the preamble |
| 09:08:20 | 13 | argument. |
| 09:08:21 | 14 | MR. SHORE:  Thank you, your Honor. |
| 09:08:22 | 15 | THE COURT:  All right.  With that, we'll go back |
| 09:08:23 | 16 | to Mr. Ciccarelli. |
| 09:08:25 | 17 | MR. CICCARELLI:  Thank you, your Honor. |
| 09:08:33 | 18 | We're starting with the 112 patent that has two |
| 09:08:36 | 19 | terms.  The terms are "a second thicker oxide layer" |
| 09:08:41 | 20 | that's used in claim 1, and the other one is "a gate oxide |
| 09:08:45 | 21 | layer" that's used in claim 6.  Although they use |
| 09:08:47 | 22 | defendant words, the parties agree that those terms are |
| 09:08:50 | 23 | referring to the physical structure that is the insulator |
| 09:08:53 | 24 | that is around the gate, and that would insulate the gate |
| 09:08:56 | 25 | from the metal that is later deposited on top of that |

09:08:59  1  oxide.

09:09:00  2          So we know what we're talking about, although the

09:09:02  3  two different claims use slightly different terms, so

09:09:05  4  we're going to discuss those together.

09:09:07  5          THE COURT:  Okay.

09:09:09  6          MR. CICCARELLI:  This is the Court's preliminary

09:09:10  7  construction.  Melissa, is there any way that you could

09:09:17  8  minimize that window so that we can see it?  I don't know

09:09:20  9  if that's possible or not.  There you go.  Thank you.

09:09:25  10  Perfect.  Appreciate it.

09:09:27  11          So the Court went with a plain and ordinary

09:09:31  12  meaning.  And I wanted to point out that there was some

09:09:33  13  discussion in the briefing and some suggestion that maybe

09:09:37  14  ST was trying to limit the term to just a grown oxide.

09:09:41  15  That's not what our construction proposes and I've

09:09:43  16  highlighted it here on the screen.  Our construction talks

09:09:46  17  about a layer that is formed, created, or grown by

09:09:50  18  reacting the gate.  So grown is one of those

09:09:53  19  possibilities, but there's other possibilities.

09:09:55  20          And the way we pick those words is, we looked to

09:09:58  21  the patent and what the patent said was the limit of the

09:10:03  22  invention.  So I want to go through that process to kind

09:10:05  23  of show the Court how we came up with these words and why

09:10:08  24  they're important.

09:10:09  25          THE COURT:  Okay.

09:10:10 1          MR. CICCARELLI:  So the patent begins by talking
09:10:12 2   about what the invention is, and we're lucky that it
09:10:14 3   doesn't just say it once, it says it many times.  So it
09:10:18 4   starts out in the title.  In the title, it says silicon
09:10:22 5   carbide power MOSFET with self-aligned source contact.  So
09:10:26 6   we start seeing the self-aligned feature is a critical
09:10:28 7   feature.  In the background, it says this invention
09:10:32 8   relates generally to semiconductor field effect
09:10:36 9   transistors and more particular to field effect
09:10:40 10  transistors having self-aligned source contacts.  So
09:10:42 11  again, we're talking about self-aligned source contacts.
09:10:44 12  In the summary of the invention, same thing.  The present
09:10:46 13  invention provides high voltage -- not just an embodiment,
09:10:50 14  right?  The present invention provides power voltage
09:10:54 15  MOSFETs with self-aligned source contacts.
09:10:57 16          Then again, on column 3, lines 55 through 59,
09:11:02 17  talks about both these problems from mask alignment and
09:11:06 18  the increased cell width are eliminated in the present
09:11:10 19  invention by negating the opportunity for misalignment.
09:11:12 20  So this whole alignment thing is a very important thing to
09:11:15 21  this patent that the patent is trying to solve.
09:11:19 22          And it then talks about this alignment issue and
09:11:21 23  the fact that it's related to the masks, and it says the
09:11:24 24  area of the functional source contact is not determined by
09:11:27 25  the alignment of any mask levels, instead, it is totally

09:11:31  1   determined by the spacing between the adjacent polysilicon

09:11:36  2   gates and is, in fact, self-aligned to the gate level.  So

09:11:39  3   the patent starts out by saying we're trying to solve this

09:11:42  4   alignment problem, how do we solve it.

09:11:46  5          And the specification goes forward and it

09:11:50  6   describes this problem and it describes the solution.  The

09:11:53  7   specific solution it describes is all about growing the

09:11:57  8   oxide.  And again, remember our construction is not

09:12:00  9   limited to just growing, which is that preferred

09:12:03  10  embodiment, our construct is broader.  So the patent after

09:12:06  11  describing the embodiment says, okay, alternative

09:12:09  12  embodiments are contemplated.  How broad can we go from

09:12:14  13  this embodiment?  The patent tells us.  It says

09:12:17  14  alternative embodiments are contemplated so long as, and

09:12:20  15  it says two things after that.  The first is that the gate

09:12:23  16  and the substrate react to form, create or grow in an

09:12:31  17  insulation layer, and that's where we got the language for

09:12:33  18  our construction.  The patent here is saying you can have

09:12:35  19  other embodiments so long as the gate and source react to

09:12:42  20  form, create or grow.  Then this goes a little bit further

09:12:44  21  and it explains why and it says what it means.  It says

09:12:49  22  you need to grow them sufficiently faster at the gate

09:12:52  23  surface than at the substrate surface.  Let me see if I

09:12:57  24  can pull up the pointer.

09:12:59  25          So it's saying growing faster at the gate surface

09:13:06  1   than at the source surface.  And that's why the source

09:13:08  2   here is shown thinner and the gate is shown thicker.  And

09:13:13  3   it says that it's doing that because it will, therefore,

09:13:16  4   be uniformly removable at a rate which will remove all

09:13:22  5   such form, created or grown layer completely from the

09:13:27  6   substrate surface and leave a sufficiently insulated layer

09:13:29  7   around the gate.

09:13:30  8        So here, in this section -- and I'm going to

09:13:32  9   break this down a little bit and talk more about it, but

09:13:34  10  what we have is a paragraph that at the end of the patent

09:13:37  11  says we have shown an embodiment, you can do it different

09:13:39  12  ways so long as you meet this criteria.  So the patent is

09:13:43  13  clearly explaining what it considers to be the breadth of

09:13:46  14  the invention.  And that's why we're asking the Court to

09:13:49  15  limit the claims to that breadth of invention that the

09:13:53  16  patentee establishes.

09:14:04  17       So what I wanted to do now is step back a little

09:14:06  18  bit and talk about the technology and why that matters,

09:14:09  19  why this reaction language matters.  So the problem that

09:14:12  20  the patent is dealing with is that when you have a

09:14:16  21  deposited oxide -- and I want to show what a deposited

09:14:19  22  oxide is -- to create a deposited oxide, you start out

09:14:22  23  with a silicon -- a gas that has silicon and a gas that

09:14:25  24  has oxygen.  These two gases come together and they form

09:14:29  25  silicon dioxide, which is an oxide, molecules.  These

| | |
|---|---|
| 09:14:33 | 1 |
| 09:14:37 | 2 |
| 09:14:39 | 3 |
| 09:14:42 | 4 |
| 09:14:44 | 5 |
| 09:14:49 | 6 |
| 09:14:53 | 7 |
| 09:14:56 | 8 |

1  molecules that fall down towards the substrate and we have

2  an animation to show that.  And what's different here is

3  that the silicon for the reaction for the oxide is not

4  coming from the gate, it's coming from the gas.  So I'm

5  going to play that animation and you'll see the silicon

6  and oxygen coming together to form the silicon dioxide,

7  which then gets deposited in a uniform layer across the

8  underlying structures.

9          So that's -- when you do that, when you have a

10  layer that is of uniform thickness, how do you cut an

11  opening?  We now have to cut an opening through that oxide

12  to make the connection to the source.  How do we do that?

13  When you have a uniform thickness, you have to use a mask.

14  So what you do is, you put a layer of photo resist.  It's

15  just a material that is sensitive to light.  You then use

16  a mask, and a mask, your Honor probably knows, is just a

17  piece of glass with a pattern on it so when you shine a

18  light, that pattern is then transferred over to the wafer.

19          So you use a mask and when you apply the light,

20  the light will interact with the photo resist where it

21  hits, and it weakens the photo resist so you can then

22  remove it.  So we're showing that in the animation, the

23  light touching the photo resist weakens it so that it can

24  be removed.

25          Now, you use an etch and the etch is

09:15:52   1   preferential.  It doesn't etch away the photo resist, it

09:15:55   2   only etches away the oxide.  And so, we've animated that

09:15:58   3   to show that through this etch process, the oxide is

09:16:03   4   etched away to cut that opening into the oxide.  Once

09:16:07   5   you've done that, you can remove that photo resist and you

09:16:11   6   can put down your metal, which provides the connection

09:16:13   7   from the source to the outside world.  But again, we have

09:16:17   8   to use a mask for this process.

09:16:18   9         Now, what's this mask alignment problem that we

09:16:21   10  were talking about?  If you align the mask perfectly,

09:16:25   11  everything's good.  The problem is that as we show here,

09:16:29   12  as the mask is misaligned, it could create a problem.

09:16:32   13  Like here, for example, the insulation is now getting thin

09:16:35   14  around the gate; or if it gets misaligned even more, you

09:16:40   15  could totally remove the insulation and now you have a

09:16:42   16  short circuit.  Not good in an electrical product.  So

09:16:45   17  alignment is this problem that comes in because you may

09:16:48   18  not be able to align the mask perfectly, and that's the

09:16:50   19  problem that the 112 patent was trying to solve.

09:16:53   20        So how does it solve that problem?  One second.

09:16:57   21  Okay.  It does it because it's using a silicon carbide

09:17:01   22  substrate, it uses a grown oxide and I want to describe

09:17:04   23  that next.  So when you grow an oxide, you put it in a

09:17:10   24  environment that has oxygen, a lot of oxygen and it's at

09:17:15   25  high temperature.  What happens there is, the silicon in

09:17:17  1  the gates will react with the oxygen and create silicon

09:17:21  2  dioxide -- or your oxide just around the gates.  And

09:17:24  3  there, it does it very fast because the gates are made of

09:17:28  4  polysilicon, which give up its silicon very easily, so it

09:17:32  5  reacts easily and it oxidizes fast.  So you get a thick

09:17:35  6  layer there whereas around the source, because it's made

09:17:38  7  of silicon carbide, silicon carbide doesn't give up its

09:17:44  8  silicon atoms as easily as polysilicon, so it reacts

09:17:48  9  slower and so, the thickness is less.  And so, we've

09:17:50  10  animated that to kind of show that, and what you notice is

09:17:52  11  the gate is getting smaller because it's reacting with the

09:17:56  12  oxygen.  So this is the "reacting with" language that we

09:17:58  13  saw earlier in our construction.

09:18:00  14        Now, once you have done that, again, you have

09:18:02  15  thicker oxide around the gates, thinner oxide over the

09:18:07  16  source.  What do you do now?  Now you don't need a mask.

09:18:10  17  You can do an etch over the entire wafer and etch it back

09:18:13  18  just enough to eliminate that thickness that's over the

09:18:16  19  source.  And so, we show that right now and you can see

09:18:19  20  that's etching away, it's also etching away the oxide on

09:18:22  21  top of the gate.

09:18:23  22        That's okay because it's thicker so you remove a

09:18:26  23  little bit.  Let's say you remove ten percent, you still

09:18:28  24  have a lot of oxide to protect the gate.  And so, what you

09:18:32  25  now have is an opening that is self-aligned to the gates.

| | | |
|---|---|---|
| 09:18:36 | 1 | It's self-aligned because you didn't have to use a mask |
| 09:18:38 | 2 | that you have to align it.  It aligns itself because the |
| 09:18:41 | 3 | oxide grows around the gate, so it grows exactly where you |
| 09:18:44 | 4 | need it.  And then, when you put in the metal to make the |
| 09:18:47 | 5 | connection from the source to the outside world, |
| 09:18:49 | 6 | everything's aligned without using a mask. |
| 09:18:52 | 7 | That's what the embodiment shows.  The embodiment |
| 09:18:55 | 8 | in the patent says you grow the oxide.  And in case |
| 09:18:59 | 9 | there's any question that I'm making all this stuff -- |
| 09:19:01 | 10 | well, actually, this is a summary real quick.  I can skip |
| 09:19:04 | 11 | through the summary.  I think the Court gets it.  The |
| 09:19:07 | 12 | patent describes all the stuff that I went through, okay? |
| 09:19:10 | 13 | It just doesn't do it with fancy animations and that's |
| 09:19:13 | 14 | fine, but it talks about misalignment of the source |
| 09:19:17 | 15 | contact mask.  It talks about oxidation layer is grown, so |
| 09:19:21 | 16 | it does talk about growing.  It talks about that the -- |
| 09:19:25 | 17 | that growing step grows oxidation on the polysilicon gates |
| 09:19:29 | 18 | about ten times faster or more than the silicon carbide |
| 09:19:33 | 19 | substrate without using a photo mask. |
| 09:19:36 | 20 | Then even during the prosecution history, your |
| 09:19:39 | 21 | Honor, there was another claim, claim 4 that is now claim |
| 09:19:43 | 22 | 2 and that's similar to claim 6, where, again, it has an |
| 09:19:47 | 23 | oxide layer around the gate.  And on the next slide, I'm |
| 09:19:49 | 24 | going to show what the applicant argued during |
| 09:19:54 | 25 | prosecution.  It said applicant's invention provides for a |

09:19:58   1   silicon substrate and polysilicon gates because growth of

09:20:03   2   the oxidation layer on the polysilicon gates occurs

09:20:06   3   considerably faster than on the silicon carbide substrate

09:20:10   4   which creates a much thicker combined oxide layer between

09:20:14   5   adjacent gates.  Thus after a short oxide etch is applied

09:20:18   6   long enough to completely remove the thin combined oxide

09:20:21   7   layer over the substrate surface, there is still left a

09:20:23   8   very thick insulating oxide layer on the tops and sides of

09:20:26   9   the gates.

09:20:26   10          So again, this is what we just discussed earlier,

09:20:29   11  they repeated it during prosecution.

09:20:32   12          THE COURT:  Let me ask you just real quick,

09:20:34   13  sorry, Mr. Ciccarelli.  On this one, just for my notes, is

09:20:37   14  this response one of the exhibits to the Markman briefing?

09:20:43   15  I just wanted to get a docket number.

09:20:46   16          MR. CICCARELLI:  I can't remember.  But we can

09:20:48   17  provide the Court the copy.  And it's also on our -- yes.

09:20:50   18  We can provide the Court a copy for sure.  And I just

09:20:52   19  can't remember, so I apologize.

09:20:53   20          THE COURT:  Yeah.  If it's in there, I'm sure I

09:20:56   21  saw it.  I just can't remember reading it.  Okay.  Go

09:20:58   22  ahead.

09:20:58   23          MR. CICCARELLI:  You already read it and studied

09:21:00   24  it, your Honor, I know.

09:21:01   25          Okay.  So basically without using a photo mask,

| | | |
|---|---|---|
| 09:21:04 | 1 | the specification talks about all those things and why |
| 09:21:07 | 2 | this solution of different thicknesses is such a great |
| 09:21:10 | 3 | solution in the expert's sort of opinion, let's say.  So |
| 09:21:16 | 4 | again, we are not -- our construction doesn't say just |
| 09:21:19 | 5 | grown.  It uses the words that the patent used in this "so |
| 09:21:23 | 6 | long as" paragraph that we discussed earlier because, |
| 09:21:26 | 7 | again, I think it's pretty clear that this paragraph says |
| 09:21:29 | 8 | you can go broader than the embodiments, but then, it puts |
| 09:21:32 | 9 | a limit and the limit are those two things.  So long as |
| 09:21:36 | 10 | the gate and source react to form, create or grow an |
| 09:21:39 | 11 | insulation layer of different thicknesses so that you |
| 09:21:42 | 12 | don't need a mask. |
| 09:21:43 | 13 | That's the heart of how far this invention can |
| 09:21:45 | 14 | go, and we're just trying to be clear that that's what |
| 09:21:49 | 15 | we're limiting it to.  That's our understanding of the |
| 09:21:52 | 16 | plain and ordinary meaning of this word as it's used in |
| 09:21:54 | 17 | this patent and this claim.  But I think there's some |
| 09:21:56 | 18 | disagreement.  And I think it's ripe for the Court to |
| 09:21:59 | 19 | decide whether, in fact, the invention can go broader than |
| 09:22:02 | 20 | what the patent says the invention is. |
| 09:22:06 | 21 | THE COURT:  Okay.  And to make sure I follow you, |
| 09:22:11 | 22 | then, it's ST's position that its proposed definition, |
| 09:22:18 | 23 | which I'm trying to scroll back to here, does not -- the |
| 09:22:24 | 24 | formed, created or grown by reacting the gate would not |
| 09:22:28 | 25 | exclude forming it by deposition? |

| | | |
|---|---|---|
| 09:22:32 | 1 | MR. CICCARELLI:  Well, again, I don't -- it |
| 09:22:33 | 2 | depends on what deposition process you're talking about, |
| 09:22:35 | 3 | right?  If it's a cold deposition process that creates a |
| 09:22:39 | 4 | layer of the same thickness, then no, it can't cover that |
| 09:22:43 | 5 | because that requires a mask, right?  If there is some |
| 09:22:46 | 6 | fancy process -- and Dr. Bhat included in his -- I think |
| 09:22:52 | 7 | it was his supplemental declaration that we haven't had a |
| 09:22:54 | 8 | chance to respond to, he pulls one out of the air and says |
| 09:22:57 | 9 | you've got the selective deposition process that gives you |
| 09:23:01 | 10 | different thicknesses, provides no support.  So we can't |
| 09:23:03 | 11 | even test to see where he's pulling it from or when it was |
| 09:23:06 | 12 | developed, or created, or invented.  Maybe it's something |
| 09:23:08 | 13 | that's very recent. |
| 09:23:09 | 14 | Our point is, it doesn't matter.  First of all, |
| 09:23:11 | 15 | it's not in the patent, it's not used in the accused |
| 09:23:14 | 16 | product, so it makes no difference.  It's a red herring |
| 09:23:17 | 17 | that he throws in there to try to say there could be some |
| 09:23:19 | 18 | other process.  As long as the process reacts -- as long |
| 09:23:22 | 19 | as the gate reacts with the gate to form, create or grow |
| 09:23:27 | 20 | the layer to where you don't need a mask, then there may |
| 09:23:31 | 21 | be other processes, and the experts will opine on those if |
| 09:23:35 | 22 | it's necessary.  We don't need to resolve that now. |
| 09:23:37 | 23 | THE COURT:  Okay.  And is there anything in ST's |
| 09:23:40 | 24 | proposed definition that excludes the use of a mask, or |
| 09:23:45 | 25 | does that come from other claim elements? |

| | | |
|---|---|---|
| 09:23:48 | 1 | MR. CICCARELLI:  So we thought that this language |
| 09:23:49 | 2 | is sufficient, the language that we proposed, because we |
| 09:23:51 | 3 | think that gets to the heart of it technologically.  I |
| 09:23:55 | 4 | think implicit in that is, when you read the patent, the |
| 09:23:57 | 5 | whole point is to remove the mask to solve the alignment |
| 09:24:00 | 6 | problem.  You could add that in very easily.  I think that |
| 09:24:05 | 7 | would help to make it clear.  We think it's clear and |
| 09:24:07 | 8 | trying to keep constructions to fewer words.  That's why |
| 09:24:10 | 9 | we went with fewer.  I think it would be better if we did |
| 09:24:12 | 10 | as long as we all understand where we are, that's our |
| 09:24:14 | 11 | point is, let's understand what the invention is.  The |
| 09:24:17 | 12 | invention is reacting to form, create or grow so you have |
| 09:24:21 | 13 | different thicknesses so that you don't need a mask. |
| 09:24:23 | 14 | That's what this paragraph says.  We need to find a way to |
| 09:24:27 | 15 | limit that and all be on the same page. |
| 09:24:29 | 16 | THE COURT:  Okay.  Just to make sure, it's your |
| 09:24:35 | 17 | position that the proposed construction from ST would |
| 09:24:39 | 18 | include that limitation that it would not -- |
| 09:24:42 | 19 | MR. CICCARELLI:  Tacitly so, your Honor, yes. |
| 09:24:45 | 20 | THE COURT:  Okay. |
| 09:24:47 | 21 | MR. CICCARELLI:  Yes, tacitly so. |
| 09:24:48 | 22 | THE COURT:  I just wanted to make sure it wasn't |
| 09:24:50 | 23 | somewhere else in the claim we would have to look for |
| 09:24:52 | 24 | that. |
| 09:24:52 | 25 | MR. CICCARELLI:  Understood.  This would be right |

09:24:54  1   -- if the Court was inclined to include that language,
09:24:56  2   this would be the perfect place to put it or be one good
09:24:59  3   place to put it.
09:25:00  4            THE COURT:  Okay.  All right.  Thank you, Mr.
09:25:01  5   Ciccarelli.
09:25:02  6            And who will be responding for Purdue?
09:25:36  7            MR. OFFOR:  Good morning, your Honor.
09:25:37  8            THE COURT:  Good morning, Mr. Offor.
09:25:39  9            MR. OFFOR:  I think clearly the dispute here is
09:25:43  10  whether the claimed invention, which is not a process,
09:25:46  11  whether you should read a process limitation into the
09:25:49  12  claimed invention.  And our construction, plaintiff's
09:25:56  13  construction is consistent with the claim language while
09:26:02  14  defendant's construction is trying to read in a process
09:26:06  15  limitation.  They are trying to read in a limitation that
09:26:09  16  requires you to understand how the -- how the oxide layer
09:26:16  17  was formed in order to determine infringement, and that is
09:26:21  18  an improper way to read the claims.
09:26:24  19           And first and foremost, if you could advance to
09:26:27  20  the next slide.  In the briefing, it's clear that both
09:26:33  21  parties understand the meaning of the claim language
09:26:37  22  that's at issue here.  This is a quote from ST's own
09:26:41  23  briefing.  Here, the disputed terms, "a second, thicker
09:26:46  24  oxide layer" that's out of claim 1 and "a gate oxide
09:26:49  25  layer" out of claim 6 refer to the layer of oxide that is

09:26:53  1   located over the tops and the sides of the gates.  That's
09:26:58  2   simple, that comes -- that is right from the claim --
09:27:00  3   that's basically from the claim language and as the
09:27:02  4   purpose of claim construction is so that the jury can
09:27:05  5   understand what the claim language means, this is the
09:27:09  6   proper construction -- this is the proper construction.
09:27:13  7          If we turn to the specification, the
09:27:19  8   specification also supports plaintiff's construction,
09:27:23  9   here, as you can see, referring to the figures 3 and 4, we
09:27:29  10  have the language the polysilicon -- the poly crystalline
09:27:33  11  silicon gate that is surrounded along its top, bottom,
09:27:37  12  left and right sides by an insulating layer of silicon
09:27:42  13  dioxide.  Again, the specification is clear, the claim
09:27:46  14  language is clear.  Next slide.
09:27:53  15         Now, you heard -- at least what I heard was a
09:27:57  16  long presentation about a method claim, about a method of
09:28:01  17  how -- of what was disclosed in the patent about a process
09:28:06  18  to create this final product.  And ST has told the Court
09:28:10  19  that they're not importing a process limitation, but
09:28:15  20  again, formed, created or grown by reacting the gate,
09:28:20  21  these are -- this is process language.  This changes a
09:28:25  22  clear claim, clear claim language about a structure that's
09:28:31  23  claimed and forces you to look at how the structure was
09:28:35  24  formed, and that's not what's claimed.
09:28:43  25         The next slide.  And again, this is just a

09:28:49  1   depiction of the claim so we know what we're talking about
09:28:52  2   here.  A second thicker oxide layer over said top surface
09:28:57  3   and side wall of said first gate.  It's in claim 1.
09:29:02  4   Similar language in claim 6, a gate oxide layer, thicker
09:29:06  5   than said substrate surface oxidation layer, and over said
09:29:14  6   tops and sides of each of said gates.  Again, this doesn't
09:29:17  7   require a reinterpretation of the claims and it does not
09:29:21  8   require reading in process limitations to describe how
09:29:27  9   these layers were formed.
09:29:31  10           Again, next slide, the specification repeatedly
09:29:36  11   refers to MOSFET devices.  So the idea that the invention
09:29:42  12   is only the process of creating the devices is incorrect.
09:29:50  13   And in fact, next slide, during prosecution, Purdue
09:29:56  14   specifically elected an apparatus claim, and again, that's
09:30:01  15   what's before the Court here.  It's not a process claim.
09:30:09  16           Next slide, there's more support in the
09:30:14  17   specification that makes clear, yes, the invention can be
09:30:16  18   made in a variety of ways.  But the bigger thing to focus
09:30:21  19   on here is that the claim language, the claims that we are
09:30:24  20   talking about are apparatus claims, they are not process
09:30:27  21   claims.
09:30:51  22           So again, we believe that our construction, it's
09:30:53  23   consistent with the claim language.  Could you advance two
09:30:57  24   sides, please.  Plaintiff's construction is consistent
09:31:05  25   with the claim language.  Plaintiff's construction does

09:31:09  1   not read in process limitations.  And we believe that

09:31:15  2   plaintiff's construction should be adopted for those

09:31:17  3   reasons.

09:31:20  4           THE COURT:  Okay.  Is that all, Mr. Offor?

09:31:26  5           MR. OFFOR:  That's all we have.

09:31:27  6           THE COURT:  Okay.  Mr. Ciccarelli, would you like

09:31:29  7   to respond?

09:31:30  8           MR. CICCARELLI:  I would, your Honor.

09:31:40  9           Regarding your Honor's question about the file

09:31:41  10  history, I'm not sure the full extent that's there, but at

09:31:46  11  ECF 74, Exhibit E has the portions of the file history.

09:31:52  12  So I think that may be there, so that's one place to look.

09:31:56  13          The main argument I heard is, we can't read in

09:32:00  14  this limitation about that the patent places on the

09:32:05  15  invention because it somehow related to a process and this

09:32:08  16  is a product claim.  That doesn't matter, your Honor.

09:32:12  17  When the applicant defines his invention to be something,

09:32:16  18  you can't ignore that, even if it's a process step.  And

09:32:20  19  there's other cases where that's been done and we've cited

09:32:22  20  them in our brief.

09:32:24  21          ECF 74, page 3, we cite to Andersen Corp vs.

09:32:30  22  Fiber Composites.  And then, there's also Southwall Tech

09:32:35  23  vs. Cardinal where the Court held that a claim to a

09:32:39  24  dielectric layer -- this is, again, dielectric layer is

09:32:43  25  part of semiconductor layer -- was limited to a dielectric

09:32:47  1  layer prepared by a one-step process because the patentee

09:32:49  2  excluded those formed by a two-step process.  So I think

09:32:53  3  that is sort of neither here nor there whether it is --

09:32:57  4  whether we're using a process step.

09:32:59  5        We also presented the position that a oxide

09:33:03  6  formed is not really a process step; it's describing the

09:33:08  7  nature of that oxide layer.  But regardless, we think it

09:33:12  8  doesn't matter.  If you have to, limit the claim by

09:33:16  9  putting in a process limitation to limit it to what the

09:33:20  10  inventor said it is, you absolutely can do it and you

09:33:22  11  should do it.  And all we're doing here is, we're looking

09:33:28  12  at the paragraph that we talked about earlier where we

09:33:32  13  think it's very clear that the inventor defined the outer

09:33:38  14  edges of where the invention lies.  And Purdue wants it to

09:33:43  15  go beyond that and I think this is a perfect place to

09:33:45  16  limit the claims to what the patent says the invention is.

09:33:50  17  Unless the Court has additional questions, I think that's

09:33:52  18  all I have.

09:33:53  19        THE COURT:  Okay.  Thank you, Mr. Ciccarelli.

09:33:56  20        Mr. Offor, I would like you to address the

09:34:00  21  section that's on the screen.  Try and see where --

09:34:09  22  especially beginning where it describes the "so long as"

09:34:12  23  and goes into specific description of how the invention

09:34:16  24  has to be created.  How is that not a disclaimer or a

09:34:22  25  limitation to be imported into the claim?

| | | |
|---|---|---|
| 09:34:32 | 1 | MR. SHORE:  Can I take that, your Honor? |
| 09:34:34 | 2 | THE COURT:  Yes, sir.  That's fine. |
| 09:34:37 | 3 | MR. SHORE:  So when this patent was prosecuted, |
| 09:34:39 | 4 | it does have in it ways to make devices as well as the |
| 09:34:44 | 5 | device that results.  And when the patent office came in |
| 09:34:47 | 6 | and said, what do you want, do you want apparatus claims |
| 09:34:49 | 7 | or do you want process claims, they chose the apparatus |
| 09:34:52 | 8 | claims.  And so, how those apparatus are made is |
| 09:34:56 | 9 | completely irrelevant.  There is no disclaimer.  There's |
| 09:34:59 | 10 | no clear and unequivocal disclaimer. |
| 09:35:01 | 11 | And as a matter of fact, if you pull up -- it |
| 09:35:09 | 12 | literally has in it and this is -- I believe this would be |
| 09:35:23 | 13 | slide 13.  They actually go into and they quote the Baliga |
| 09:35:30 | 14 | textbook where they say several different types of |
| 09:35:33 | 15 | vertical power MOSFETs have been proposed including the |
| 09:35:36 | 16 | double-diffused MOSFET, D-MOSFET, and trench gate or |
| 09:35:39 | 17 | U-MOSFET.  These and other power MOSFETs are described in |
| 09:35:41 | 18 | a textbook by Baliga, which is incorporated herein and by |
| 09:35:44 | 19 | reference.  So the Baliga textbook literally is |
| 09:35:49 | 20 | incorporated -- any MOSFET made using any of those |
| 09:35:51 | 21 | processes, any of those types of MOSFETs that includes |
| 09:35:54 | 22 | this structure are meant to be covered. |
| 09:35:58 | 23 | So that language that they pointed to in there, |
| 09:36:00 | 24 | it's not a clear and unequivocal disclaimer.  It is not |
| 09:36:04 | 25 | saying -- as a matter of fact, if they wanted to disclaim |

09:36:06  1   it, the language that they're asking to be put in could

09:36:09  2   very easily have been put in.

09:36:11  3        So when a jury is looking at this claim in court

09:36:14  4   and they see, okay, the layer is thicker here, it's

09:36:17  5   thinner here, that's easy.  You look at the reverse-

09:36:20  6   engineering, is it thicker or is it thinner.  But when

09:36:23  7   they come in and said, oh, wait a minute, how did it get

09:36:25  8   thicker, how did it get made, that's a process patent.

09:36:28  9   That is not an apparatus patent.  That will be confusing

09:36:32  10  to the jury.  It will be incorrect and there is no clear

09:36:35  11  and unequivocal disclaimer.

09:36:37  12       In fact, I don't even think they claim in their

09:36:39  13  briefing that there was a disclaimer.  Now, this would be

09:36:42  14  the first time I think that they've said that it was

09:36:46  15  disclaimed -- that anything else was disclaimed.  So I

09:36:51  16  don't recall anywhere that they've even said that there

09:36:53  17  was some sort of a disclaimer of scope.  So that would be

09:36:59  18  a new one.

09:37:04  19       The other part of this that I think should sort

09:37:09  20  of be self-evident is, they literally in their own

09:37:12  21  briefing, which we pointed out, they admit that the

09:37:17  22  thickness -- the differences in thickness are the

09:37:21  23  invention.  And then, they said, well, wait a minute, we

09:37:24  24  don't like that.  And so, as a purely to try to escape

09:37:28  25  infringement, they're trying to build in process

09:37:31  1  limitations, and it doesn't say a process.  The preamble

09:37:35  2  doesn't say a process, it says a MOSFET.  It doesn't say a

09:37:38  3  process for making MOSFET.  It doesn't say a MOSFET made

09:37:41  4  by a particular process.  It doesn't say any of those

09:37:44  5  things.

09:37:44  6          So to come in and create a disclaimer where

09:37:50  7  clearly none exists, and to change a perfectly clear and

09:37:54  8  concise, well-written claim, thicker here, thinner here,

09:37:59  9  you can look at it and you can see it, very simple for a

09:38:01  10  jury to understand and try to say okay, well, now we've

09:38:03  11  gotta get into how it's made and what the process is and

09:38:07  12  other things, that's -- it would be confusing and, worst

09:38:11  13  of all, it'd be incorrect.

09:38:13  14          THE COURT:  Okay.  Thank you.

09:38:16  15          Any response, Mr. Ciccarelli?

09:38:18  16          MR. CICCARELLI:  Depends if the Court wants to

09:38:20  17  hear a response or not.

09:38:23  18          THE COURT:  I'm happy to hear if there's

09:38:25  19  something you want to add.

09:38:30  20          MR. CICCARELLI:  What Purdue is advocating is

09:38:32  21  that all you're left with in this structure is the

09:38:36  22  thickness of this oxide layer after the product is fully

09:38:41  23  fabricated.  And keep in mind, so you have the oxide that

09:38:44  24  is above the gate and then, you have the oxide that's

09:38:46  25  below the gate.  And the claim language says the oxide

| | | |
|---|---|---|
| 09:38:53 | 1 | above the gate is thicker than the oxide below the gate. |
| 09:38:56 | 2 | So make sure that there's no confusion, that's -- the |
| 09:38:58 | 3 | oxide below the gate is not the oxide that we're talking |
| 09:39:01 | 4 | about earlier over the source.  That a different oxide. |
| 09:39:03 | 5 | So in construing this oxide layer above the gate, |
| 09:39:09 | 6 | Purdue wants to remove any limitation from that other than |
| 09:39:11 | 7 | it's an oxide.  When they do that, they -- it could be a |
| 09:39:15 | 8 | deposited oxide having uniform thickness that uses a mask, |
| 09:39:19 | 9 | which totally flies in the face of what this patent |
| 09:39:22 | 10 | clearly says is the invention.  Thank you. |
| 09:39:24 | 11 | THE COURT:  Thank you.  Dr. Yi, could I see you. |
| 09:44:08 | 12 | Okay.  Let's go back on the record.  All right. |
| 09:44:13 | 13 | So after considering the briefing and the arguments of |
| 09:44:15 | 14 | counsel, and of course, we'll issue an opinion to follow, |
| 09:44:19 | 15 | but the Court's going to maintain its preliminary |
| 09:44:22 | 16 | construction.  Yeah.  The "so long as" language in column |
| 09:44:28 | 17 | 7 is close; but then, it's not clear entirely in my |
| 09:44:35 | 18 | opinion in light of the election between the method and |
| 09:44:40 | 19 | apparatus claims that the applicant had to undertake, |
| 09:44:42 | 20 | because obviously the specification is directed at both |
| 09:44:46 | 21 | method and apparatus claims, and what we're now discussing |
| 09:44:50 | 22 | is the elected apparatus claim.  So we're going to stay |
| 09:44:52 | 23 | with the Court's preliminary construction on that and not |
| 09:44:57 | 24 | incorporate the process elements into the claim language. |
| 09:45:03 | 25 | Okay.  So the next claim, I believe this would go |

| | | |
|---|---|---|
| 09:45:07 | 1 | back to ST, as well. |
| 09:45:11 | 2 | MR. CICCARELLI:  Actually, on this one, we won |
| 09:45:13 | 3 | this one at the preliminary -- |
| 09:45:15 | 4 | THE COURT:  Oh, this is the preamble one.  Okay. |
| 09:45:16 | 5 | Well, there we go.  Let's go to the preamble argument and |
| 09:45:19 | 6 | I believe, Mr. Offor, will you be handling that? |
| 09:45:40 | 7 | MR. OFFOR:  Your Honor, for the 633 patent, the |
| 09:45:44 | 8 | improvement in the 633 patent is the narrowed JFET region |
| 09:45:48 | 9 | and segmented base contacts.  And you can see that |
| 09:45:53 | 10 | described in the first and second columns of the patent. |
| 09:45:59 | 11 | In fact, so the segmented base contacts are shown at |
| 09:46:04 | 12 | column 2, line 16 through 28, where we see further |
| 09:46:10 | 13 | comprise a plurality of base contact regions formed in |
| 09:46:13 | 14 | each of the first and second source regions.  The base |
| 09:46:16 | 15 | regions being smaller than the first and the second source |
| 09:46:18 | 16 | regions.  Next slide. |
| 09:46:20 | 17 | And our argument here on the preamble and we |
| 09:46:22 | 18 | appreciate your Honor's construction, but we believe that |
| 09:46:25 | 19 | the term "double implanted" in the preamble cannot be |
| 09:46:30 | 20 | limiting.  And basic question here is, what structure does |
| 09:46:34 | 21 | the term "double implanted" supply?  It doesn't supply a |
| 09:46:41 | 22 | gate.  It doesn't supply the gate insulator structure. |
| 09:46:44 | 23 | And I think as you've seen from -- you'll see from ST's |
| 09:46:48 | 24 | arguments, it's really the MOSFET aspect that supplies any |
| 09:46:52 | 25 | structure that may be missing from the claim.  Next slide. |

09:46:57  1          And we've just taken this cutout from ST's

09:47:01  2   slides, and you'll see, they indicate that the preamble

09:47:05  3   needs to be limiting because there's no gate, there's no

09:47:09  4   gate insulator, there's no drain recited in the actual

09:47:13  5   claim language but the -- a MOSFET includes all of those

09:47:19  6   structures.  Whether or not it's double implanted is not

09:47:25  7   relevant to there being a gate, a gate insulator, and a

09:47:30  8   drain.  And so, again, our position is that double

09:47:33  9   implanted should not be limiting.  Next slide.

09:47:39  10          So as I said, a MOSFET includes a gate, gate

09:47:42  11   insulator, source, drain in a substrate, and as you've

09:47:47  12   seen on the previous slide, ST basically admits that.

09:47:51  13   We've included here just a definition.  This is a fairly

09:47:55  14   standard understanding of what the MOSFET means.  And as

09:47:58  15   you can see, this includes structurally, a gate, source,

09:48:03  16   drain, and this gate insulator.  Next slide.

09:48:11  17          And the gate is separated from the semiconductor

09:48:14  18   body below by the gate insulator.  Next slide.  And that

09:48:18  19   the gate electrode, the gate itself, it can be a

09:48:22  20   polysilicon gate.  It doesn't have to be metal.  The prior

09:48:26  21   art that was cited against this patent, against the 633

09:48:31  22   patent makes that clear.  And the examiner referring to

09:48:36  23   the Kumar reference indicated this MOSFET operates

09:48:40  24   normally off accumulation mode so that when no voltage is

09:48:45  25   applied to the polysilicon gate electrode.  And you'll see

09:48:46   1   that throughout and I don't think that ST is here

09:48:49   2   contending that MOSFET needs to be limited to a gate

09:48:53   3   that's only metal.

09:48:57   4        The gate electrode -- again, the gate electrode

09:48:59   5   can be polysilicon, it can be metal.  Can you slip two

09:49:06   6   slides.  And the gate insulator is usually an oxide, but

09:49:09   7   it doesn't have to be an oxide.  In the prior art of

09:49:15   8   record confirms that a MOSFET and an IGFET are synonymous,

09:49:21   9   and basically that's an insulated-gate field effect

09:49:27   10  transistor.  These terms are effectively synonymous.  If

09:49:34   11  the term "MOSFET" is limiting, it should be construed as a

09:49:38   12  POSITA would understand it, and that is as a field effect

09:49:44   13  transistor, the gate doesn't need to be metal.  The gate

09:49:48   14  insulator doesn't need to be an oxide with all the

09:49:50   15  components of a MOSFET.  Could you advance another slide.

09:49:54   16       And so, again, while we are definitely -- we

09:49:57   17  appreciate the Court's construction, our position is that

09:50:04   18  double implanted doesn't supply any structural limitation.

09:50:08   19  And since double implanted appears in the preamble, the

09:50:11   20  presumption that it's not a limitation, and the only

09:50:14   21  reason to include it as a limitation is if it provides a

09:50:20   22  structural component.  And I have not seen anything in the

09:50:23   23  briefing throughout anywhere in the briefing where ST has

09:50:27   24  even suggested that there's a structural limitation that

09:50:31   25  is brought about by the double implanted language.

| | | |
|---|---|---|
| 09:50:35 | 1 | And so, with that, could we go to the next slide. |
| 09:50:45 | 2 | Without identifying what structural limitation this double |
| 09:50:50 | 3 | implanted language imparts, it can't be read into the |
| 09:50:52 | 4 | claims since it's found in the preamble. |
| 09:51:12 | 5 | THE COURT: Oh, sorry. I thought you had more. |
| 09:51:14 | 6 | I was waiting. |
| 09:51:16 | 7 | MR. OFFOR: If you had any questions for me. |
| 09:51:18 | 8 | THE COURT: Yeah. So as I'll follow it then, the |
| 09:51:21 | 9 | plaintiff's argument essentially boils down to whether the |
| 09:51:25 | 10 | double -- or the issue, I guess, from the plaintiff's |
| 09:51:28 | 11 | perspective is whether the double implanted is a |
| 09:51:30 | 12 | limitation but no issue with regard to whether MOSFET is a |
| 09:51:32 | 13 | limitation. |
| 09:51:35 | 14 | MR. OFFOR: Yeah. We believe it's accurate that |
| 09:51:38 | 15 | MOSFET provides structure that's not explicitly recited in |
| 09:51:41 | 16 | the claim, but again, the double implanted does not and |
| 09:51:44 | 17 | so, it should not be read in. |
| 09:51:45 | 18 | THE COURT: And if it were read in, does |
| 09:51:50 | 19 | plaintiff have a suggested definition for double |
| 09:51:55 | 20 | implanted? |
| 09:51:56 | 21 | MR. OFFOR: We do not have a suggested definition |
| 09:51:58 | 22 | right this second, but we can convene and I can provide |
| 09:52:02 | 23 | one if that's -- if you need one. |
| 09:52:04 | 24 | THE COURT: Okay. I think it might be helpful. |
| 09:52:06 | 25 | I'm not saying which way we'll go just yet. But that |

| | | |
|---|---|---|
| 09:52:10 | 1 | might be helpful.  So. |
| 09:52:10 | 2 | MR. OFFOR:  Okay. |
| 09:52:12 | 3 | MR. SHORE:  Your Honor, if I could add one quick |
| 09:52:14 | 4 | thing. |
| 09:52:15 | 5 | THE COURT:  Yes, Mr. Shore. |
| 09:52:16 | 6 | MR. SHORE:  The title of the patent obviously is |
| 09:52:18 | 7 | not something that the inventor comes up with.  The title |
| 09:52:21 | 8 | of the patent is something the patent office comes up |
| 09:52:23 | 9 | with.  And this title, the double implanted is an artifact |
| 09:52:25 | 10 | of the fact that there were both process claims that could |
| 09:52:29 | 11 | have been elected and apparatus claim that could have been |
| 09:52:32 | 12 | elected.  If a process claim had been elected, the double |
| 09:52:35 | 13 | implanting might have some relevance, but it doesn't in |
| 09:52:38 | 14 | the process claim.  MOSFET supplies all of the structure |
| 09:52:42 | 15 | that ST claims is missing.  And if MOSFET alone provides |
| 09:52:47 | 16 | all the structure that ST claims is missing, then that's |
| 09:52:50 | 17 | all that needs to be imported from the preamble.  But |
| 09:52:54 | 18 | that's why I believe that language was there.  That's |
| 09:52:57 | 19 | language chosen by the title of the patent.  This language |
| 09:53:03 | 20 | was chosen by the patent office, but the double implanting |
| 09:53:06 | 21 | is an artifact of the fact that we were at one time both |
| 09:53:09 | 22 | prosecuting process and apparatus claims before the |
| 09:53:12 | 23 | election. |
| 09:53:13 | 24 | THE COURT:  Okay.  And I understand it just to |
| 09:53:14 | 25 | make clear, though, we're not talking about importing a |

09:53:18  1   limitation from the title of the patent.  We're talking

09:53:19  2   about the preamble of claim 9, which was the

09:53:24  3   lexicographer's work, right?

09:53:24  4        MR. SHORE:  Absolutely.  And again, I think the

09:53:26  5   main thing to point out is that you import limitations

09:53:30  6   from the preamble only as necessary to provide a complete

09:53:34  7   invention.

09:53:34  8        THE COURT:  Understood.  Understand.

09:53:37  9        MR. SHORE:  MOSFET provides the complete

09:53:39  10  invention.  Every single thing that ST says is missing is

09:53:43  11  provided by including MOSFET.

09:53:44  12        THE COURT:  Okay.  Could, yeah, y'all convene and

09:53:50  13  let me know if we did limit it -- or import that

09:53:53  14  limitation or say that that portion of the preamble was

09:53:56  15  limiting what plaintiff's proposed, you know, definition

09:54:01  16  might be.

09:54:02  17        Could I hear from Mr. Ciccarelli on this issue?

09:54:05  18        MR. CICCARELLI:  Your Honor, I'm hearing three

09:54:34  19  different arguments by plaintiff.  The first is, shouldn't

09:54:37  20  be limiting at all.  The second is, if it is limiting,

09:54:41  21  only a portion of it should be limiting.  And then,

09:54:44  22  finally, they want actual constructions for the MOSFET,

09:54:49  23  for example.  And now, your Honor is suggesting maybe a

09:54:52  24  construction for double implanted.

09:54:54  25        So I want to address their third point first.

| | |
|---|---|
| 09:54:58 | 1 |
| 09:55:00 | 2 |
| 09:55:04 | 3 |
| 09:55:09 | 4 |
| 09:55:11 | 5 |
| 09:55:15 | 6 |
| 09:55:18 | 7 |

1  This court has a procedure for claim construction and
2  there's a reason for it.  We exchange claim terms, we then
3  exchange constructions, we then exchange extrinsic
4  evidence, we then do briefing, we then meet and confer,
5  and the goal and idea there is, let's make this a well-
6  thought-out process where we get to hopefully the correct
7  answer.

8          What we hear is last night, Mr. Shore raising his
9  hand and saying, oh, but wait a minute, let's go ahead and
10 construe these other terms while we're at it.  Never
11 before indicated, he never indicated that he wanted to
12 construe those terms months ago when we went through this
13 process.  And now, he wants to do this process overnight
14 and this morning on the fly?  We don't think that's right.
15 We object to it.  We don't think it's proper.  We think
16 it's going to get us to the wrong result and it's
17 prejudicial to ST to do that.

18         Now, in terms of the rest of the arguments, I
19 want to address something Mr. Shore said and I don't think
20 Mr. Shore is a patent prosecutor.  I did some patent
21 prosecution almost 30 years ago.  And the way it worked
22 back then, and I think it's the same now, the applicant
23 actually provides a title and then, the patent office
24 tweaks it as necessary and makes suggestions.  So I don't
25 know where he was getting that from, but maybe he does

09:56:11  1   prosecution somewhere else.

09:56:12  2            THE COURT:  I will say that that I consider the

09:56:16  3   title irrelevant for this argument since we're talking

09:56:19  4   about the preamble of the specific claim.

09:56:21  5            MR. CICCARELLI:  I do, too, your Honor.  Thank

09:56:23  6   you.

09:56:23  7            So the other point I needed to make is in terms

09:56:25  8   of their second argument, which is, if it is limiting,

09:56:28  9   let's just make it partially limiting.  Let's start

09:56:30  10  parsing it.  I've never seen a case, they have not cited a

09:56:33  11  case where the Court actually takes a preamble and starts

09:56:36  12  parsing it up into yeah, this is needed, this is not

09:56:39  13  needed.  We don't think that's proper.

09:56:41  14           It's a binary decision:  It either is limiting or

09:56:44  15  it's not.  And they seem to acknowledge that you need the

09:56:48  16  MOSFET.  They have acknowledged that.  And so, now the

09:56:52  17  question is, if that is limiting, the whole preamble comes

09:56:55  18  in.  And in terms of these terms, they seem to be arguing

09:56:59  19  with respect to MOSFET, as well, it's a term of art.

09:57:02  20  People in the industry know exactly what it is.  If that's

09:57:05  21  the case, why are we construing it?  They're not saying it

09:57:08  22  takes on a different meaning than its ordinary meaning.

09:57:11  23  So there is absolutely no reason to construe it.  If, for

09:57:13  24  some reason, down the road, the experts do have a

09:57:16  25  disagreement as to what the plain and ordinary meaning is,

09:57:19  1   there will be an opportunity, as Judge Albright often

09:57:22  2   gives us, to address that through a mini Markman.

09:57:26  3          But right now, based on a raising of the hand the

09:57:29  4   day before, trying to submit extrinsic evidence that we

09:57:32  5   have never seen before without us having an opportunity to

09:57:35  6   go gather our own extrinsic evidence, that is -- that

09:57:38  7   makes no sense in my mind, your Honor.

09:57:42  8          In terms of the structure, now getting back to

09:57:44  9   the is it limiting or not, right, I want to show where the

09:57:50  10  double implanting fits in in terms of structure.  And if

09:57:54  11  you look at our slide, I want to explain what the double

09:57:58  12  planting does.  I want to try to zoom in a little bit.

09:58:11  13  Okay.

09:58:12  14         The way these structures are made is through

09:58:16  15  implantation, right?  You start with the wafer, which is

09:58:19  16  your substrate, and then, you start making these -- like

09:58:22  17  these blue regions, the P well that's shown on the

09:58:25  18  drawing.  The way you make that P well is, you implant,

09:58:29  19  you implant dopants to create that P well.  So originally

09:58:33  20  the material is a red color, it's an N type.  You take

09:58:37  21  some P-type dopants, you implant them in so that you

09:58:40  22  basically pollute that area with these ions, with this

09:58:45  23  P-type ions, and that creates that structure.  So

09:58:47  24  implantation is very much that.  So that's one

09:58:50  25  implantation.

| | | |
|---|---|---|
| 09:58:50 | 1 | The other implantation then creates your N plus |
| 09:58:54 | 2 | source.  That's the N plus region right here.  You create |
| 09:59:00 | 3 | -- you do another implant to create that region, which is |
| 09:59:03 | 4 | N type within the P type.  So and what that does, your |
| 09:59:07 | 5 | Honor, is it creates this channel right here, little area |
| 09:59:12 | 6 | that I'm showing.  I don't know if you can see the cursor |
| 09:59:14 | 7 | on the screen. |
| 09:59:14 | 8 | THE COURT:  I can, yeah. |
| 09:59:16 | 9 | MR. CICCARELLI:  So that's called the channel and |
| 09:59:17 | 10 | with these two implantations, you have created this |
| 09:59:20 | 11 | channel.  So now you have the N region, you have the P |
| 09:59:23 | 12 | region, and then, you have the N plus region.  When you |
| 09:59:26 | 13 | apply a little voltage to the gate, it creates an electric |
| 09:59:33 | 14 | field which changes the nature of this channel and turns |
| 09:59:35 | 15 | it more into a red-type material and let's see current |
| 09:59:38 | 16 | flow down to the bottom of the device.  That's how you |
| 09:59:41 | 17 | turn on a MOSFET on and off.  You apply a voltage to the |
| 09:59:44 | 18 | gate, it creates an electric field, which turns this |
| 09:59:47 | 19 | little channel area and opens it up for the current to |
| 09:59:51 | 20 | flow.  And that's what the double implanted means.  You do |
| 09:59:55 | 21 | these two implants to create these wells and to create the |
| 09:59:58 | 22 | channel. |
| 09:59:59 | 23 | So the double implantation very much tells you |
| 10:00:01 | 24 | about the structure.  And recall, there are generic |
| 10:00:04 | 25 | MOSFETs, there are double-implanted MOSFETs, there are |

| | | |
|---|---|---|
| 10:00:07 | 1 | vertical double-implanted MOSFETs, there's all different |
| 10:00:11 | 2 | types.  And that's where the double implantation comes in |
| 10:00:14 | 3 | in terms of structure.  So we think it very much does |
| 10:00:17 | 4 | breathe life into the claims because the claim elements |
| 10:00:19 | 5 | themselves only identify two, and from there, you can take |
| 10:00:22 | 6 | all different directions and create different devices. |
| 10:00:24 | 7 | But even they agree, this patent is limited to MOSFETs. |
| 10:00:27 | 8 | And specifically in this claim, the preamble says double |
| 10:00:30 | 9 | implanted.  I think that's all I needed to address unless |
| 10:00:38 | 10 | your Honor has any questions. |
| 10:00:40 | 11 | THE COURT:  I don't have any questions, Mr. |
| 10:00:42 | 12 | Ciccarelli. |
| 10:00:42 | 13 | MR. CICCARELLI:  Thank you. |
| 10:00:42 | 14 | THE COURT:  And, Mr. Shore, before you begin, |
| 10:00:45 | 15 | I'll tell you, I'm kind of inclined to do as Mr. |
| 10:00:47 | 16 | Ciccarelli suggested and stay with the preliminary |
| 10:00:51 | 17 | construction that it's a limitation.  And if there's a |
| 10:00:53 | 18 | further dispute, we can have a supplemental briefing and |
| 10:00:57 | 19 | argument on that, if it even winds up being a dispute. |
| 10:01:02 | 20 | MR. SHORE:  Just quickly, we just finished our -- |
| 10:01:06 | 21 | I say just finished.  A few months ago, we finished a |
| 10:01:09 | 22 | trial with Judge Albright, and in the middle of the trial, |
| 10:01:13 | 23 | we had to do a claims construction on a term. |
| 10:01:16 | 24 | THE COURT:  Yeah. |
| 10:01:17 | 25 | MR. SHORE:  So what we're trying to do here is, |

```
10:01:18    1   we're getting ready to start discovery.  And as we start
10:01:21    2   discovery, we need to know what the -- this preamble
10:01:25    3   limits, if anything.  And the two points I'd like to make
10:01:29    4   in response to him is, one, if STMicro cannot articulate
10:01:34    5   what a MOSFET is here today, we have a really serious
10:01:38    6   problem because MOSFET is what they do.  They sell
10:01:41    7   MOSFETs, they advertise MOSFETs, they call these things
10:01:45    8   MOSFETs.  And for them to say that they can't come in when
10:01:48    9   they're the ones who asked -- they asked that the preamble
10:01:51   10   be limiting and I'm sure they had some idea when they
10:01:54   11   asked the Court to have the preamble be limiting as to
10:01:57   12   what those limits were.
10:01:58   13         We didn't ask the Court to limit it.  So we
10:02:01   14   didn't think it should be, but it's done, you've limited,
10:02:04   15   it, so that's fine.  But for them to say that we want it
10:02:07   16   to be limited but we don't want to tell Purdue how it's
10:02:10   17   limited, we want to start discovery not knowing how it's
10:02:13   18   limited when the term is MOSFET.
10:02:15   19         And the other interesting thing that he got up
10:02:17   20   and he showed the figure and he didn't dispute this.
10:02:21   21   MOSFET when -- when they said in their brief that they
10:02:24   22   wanted the preamble construed, they said because without
10:02:28   23   it, you don't have a source, a drain and a gate, or the
10:02:33   24   layer.  Well, we just showed how MOSFET provides all of
10:02:37   25   that structure.  Every single thing that they claimed was
```

10:02:39  1   missing is provided by MOSFET.   Double implanting is a
10:02:44  2   process.   He also now just told you that, well, double
10:02:48  3   implanted means this thing, but vertical double implanted
10:02:53  4   means another.
10:02:54  5         This is a comprising claim.   So if you have two
10:02:59  6   implants, you're double implanted.   If you have more than
10:03:02  7   two, you're still double implanted.   If you have 15
10:03:05  8   implants, you're still double implanted because it's a
10:03:07  9   comprising claim.   You may -- if you want to construe
10:03:12  10  something, it would be two -- the two implanted regions.
10:03:16  11  But the two implanted regions are already disclosed in the
10:03:20  12  body of the claim, and he admitted that.   He just showed
10:03:23  13  you that the two implanted regions are these source
10:03:25  14  regions and base regions.   He just showed them to you.
10:03:28  15        They're in the body of the claim.   Those two, you
10:03:31  16  know -- it's a comprising claim but those two are in body
10:03:34  17  of the claim.   So the only thing that we need to do and
10:03:37  18  it's simple, it's not catching ST off guard.   They make
10:03:43  19  MOSFETs.   They call these products MOSFETs.   They are a
10:03:45  20  MOSFET company.   It's not surprising that a MOSFET
10:03:48  21  includes a source, a gate, and a drain, and an insulating
10:03:53  22  layer.   That's all that's required.   They know that.   And
10:03:56  23  so, we would ask that the Court to construe it so that we
10:03:59  24  can do discovery.   So that we can do our discovery
10:04:03  25  understanding if there is going to be a limitation, we

| | | |
|---|---|---|
| 10:04:05 | 1 | understand what it is. |
| 10:04:07 | 2 | THE COURT:  Well, and I think at this point -- |
| 10:04:11 | 3 | actually, let me confer with Dr. Yi. |
| 10:05:55 | 4 | We can go back on the record.  Okay.  For this |
| 10:05:58 | 5 | one, we will similar to the previous one, we'll maintain |
| 10:06:03 | 6 | the Court's prior construction that the preamble is |
| 10:06:06 | 7 | limiting and at least at this stage, just give it its |
| 10:06:14 | 8 | plain and ordinary meaning.  I will admit that even as a |
| 10:06:17 | 9 | mechanical engineer, MOSFET seems like in this area to be |
| 10:06:22 | 10 | a term, if any term has a plain and ordinary meaning, it |
| 10:06:25 | 11 | would be that one. |
| 10:06:28 | 12 | So we're going to stay with the preamble as the |
| 10:06:30 | 13 | limitation.  If it becomes an issue in discovery, Mr. |
| 10:06:32 | 14 | Shore, or at the expert report stage, which I think you've |
| 10:06:37 | 15 | sort of foreshadowed for us, we'll bring it back and we'll |
| 10:06:41 | 16 | address it at that time. |
| 10:06:43 | 17 | And then, I believe we're just down to the last |
| 10:06:46 | 18 | term, which is "less than three micrometers."  And would |
| 10:06:51 | 19 | ST like to start with that, Mr. Ciccarelli? |
| 10:06:54 | 20 | MR. CICCARELLI:  Certainly, your Honor, thank |
| 10:06:55 | 21 | you. |
| 10:07:09 | 22 | So as our briefing indicates, we think this term |
| 10:07:12 | 23 | is indefinite.  To be clear, we're not saying that every |
| 10:07:15 | 24 | time the word "about" is used is indefinite.  That's not |
| 10:07:19 | 25 | the case.  That's not the case law.  The Federal Circuit |

| | | |
|---|---|---|
| 10:07:21 | 1 | has told us otherwise and we understand that.  There are |
| 10:07:24 | 2 | situations where you can use the word "about" as long as |
| 10:07:27 | 3 | you know what you're trying to achieve, as long as you |
| 10:07:31 | 4 | know the objective, experts can opine on how much latitude |
| 10:07:34 | 5 | the word "about" gives you. |
| 10:07:36 | 6 | I have an example.  A few weeks ago, I called my |
| 10:07:39 | 7 | son who lives up in Denton, and I asked him, how wide is |
| 10:07:43 | 8 | your couch?  He said about three feet.  Okay.  How do I |
| 10:07:48 | 9 | decide how close to three feet that couch really is, |
| 10:07:52 | 10 | right?  If the whole purpose of it was for me to go up |
| 10:07:55 | 11 | there to go hunting the next morning, for me to crash on |
| 10:07:58 | 12 | his couch, about three feet, it could be three and a half, |
| 10:08:01 | 13 | it could be two and a half, could even be two feet.  I |
| 10:08:04 | 14 | think me and my dogs could sleep on the couch. |
| 10:08:08 | 15 | You get a lot of leeway on the word "about" in |
| 10:08:11 | 16 | that circumstance.  On the other hand, if the reason I was |
| 10:08:13 | 17 | asking was because he's moving back home and we're trying |
| 10:08:16 | 18 | to figure out if we can fit the couch into the spare |
| 10:08:18 | 19 | bedroom where the doorway's 37 inches wide, all of a |
| 10:08:22 | 20 | sudden, I can't give the word "about" that much leeway, |
| 10:08:25 | 21 | right?  In that situation, you need to know with more |
| 10:08:29 | 22 | precision how close to three feet it is.  Plus or minus a |
| 10:08:32 | 23 | foot won't cut it when you're trying to fit it through the |
| 10:08:34 | 24 | door.  Plus or minus six inches won't.  Plus or minus one |
| 10:08:38 | 25 | may not.  I may have to get down to the quarter inch. |

| | | |
|---|---|---|
| 10:08:41 | 1 | Once I know whether I'm crashing on his couch or |
| 10:08:43 | 2 | trying to fit it into the room, I then have something on |
| 10:08:46 | 3 | which to base the amount of -- to determine the amount of |
| 10:08:50 | 4 | leeway that the word "about" gets.  The problem with this |
| 10:08:52 | 5 | patent is that that's what the patent doesn't tell you. |
| 10:08:55 | 6 | It doesn't tell you what you're trying to achieve, and |
| 10:08:58 | 7 | therefore, I have no way of knowing of placing boundaries |
| 10:09:01 | 8 | on the "about" word.  So that's what I'd like to discuss. |
| 10:09:04 | 9 | THE COURT:  Okay. |
| 10:09:05 | 10 | MR. CICCARELLI:  So I'd like to start with the |
| 10:09:09 | 11 | Cohesive Tech case, which is a really good case in terms |
| 10:09:11 | 12 | of how do you construe what "about" means, how much leeway |
| 10:09:15 | 13 | do you get?  And so, it says, look, the word "about" does |
| 10:09:17 | 14 | not have a universal meaning in patent claims.  Okay.  Its |
| 10:09:21 | 15 | meaning depends on the technological facts of a particular |
| 10:09:24 | 16 | case.  That's simple enough.  Its range must be |
| 10:09:27 | 17 | interpreted in its technologic and stylistic context in |
| 10:09:30 | 18 | determining how far beyond the claimed range the term |
| 10:09:33 | 19 | "about" extends the claim, we must focus on the |
| 10:09:37 | 20 | criticality of the numerical limitation to the invention. |
| 10:09:40 | 21 | So this criticality, right, how critical is it? |
| 10:09:44 | 22 | We have to have something that tells us how critical the |
| 10:09:49 | 23 | measurement is so that we can decide the amount of leeway |
| 10:09:51 | 24 | on the word "about."  So the interesting thing about this |
| 10:09:54 | 25 | patent is, the JFET width is not the only parameter that |

10:09:59  1   it talks about changing.  It talks about a variety.  It

10:10:03  2   talks about you can have different breakdown voltages,

10:10:05  3   different on-resistances, different substrate materials,

10:10:08  4   different thicknesses, and doping concentrations of

10:10:10  5   various different layers, the maximum electric field in

10:10:14  6   the gate oxide, the JFET doping, and then, also, the JFET

10:10:17  7   width.  So there's a lot of things that you can tweak that

10:10:21  8   the patent says you can tweak all these things and, as the

10:10:23  9   patent says, they may affect each other.

10:10:26  10         So if you go higher on one, you may push the

10:10:29  11  other one in a bad direction.  So how do I strike this

10:10:33  12  balance?  That's where the patent is silent.  It does not

10:10:37  13  tell us what balance we're trying to strike, or what we're

10:10:40  14  trying to optimize, what we're trying to build.  Are we

10:10:42  15  trying to make something that is the lowest possible on

10:10:45  16  resistance so it gives us the longest battery life?  Or is

10:10:48  17  it something that has the highest reliability?  And we

10:10:50  18  might get that by keeping the electric field around the

10:10:54  19  gate oxide lower.  It doesn't tell us what the ultimate

10:10:56  20  goal is and that's the problem.  That's why the "about" in

10:10:59  21  this case is not definite enough.

10:11:01  22         So what I wanted to do was go through the patent

10:11:04  23  and show the Court what it says about this JFET width

10:11:09  24  being three microns or less.  Does it tell us why?  What

10:11:13  25  is the reason for going below three?  So let's look at

| | | |
|---|---|---|
| 10:11:16 | 1 | that.  First column 1, line 65 through 67, says the JFET |
| 10:11:22 | 2 | region may have a width less than about three micrometers. |
| 10:11:26 | 3 | For example, it may have a width of one.  Okay.  Does it |
| 10:11:29 | 4 | tell us why, what we're trying to achieve?  Absolutely |
| 10:11:31 | 5 | not. |
| 10:11:31 | 6 | It doesn't even tell us it has to be below three. |
| 10:11:34 | 7 | It says it may have a width less than three.  That means |
| 10:11:38 | 8 | it may have it greater than three.  It may be four, five |
| 10:11:41 | 9 | six, we don't know.  It doesn't tell us, you want to be |
| 10:11:44 | 10 | less than three because this lets you do that.  Totally |
| 10:11:48 | 11 | not there. |
| 10:11:49 | 12 | The next example, column 2, lines 47 through 49, |
| 10:11:53 | 13 | the JFET region may also have a width less than about |
| 10:11:56 | 14 | three micrometers.  For example, about one.  Again, |
| 10:11:59 | 15 | nothing about why it needs to be less than three.  So we |
| 10:12:02 | 16 | have nothing that tells us how critical it is because we |
| 10:12:05 | 17 | don't know what we're trying to achieve. |
| 10:12:07 | 18 | Column 3, lines 25 through 26, the JFET region |
| 10:12:10 | 19 | may have a width of about one micrometer.  Again, doesn't |
| 10:12:14 | 20 | tell us why.  Column 6, lines 21 through 27, in some |
| 10:12:20 | 21 | embodiments, a JFET region 30 has a short width relative |
| 10:12:23 | 22 | to the typical D MOSFET.  Then it goes on, in some |
| 10:12:27 | 23 | embodiments -- that meaning in some, right?  In some, it |
| 10:12:29 | 24 | may not.  In some embodiments, the JFET region is about |
| 10:12:32 | 25 | three micrometers or less.  In one embodiment, about one. |

10:12:35  1   Again, doesn't tell us what we're trying to achieve by

10:12:38  2   that.  Are we fitting the couch through the door or are we

10:12:41  3   just sleeping on the couch?  I need to have something to

10:12:44  4   draw boundaries around the extent and flexibility of the

10:12:48  5   word "about."

10:12:49  6          So this is all that I could find in the patent

10:12:53  7   about why it needs to be less than three and it doesn't

10:12:58  8   tell us why.  It gives us no basis to evaluate

10:13:02  9   criticality.  In fact, it says -- it doesn't even have to

10:13:05  10  be less than three, it can be more.  That's because all

10:13:07  11  the other parameters could be different.  So if you leave

10:13:09  12  the JFET wider, you can play with the other parameters.

10:13:13  13  That's why this is a problem.  It's all permissive

10:13:16  14  language.  We have no way of setting boundaries.

10:13:18  15         And this is an example, your Honor, from one of

10:13:21  16  the papers that Dr. Bhat, their expert, cites in his

10:13:26  17  declaration.  It's the paperwork by Ryu and Agarwal.  In

10:13:31  18  that paper, Ryu and Agarwal were talking about a specific

10:13:34  19  device that they made that had a breakdown voltage of

10:13:36  20  2,000 volts.  It also had thicknesses that -- dopant

10:13:41  21  concentration levels, a bunch of other things that were

10:13:43  22  defined.  And what this chart is is, at the bottom, the

10:13:46  23  axis is the width of the JFET.  So on the right is six

10:13:50  24  microns, five, four, three is circled, two and one.  So

10:13:55  25  that's the width of the JFET.  And the red line gives you

10:13:57  1   the on-resistance that they measured or that they

10:14:00  2   simulated, I think it was, if I remember correctly.  So

10:14:03  3   they say at five microns, okay, here's your resistance.

10:14:06  4   At four, goes down a little bit but not much.  At three,

10:14:09  5   it goes down, but then, below three, it shoots up, right?

10:14:15  6           Now, on the other hand, the paper by Saha and

10:14:18  7   Cooper, which came after the invention, by the way, so

10:14:21  8   it's a few years later, so we have to be careful how we

10:14:24  9   use that, and we have some issue in terms of how Purdue is

10:14:28  10  using it.  But what it's showing is something a little bit

10:14:30  11  different, right, because it was based on a device that

10:14:33  12  only supported a thousand volts, had different layer

10:14:36  13  thicknesses, different doping concentrations.  So all

10:14:38  14  those other parameters that we talked about that the

10:14:40  15  patent says could change, they made a different choice

10:14:44  16  than Ryu and Agarwal.  And now, let's look at what their

10:14:47  17  resistance measurements show.

10:14:49  18          Six, five, four, three, two, the on-resistance

10:14:53  19  doesn't -- it decreases a little but not that much.  But,

10:14:56  20  then, once you get to one micron and below, it starts

10:14:59  21  shooting up.  So what does this tell us?  This tells us

10:15:03  22  that the value of the JFET width depends completely on all

10:15:07  23  these other parameters that you select.  And unless you

10:15:12  24  know what you're trying to achieve, is it the lowest

10:15:15  25  on-resistance?  Is it a rugged device that is very

10:15:18  1    reliable?  Is it a device that has the highest possible

10:15:21  2    voltage rating?  You don't know how much leeway to give

10:15:24  3    the word "about."

10:15:28  4           And again, the patent, you'll recall, says it may

10:15:31  5    have a width of less than three, right?  So, for example,

10:15:35  6    you look at their paper, at the Saha Cooper paper, and

10:15:38  7    here's three.  You could go lower on the JFET, given their

10:15:43  8    selection of layer thicknesses and concentrations, you

10:15:47  9    could go less than three.  The patent says may.  May have

10:15:51  10   a width of less.  Yeah, it may have a width of less, but

10:15:54  11   then, you make different choices and, all of a sudden,

10:15:57  12   what happens?  You can't even go, you shouldn't go less

10:15:59  13   than three.  You don't want to go less than three because

10:16:01  14   you're going to bring on-resistance through the roof

10:16:04  15   unless your objective is something different.

10:16:06  16          Is your objective low resistance or is it a

10:16:09  17   rugged device?  That's what we don't know.  And in what we

10:16:11  18   showed as I read the patent -- and I urge the Court and

10:16:14  19   technical advisor to go back and read the patent for any

10:16:17  20   inkling of what we're optimizing, it's not there.  It's

10:16:20  21   all may:  You may do this, you may do this, you may do

10:16:23  22   that, all over the place.

10:16:24  23          Now, what does Purdue do in light of that because

10:16:28  24   we called them out on it in our briefing.  So they come

10:16:30  25   back in the sur-reply and the first quote is from their

10:16:33 1    brief.  The bottom quote is from infamous Dr. Bhat's
10:16:36 2    sur-reply declaration that we never had a chance to
10:16:38 3    respond, okay?  But they both say the specification
10:16:42 4    clearly states that the JFET width is optimized according
10:16:47 5    to two objectives:  Decreasing on-resistance and reducing
10:16:50 6    the electric field.  And they cite to the specification.
10:16:54 7          So what do I do?  I go look at the specification.
10:16:56 8    I don't remember reading that, but maybe I missed
10:16:58 9    something.  So I look at it.  Says nothing to that effect.
10:17:02 10   All it says is, in some embodiments, the JFET region is
10:17:06 11   also fabricated to have short widths relative to a typical
10:17:10 12   D-MOSFET device which may reduce the specific on-
10:17:13 13   resistance of the semiconductor device.  For example, in
10:17:15 14   some embodiments, the JFET region has a width that is
10:17:18 15   about three microns.  That's the language we saw earlier,
10:17:21 16   it doesn't say that we're optimizing for on-resistance.
10:17:24 17   It says if you select the JFET and make it narrower, you
10:17:28 18   may reduce on-resistance, right?  It doesn't say that we
10:17:33 19   are driving towards a low on-resistance situation.
10:17:37 20         The next paragraph that they cite to, I now have
10:17:40 21   on the screen, conversely, the shorter width of the JFET
10:17:44 22   may tend to increase the blocking voltage.  Well, that may
10:17:47 23   be a good thing, but it doesn't tell you it's a good
10:17:50 24   thing.  It's just may do that.  It may increase the
10:17:52 25   blocking voltage.  Because such a configuration may reduce

| | |
|---|---|
| 10:17:55 | 1 |
| 10:17:57 | 2 |
| 10:17:59 | 3 |
| 10:18:04 | 4 |

1  the magnetic field.  Again, it doesn't say it does,

2  doesn't say it need to, it doesn't say that you're trying

3  to strive for either a high voltage or a low electric

4  field, magnetic field.

5       So again, these paragraphs do not tell us, the

6  patent nowhere tells us what we're optimizing for.  It's

7  the patent very much talks about you have a bunch of

8  parameters, you can adjust them all to get a good outcome.

9  Yes, great, but that doesn't help us to decide how much

10  leeway the word "about" gets because we don't know what

11  we're driving towards.  We don't know if we're putting the

12  couch through the door or if I'm just sleeping on it.

13       Again, the last case, Nautilus, your Honor's well

14  aware of it, Supreme Court case.  You have to know the

15  boundaries within reasonable certainty.  I have found

16  nothing that allows us to give us that certainty and

17  that's why we think it's indefinite.

18       THE COURT:  Let me ask you, would the minimum

19  feature size for the other features of the MOSFET, would

20  that set or help a person of skill in the art understand

21  the upper limit?

22       MR. CICCARELLI:  So you're three steps ahead of

23  us, your Honor.  And I was going to let them argue it and

24  then, respond.  So let me address it.  I'm glad you raised

25  it.  I think this relates to, again, the Bhat declaration

| | | |
|---|---|---|
| 10:19:09 | 1 | where in his original declaration, he talked about this |
| 10:19:13 | 2 | ten -- plus or minus ten percent.  No support.  Nothing. |
| 10:19:16 | 3 | Just pulled it out of thin air. |
| 10:19:19 | 4 | Everybody knows, ah, JFET width, plus or minus |
| 10:19:22 | 5 | ten percent.  Okay.  We called them out on it.  He comes |
| 10:19:24 | 6 | back in his supplemental declaration and says, oh, here's |
| 10:19:27 | 7 | the paper that talks about that.  But when you read the |
| 10:19:31 | 8 | paper and when he then -- even his declaration admits the |
| 10:19:34 | 9 | plus or minus ten percent has nothing to do with the JFET |
| 10:19:38 | 10 | width.  It has to do with the patterning of the |
| 10:19:41 | 11 | polysilicon gates. |
| 10:19:42 | 12 | Very different processes.  Remember the |
| 10:19:44 | 13 | patterning, you use a mask, right?  That's above the |
| 10:19:49 | 14 | substrate.  The JFET is formed inside the substrate. |
| 10:19:51 | 15 | That's when you're implanting, you're diffusing, that's |
| 10:19:55 | 16 | the type of tolerances that matter there.  So what he's |
| 10:19:59 | 17 | talking about in terms of plus or minus ten percent is |
| 10:20:02 | 18 | very different.  And to kind of come full circle back to |
| 10:20:05 | 19 | your question, does the line width type, does the |
| 10:20:09 | 20 | technology sort of help you? |
| 10:20:11 | 21 | I don't think it does because we don't -- so it |
| 10:20:15 | 22 | would help us in terms of manufacturing tolerances, but |
| 10:20:19 | 23 | I'm not really worried about that because any expert can |
| 10:20:21 | 24 | talk about manufacturing tolerances based on whatever |
| 10:20:25 | 25 | technology we're using for the products, right?  To your |

10:20:28    1    point, if your error is so much, then there may be that
10:20:31    2    may fit into the leeway that "about" gets.  But there's
10:20:35    3    one other more important limit -- aspect to this word
10:20:39    4    "about."  We don't know what we're driving towards, right?
10:20:43    5    So could it be four?  Forget the manufacturing tolerances.
10:20:47    6    Could the JFET be four?  Could it be five?  We don't know.
10:20:50    7    We have no idea.
10:20:51    8            There's two things.  There's the manufacturing
10:20:53    9    tolerance and then, there is the design, you know, why
10:20:55   10    you're making it that particular width.  There's nothing
10:20:58   11    in the patent that tells you why you're making it that
10:21:00   12    width; and therefore, you don't know how much leeway to
10:21:02   13    give it based on the objectives of the patent.
10:21:04   14            I don't know if that answers your question or
10:21:07   15    not.
10:21:07   16            THE COURT:  I think so.
10:21:09   17            MR. CICCARELLI:  Maybe not.  I guess I was done.
10:21:16   18    So I was just answering your question.  If there's anymore
10:21:18   19    then.
10:21:18   20            THE COURT:  I don't have any others at this
10:21:20   21    point.
10:21:20   22            MR. CICCARELLI:  Thank you.
10:21:30   23            THE COURT:  Go ahead, Mr. Shore.
10:21:31   24            MR. SHORE:  This is Mr. Shore for the court
10:21:33   25    reporter.

10:21:34  1          The practice of patent law has taught me many

10:21:36  2  things.  One of the things patent law -- practicing patent

10:21:42  3  law has taught me is when brilliant lawyers and engineers

10:21:45  4  want to be confused, want to be befuddled because it suits

10:21:51  5  their nature, it suits their purpose to say a patent's

10:21:56  6  indefinite, suddenly, their IQs drop by 75 percent.  They

10:21:58  7  don't understand anything, they can't read anything.

10:22:00  8          Why is the JFET -- why is it at about three?

10:22:04  9  It's at about three because once you get down to about

10:22:10 10  three, that is where you start getting the benefits.  And

10:22:12 11  the benefits are to protect the dielectric layer from

10:22:16 12  breakdown.  And so, by shrinking that JFET to about three

10:22:22 13  micrometers, that's where you start seeing the benefits.

10:22:25 14          Now, if you have someone who comes in and wants a

10:22:29 15  specially made part and they say, I don't care about

10:22:32 16  on-resistance.  All I care about is, you know, blocking

10:22:35 17  voltage or something else, yes, you know, you can get a

10:22:39 18  custom-made part to adjust it down to one.  You can get a

10:22:42 19  custom-made part to adjust it to 2.5 or whatever.  But

10:22:45 20  anything less than three or about three, no one thinks

10:22:50 21  four is three.  You know, this is a question for the

10:22:54 22  experts.  You know, no one thinks four is three.  That's a

10:22:57 23  33 percent increase over three.  That's not about three.

10:23:03 24          We also know and I'm sure you know as an

10:23:06 25  engineer, these things have manufacturing tolerances.  So

10:23:09  1   if you're going to say three, it needs to be about three,

10:23:13  2   anyway, because under manufacturing tolerances of your

10:23:16  3   tools and things, it's never going to be exactly three.

10:23:19  4   So if you put three or less and it comes out at 3.2, or

10:23:24  5   3.015, or whatever, then they say, oh, we don't infringe

10:23:27  6   because our manufacturing tolerances bring it out at a

10:23:30  7   different size.

10:23:31  8           So this term is used throughout patent law.  It's

10:23:35  9   not -- we're not moving a couch.  I don't sleep on couches

10:23:41  10  apparently as much as Mr. Ciccarelli does, but if I'm

10:23:44  11  sleeping on a couch, that's not the same thing as creating

10:23:48  12  a highly complex semiconductor device with features that

10:23:51  13  are less than the size of the human hair.  So "about" is

10:23:55  14  not vague, it's not indefinite.  Engineers clearly

10:24:00  15  understand what it means.

10:24:01  16          It means that you start seeing the positive

10:24:04  17  effects of decreasing the JFET region at about three, and

10:24:09  18  those effects, depending on how you want to characterize

10:24:12  19  it, can decrease all way down to one, which is what's in

10:24:16  20  the paper, basically what's in the patent and the

10:24:18  21  specification.  It's basically all the way down to one to

10:24:20  22  about three is where you'll see the benefits of the

10:24:22  23  invention.

10:24:23  24          Once you get significantly beyond three or not

10:24:26  25  about three, then you lose the benefits of the invention.

| | | |
|--|--|--|
| 10:24:34 | 1 | So this is -- it is not unusual, it is not strange, it is |
| 10:24:39 | 2 | not unclear.  They know exactly what this means.  This is |
| 10:24:44 | 3 | feigned ignorance, feigned befuddlement, and the Court |
| 10:24:48 | 4 | should recognize it for what it is. |
| 10:24:51 | 5 | THE COURT:  Mr. Ciccarelli, would you like to |
| 10:24:53 | 6 | respond? |
| 10:24:54 | 7 | MR. CICCARELLI:  I don't know if I have enough IQ |
| 10:24:56 | 8 | left. |
| 10:24:58 | 9 | THE COURT:  Well, I started as a mechanical |
| 10:25:00 | 10 | engineer, so I'm way out of this league. |
| 10:25:03 | 11 | MR. CICCARELLI:  And I don't know if having gone |
| 10:25:04 | 12 | to U.T. makes it more challenging for me now that I'm |
| 10:25:07 | 13 | here. |
| 10:25:08 | 14 | In any event, I heard Mr. Shore say about three |
| 10:25:13 | 15 | is where you see the benefit of the invention.  That's a |
| 10:25:17 | 16 | great statement, but I didn't see him point to anything in |
| 10:25:19 | 17 | the patent that says that.  That the JFET is providing any |
| 10:25:24 | 18 | specific benefit that you're striving for.  It's not |
| 10:25:27 | 19 | there; otherwise, he would have shown it to you.  And I'm |
| 10:25:30 | 20 | sure he'll come back up in a minute and show you all the |
| 10:25:32 | 21 | places in the patent where it shows that.  It just |
| 10:25:34 | 22 | doesn't.  That's the problem. |
| 10:25:35 | 23 | What the patent says is, you can play with the |
| 10:25:37 | 24 | size of the JFET.  You can play with the doping of the |
| 10:25:40 | 25 | JFET.  You can play with the doping of the current |

| | |
|---|---|
| 10:25:44 | 1 |
| 10:25:46 | 2 |
| 10:25:49 | 3 |
| 10:25:53 | 4 |
| 10:25:59 | 5 |
| 10:26:01 | 6 |
| 10:26:04 | 7 |

1 spreading layer.  You can play with a lot of different

2 things to get whatever results you want.  What we need to

3 know since this is a limitation in a claim is, what is

4 this JFET width doing for us?  Why are we making it low,

5 smaller?  What benefit is it giving to us?  That's what

6 the patent doesn't tell us and that's why we have no way

7 of deciding how much leeway to give the word "about."

8          Separate and apart from manufacturing tolerances,

9 which experts can talk about, but there's a bigger problem

10 here, which is, we have no idea what we're trying to

11 strive toward.

12          THE COURT:  Thank you, Mr. Ciccarelli.

13          MR. SHORE:  The only other thing I'd point out.

14          THE COURT:  All right.  Wait till you get to the

15 microphone, Mr. Shore, so Ms. Reznik can hear you.

16          MR. SHORE:  For the court reporter, this is

17 Michael Shore.

18          The column 6 talks about where the benefits of

19 the width and the decrease of the width come about, column

20 6 and column 7, and a little bit, actually, in column 5.

21 The other point is, I mean, this is a clear and convincing

22 evidence standard, and we had this in our last trial.  And

23 one of the things that I always enjoyed doing is pointing

24 out in pattern jury charge, this is something that they

25 would have to prove that it's indefinite and prove it to

| | |
|---|---|
| 10:26:55 | 1 |
| 10:26:57 | 2 |

you where you would come to that conclusion without

hesitation.  That's a high standard.

        This is not indefinite, the words "about,"

"approximately" are used in patent law all the time.  In

the context of this particular patent, it's clear that

that is the range at which the benefits of the invention

were shown to exist.  And the only reason why they put

"about" is, if they had put three or less and someone had

designed it to be three and it came out at 3.015, or 3.2,

or whatever, then they'd be jumping up and down saying

they don't infringe because they're more than three.

        And by the way, also in our brief, on page 6, we

have the statement and it's cited contrary to ST's

assertions, the specification clearly states that the JFET

width is optimized according to two objectives, decreasing

on-resistance and reducing the electric field in the oxide

above the JFET region.  That's the purpose, the POSITA

would understand the objectives and would adjust the width

accordingly.

        And again, if they want to come out and say make

a four -- a three-and-a-half or four-micron-wide JFET and

say it doesn't infringe, okay, it doesn't infringe.  But

if it's within the range, you know, of about three

micrometers or less, it infringes, and that's something

for an expert to opine on whether or not it is about three

| | | |
|---|---|---|
| 10:28:21 | 1 | and what that range is, it is certainly not indefinite. |
| 10:28:27 | 2 | MR. CICCARELLI:  Your Honor, could I address |
| 10:28:29 | 3 | those two things? |
| 10:28:29 | 4 | THE COURT:  Certainly. |
| 10:28:30 | 5 | MR. CICCARELLI:  We appreciate your patience.  We |
| 10:28:32 | 6 | understand that's a great benefit of practicing or having |
| 10:28:35 | 7 | hearings before you. |
| 10:28:35 | 8 | THE COURT:  That's right. |
| 10:28:37 | 9 | MR. CICCARELLI:  Thank you for -- and trials, as |
| 10:28:38 | 10 | well, right? |
| 10:28:38 | 11 | THE COURT:  Spread the word, you get lots of time |
| 10:28:40 | 12 | with a magistrate. |
| 10:28:42 | 13 | MR. CICCARELLI:  You would give us lots of time |
| 10:28:43 | 14 | at trial, as well. |
| 10:28:46 | 15 | THE COURT:  That's right.  Might even get two |
| 10:28:48 | 16 | weeks. |
| 10:28:50 | 17 | MR. CICCARELLI:  Okay.  So I'm sharing, one |
| 10:28:52 | 18 | second.  So Mr. Shore, I challenged him to find where in |
| 10:28:58 | 19 | the patent, he didn't show us, didn't really read from it. |
| 10:29:01 | 20 | He says in column 6.  So I had some of column 6 already on |
| 10:29:06 | 21 | my slide.  It's on the screen now where it talks about the |
| 10:29:13 | 22 | fact that in some embodiments, it may have some benefits. |
| 10:29:17 | 23 | Yes.  In some embodiments, you could go less than three |
| 10:29:20 | 24 | and it may reduce the specific on-resistance.  It may do |
| 10:29:24 | 25 | it.  It doesn't say it actually does it.  Doesn't say that |

| | | |
|---|---|---|
| 10:29:27 | 1 | that's what we're striving for, right? |
| 10:29:29 | 2 | And then, he goes back and he cites to their |
| 10:29:32 | 3 | brief where they in their brief say the patent says you |
| 10:29:35 | 4 | optimize for two things.  That's exactly what I pointed to |
| 10:29:41 | 5 | earlier.  I had it up on the screen.  This is the portion |
| 10:29:43 | 6 | of the brief that he's talking about in their sur-reply at |
| 10:29:47 | 7 | page 6.  The patent clearly states that there's two |
| 10:29:49 | 8 | objectives, and they cite to the two paragraphs that we |
| 10:29:52 | 9 | discussed earlier.  It does not say -- the patent doesn't |
| 10:29:55 | 10 | say that the objective is to optimize anything. |
| 10:29:58 | 11 | And in fact, your Honor, you can't even optimize |
| 10:30:01 | 12 | those two things because they're in -- they fight against |
| 10:30:03 | 13 | each other.  So -- but again, the patent doesn't say that |
| 10:30:07 | 14 | that's what we're striving for and that's the problem that |
| 10:30:11 | 15 | we have.  The patent much less says -- it doesn't even say |
| 10:30:14 | 16 | that you have to be less than three.  What it doesn't tell |
| 10:30:17 | 17 | us is, why are we below three?  Where does that take us? |
| 10:30:21 | 18 | Doesn't provide it.  Thank you. |
| 10:30:23 | 19 | THE COURT:  Okay.  Thank you.  Let's go off the |
| 10:30:25 | 20 | record just briefly. |
| 10:31:44 | 21 | Okay.  I appreciate the arguments, but we're |
| 10:31:47 | 22 | going to stay with the preliminary construction that it's |
| 10:31:50 | 23 | not indefinite and just apply the plain and ordinary |
| 10:31:54 | 24 | meaning to it, and we'll get an order out in that regard. |
| 10:32:00 | 25 | I think at this point, I'm not going to -- just for the |

10:32:02  1   parties' sake, will not strike any declarations or

10:32:06  2   affidavits, but we'll give them whatever weight, if any,

10:32:10  3   the Court thinks is appropriate.

10:32:14  4           And also want to commend both parties, one, it's

10:32:16  5   great to see everybody in person and, two, the judicious

10:32:22  6   nature with which you've picked claim terms to argue

10:32:25  7   because these were -- you didn't argue every conceivable

10:32:28  8   term obviously.  You picked ones that mattered and really

10:32:32  9   focused in on it.  I really appreciate that, and I know

10:32:35  10  that that requires a fair amount of restraint by attorneys

10:32:38  11  at times.  So that was very helpful and it also meant that

10:32:42  12  the Court gave every one of the arguments a lot of thought

10:32:46  13  and consideration.  And when I say Court, obviously I'm

10:32:52  14  including with that the great benefit Dr. Yi's provided to

10:32:54  15  this area.

10:32:56  16          And so, with that, I'll start with plaintiff.

10:32:58  17  Does the plaintiff have anything else that we need to take

10:33:00  18  up today?

10:33:02  19          MR. SHORE:  No, your Honor.  We appreciate the

10:33:03  20  Court's indulgence and time in having a live hearing.

10:33:07  21  It's wonderful to be here.  And on your comment about too

10:33:10  22  many claim terms, I'm not going to be here next week for

10:33:12  23  the next one you're doing for us, but when you're doing 20

10:33:15  24  terms, it's not us.

10:33:16  25          THE COURT:  Okay.  I'll remember that.

10:33:19  1          Anything from defendant, Mr. Ciccarelli?

10:33:21  2          MR. CICCARELLI:  Nothing from us, your Honor.

10:33:22  3  Thank you.

10:33:22  4          THE COURT:  Thank you very much.  Thank you all

10:33:24  5  for coming and we'll be adjourned.

       6              (Proceedings concluded.)

       7

       8

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

1                    * * * * * *

2

3    UNITED STATES DISTRICT COURT   )

4    WESTERN DISTRICT OF TEXAS)

5

6       I, LILY I. REZNIK, Certified Realtime Reporter,

7    Registered Merit Reporter, in my capacity as Official

8    Court Reporter of the United States District Court,

9    Western District of Texas, do certify that the foregoing

10   is a correct transcript from the record of proceedings in

11   the above-entitled matter.

12      I certify that the transcript fees and format comply

13   with those prescribed by the Court and Judicial Conference

14   of the United States.

15      WITNESS MY OFFICIAL HAND this the 24th day of May,

16   2022.

17                          *Lily Iva Reznik*

18                          ~~~~~~~~~~~~~~~~~~~~~~~
                            *LILY I. REZNIK, CRR, RMR*
19                          *Official Court Reporter*
                            *United States District Court*
20                          *Austin Division*
                            *501 West 5th Street,*
21                          *Suite 4153*
                            *Austin, Texas 78701*
22                          *(512)391-8792*
                            *SOT Certification No. 4481*
23                          *Expires:  1-31-23*

24

25