—1—

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                              WACO DIVISION

3     THE TRUSTEES OF PURDUE   *
         UNIVERSITY            *      June 28, 2022
4                              *
      VS.                      *
5                              * CIVIL ACTION NO. W-21-CV-727
      STMICROELECTRONICS N.V.  *
6        ET AL                 *

7              BEFORE THE HONORABLE ALAN D ALBRIGHT
                   DISCOVERY HEARING (via Zoom)
8
      APPEARANCES:
9
      For the Plaintiff:   Michael W. Shore, Esq.
10                         Raphael Chabaneix, Esq.
                           Shore Chan DePumpo LLP
11                         901 Main Street, Suite 3300
                           Dallas, TX 75202
12
                           Mark D. Siegmund, Esq.
13                         Steckler Wayne Cochran Cherry, PLLC
                           8416 Old McGregor Rd.
14                         Waco, TX 76712

15    For the Defendant:   Justin S. Cohen, Esq.
                           Dina W. McKenney, Esq.
16                         Bruce S. Sostek, Esq.
                           Thompson & Knight, LLP
17                         1722 Routh Street, Suite 1500
                           Dallas, TX 75201
18
                           Massimo Ciccarelli, Esq.
19                         Ciccarelli Law Firm
                           750 N. St. Paul St., Suite 200
20                         Dallas, TX 75201

21    Court Reporter:      Kristie M. Davis, CRR, RMR
                           PO Box 20994
22                         Waco, Texas 76702-0994
                           (254) 340-6114
23

24       Proceedings recorded by mechanical stenography,

10:38  25   transcript produced by computer-aided transcription.

2

| | | |
|---|---|---|
| 10:38 | 1 | (Hearing begins.) |
| 02:01 | 2 | DEPUTY CLERK:  A civil action in Case |
| 02:01 | 3 | 6:21-CV-727, The Trustees of Purdue University versus |
| 02:01 | 4 | STMicroelectronics NV.  Case called for a discovery |
| 02:01 | 5 | hearing. |
| 02:01 | 6 | THE COURT:  Mr. Shore, if you'd like to |
| 02:01 | 7 | make announcements for counsel. |
| 02:01 | 8 | MR. SHORE:  Yes, Your Honor.  Michael |
| 02:01 | 9 | Shore for Purdue Research Foundation and Purdue |
| 02:01 | 10 | University.  With me are Raphael Chabaneix and Chris |
| 02:02 | 11 | Hsu in my office.  And I believe joining us on the Zoom |
| 02:02 | 12 | will be two client representatives, Kenneth Waite who |
| 02:02 | 13 | is also the declarant in the declaration that was |
| 02:02 | 14 | provided to the Court, and Brooke Biere, B-i-e-r-e. |
| 02:02 | 15 | THE COURT:  Welcome to them.  Welcome to |
| 02:02 | 16 | you. |
| 02:02 | 17 | Mr. Cohen? |
| 02:02 | 18 | MR. COHEN:  Thank you, Your Honor.  Good |
| 02:02 | 19 | afternoon.  Justin Cohen from Holland & Knight on |
| 02:02 | 20 | behalf of STMicroelectronics, Inc.  With me today is |
| 02:02 | 21 | Bruce Sostek and Dina McKenney, also of Holland & |
| 02:02 | 22 | Knight.  Max Ciccarelli of the Ciccarelli Law Firm, and |
| 02:02 | 23 | also our client representative, Andrew Mayo of -- |
| 02:02 | 24 | in-house counsel for STMicroelectronics, Inc., Your |
| 02:02 | 25 | Honor. |

| | | |
|---|---|---|
| 02:02 | 1 | THE COURT:  Welcome to Mr. Mayo and |
| 02:02 | 2 | everyone else. |
| 02:02 | 3 | And I'm happy to take up these issues. |
| 02:02 | 4 | MR. COHEN:  Well, thank you, Your Honor, |
| 02:02 | 5 | and thank you for making time so quickly today.  We |
| 02:02 | 6 | really appreciate it. |
| 02:02 | 7 | THE COURT:  Well, just remember when |
| 02:02 | 8 | you're doing your Yelp reviews... |
| 02:02 | 9 | (Laughter.) |
| 02:02 | 10 | THE COURT:  Give me five stars.  You |
| 02:02 | 11 | never know how long they're going to keep me here so I |
| 02:02 | 12 | want to keep my score up. |
| 02:03 | 13 | MR. COHEN:  Google, Yelp, Better Homes. |
| 02:03 | 14 | I mean, you got all the reviews from us, Your Honor. |
| 02:03 | 15 | THE COURT:  Okay. |
| 02:03 | 16 | MR. COHEN:  So starting -- what we're |
| 02:03 | 17 | seeking is a motion to compel on a number of |
| 02:03 | 18 | interrogatories, Your Honor. |
| 02:03 | 19 | Starting with Interrogatory No. 1 which |
| 02:03 | 20 | is the Court's standard form interrogatory asking |
| 02:03 | 21 | essentially to identify individuals with relevant |
| 02:03 | 22 | knowledge.  It's straight out of Local Rule |
| 02:03 | 23 | CV 33(b)(1).  Purdue objected, although they're not |
| 02:03 | 24 | allowed to object. |
| 02:03 | 25 | We have a number of issues we've asked |

4

02:03 1 for them to supplement.  They supplemented once, but
02:03 2 unfortunately their response is still deficient in that
02:03 3 no one from Purdue University, the named plaintiff, is
02:03 4 identified.  None of the licensees of these
02:03 5 patents-in-suit are identified.  And none of the
02:03 6 individuals who negotiated the licenses on behalf of
02:03 7 Purdue and Purdue Research Foundation are identified.
02:03 8            So what we're concerned of, Your Honor,
02:03 9 is that we're going to get sandbagged at trial when
02:04 10 Purdue wants to call witnesses that were never
02:04 11 identified in their initial disclosures.  So what we're
02:04 12 asking for is an order to compel them to provide us
02:04 13 their final list within a week, and for the Court to
02:04 14 enter an order that states that they will not be
02:04 15 entitled to call anyone at trial who's not on their
02:04 16 list, absent a showing of good cause.
02:04 17            And, Your Honor, you might recall,
02:04 18 actually Ms. McKinney and I had a case in front of you
02:04 19 about a year ago this issue came up.  And it was
02:04 20 actually this precise issue at pretrial.  Judge Manske
02:04 21 had entered a similar order.  And it was right before
02:04 22 trial the defendant in that case had tried to call
02:04 23 witnesses that were never disclosed on their initial
02:04 24 disclosures or in response to Interrogatory No. 1.
02:04 25            So we're asking for a similar order, Your

| | | |
|---|---|---|
| 02:04 | 1 | Honor. |
| 02:04 | 2 | THE COURT:  Mr. Shore? |
| 02:04 | 3 | MR. SHORE:  First of all, Your Honor, |
| 02:04 | 4 | what he told you about what was disclosed is not true. |
| 02:04 | 5 | We not only disclosed -- we disclosed every single |
| 02:05 | 6 | license agreement that applies to these patents.  So |
| 02:05 | 7 | all the signatories on those license agreements are |
| 02:05 | 8 | sitting right there in front of them.  They have the |
| 02:05 | 9 | signatories, they have their names.  So to the extent |
| 02:05 | 10 | that there are any licenses at all, they have been |
| 02:05 | 11 | produced. |
| 02:05 | 12 | And the signatories on the licenses are |
| 02:05 | 13 | there.  The contact information on the licenses is |
| 02:05 | 14 | there.  The notice provisions on who you notify under |
| 02:05 | 15 | the license are there.  So they have all that |
| 02:05 | 16 | information as far as licensees. |
| 02:05 | 17 | As far as people from Purdue, another |
| 02:05 | 18 | misstatement.  The inventors are listed.  The inventors |
| 02:05 | 19 | were employees of Purdue.  They are the only employees |
| 02:05 | 20 | of Purdue who have any knowledge of anything related to |
| 02:05 | 21 | this, because they are the inventors of the patents. |
| 02:05 | 22 | These patents go back several years.  So there is |
| 02:05 | 23 | nobody else to identify. |
| 02:05 | 24 | As far as the -- I think the other thing |
| 02:05 | 25 | he brought up was they asked in their -- they want |

02:05  1    anybody involved in government research grants.  Our

02:06  2    declaration from Mr. Waite indicates that that is

02:06  3    thousands of people, none of which -- and by the way,

02:06  4    we only -- our record retention policy, which we also

02:06  5    gave them -- only -- we only keep records for five

02:06  6    years.  Now, we have a record hold now, so obviously

02:06  7    nothing else is being destroyed.

02:06  8               But when you ask for everybody related to

02:06  9    the research projects, these are DARPA research

02:06  10   projects funded by the federal government that go on

02:06  11   for a decade, that means every Ph.D. student that came

02:06  12   through.  We'd have to go figure out what Ph.D.

02:06  13   students were there.  Have to go figure out anybody who

02:06  14   touched any of this research, anybody who ever entered

02:06  15   the lab.

02:06  16              It is crazily overly broad, unduly

02:06  17   burdensome, not reasonably calculated to lead to

02:06  18   discovery of admissible evidence.  We've identified the

02:06  19   inventors.

02:06  20              As far as the negotiators of the license,

02:06  21   the only knowledge we have -- there's no one at Purdue

02:06  22   right now that we're aware of who negotiated any

02:07  23   licenses for these patents.  And to the extent there is

02:07  24   anybody at Purdue, it would only be the people who are

02:07  25   listed on the license agreements or on the notice of

7

| | | |
|---|---|---|
| 02:07 | 1 | the license agreements.  So we fully responded to this |
| 02:07 | 2 | interrogatory. |
| 02:07 | 3 | We also refer the response to |
| 02:07 | 4 | Interrogatory No. 3 where there's several more people |
| 02:07 | 5 | listed in response to that interrogatory.  And |
| 02:07 | 6 | obviously we are not going to call anybody at trial who |
| 02:07 | 7 | we do not identify in pretrial disclosures or in |
| 02:07 | 8 | pretrial interrogatory responses or whatever is |
| 02:07 | 9 | required.  I know better.  I've been doing this for |
| 02:07 | 10 | 30 years. |
| 02:07 | 11 | But to the extent that we discover any |
| 02:07 | 12 | additional people, to the extent that we can find any |
| 02:07 | 13 | other people who might be remotely relevant, we'll do |
| 02:07 | 14 | that.  But we think them asking as they have in |
| 02:07 | 15 | their -- in the chart that they sent the Court, for us |
| 02:07 | 16 | to go back and try to figure out over 20 years anybody |
| 02:07 | 17 | who ever entered a lab, anybody who ever did research, |
| 02:08 | 18 | any Ph.D. student, anybody who ever touched anything |
| 02:08 | 19 | related to silicon carbide is grossly overbroad. |
| 02:08 | 20 | And the affidavit, actually, from -- or |
| 02:08 | 21 | the declaration from Mr. Waite outlines that our client |
| 02:08 | 22 | has already spent hundreds of hours responding to the |
| 02:08 | 23 | discovery.  And we think that what -- the burden that |
| 02:08 | 24 | we've gone to and the effort we've gone to is more than |
| 02:08 | 25 | sufficient. |

8

```
02:08   1                    THE COURT:  A response?
02:08   2                    MR. COHEN:  Briefly, Your Honor.
02:08   3                    Just Interrogatory No. 1, again, is the
02:08   4   Court's standard form.  Mr. Waite, who is the
02:08   5   declarant, who's the chief patent counsel at PRF, is
02:08   6   not on Purdue's initial disclosures or stated in a
02:08   7   response to Interrogatory No. 1.
02:08   8                    If Purdue is -- you know, Purdue is
02:08   9   essentially putting us on a little bit of a fishing
02:08  10   expedition to go find all the relevant people, when all
02:08  11   we're asking for is for them to respond to
02:08  12   Interrogatory No. 1, the Court's standard form, and
02:08  13   identify folks.  And then agree not to call anyone that
02:08  14   they don't specifically identify.
02:09  15                    THE COURT:  Mr. Shore, if I could ask
02:09  16   you, it seems to me that it would be in your best
02:09  17   interest to go through and make sure that you -- as of
02:09  18   June 28th, you had identified everyone in a formal
02:09  19   document that you thought was relevant to make sure
02:09  20   that you have a stake in the ground and there wouldn't
02:09  21   be an argument about whether or not you had disclosed
02:09  22   them.  I'm not sure what the pushback is here.
02:09  23                    Now, if it's over-breadth, like they want
02:09  24   everyone whoever touched anything, I'm not asking you
02:09  25   to do that either.  What I'm really trying to do is
```

| | | |
|---|---|---|
| 02:09 | 1 | find out from you why you would not want to protect |
| 02:09 | 2 | yourself by saying, here you go, ST, here's everyone |
| 02:09 | 3 | that we think is relevant at this point.  And we go |
| 02:09 | 4 | from there.  I'm not sure what the problem with that |
| 02:10 | 5 | is. |
| 02:10 | 6 | MR. SHORE:  There's not a problem and |
| 02:10 | 7 | we've done that. |
| 02:10 | 8 | And, by the way, when he brings up the |
| 02:10 | 9 | chief patent counsel's not named, he's only been there |
| 02:10 | 10 | two years.  So he wasn't there for the negotiation of |
| 02:10 | 11 | any of those old -- |
| 02:10 | 12 | THE COURT:  So let me -- I'm sorry to |
| 02:10 | 13 | interrupt you.  So that gentleman is someone you're not |
| 02:10 | 14 | planning to call? |
| 02:10 | 15 | MR. SHORE:  No.  We're not planning to |
| 02:10 | 16 | call him.  And if that changes, we'll supplement way |
| 02:10 | 17 | before the close of fact discovery so they can take his |
| 02:10 | 18 | deposition or do whatever they want to do. |
| 02:10 | 19 | This is a motion to compel of something |
| 02:10 | 20 | that is completely unnecessary.  And, again, I realize |
| 02:10 | 21 | that before the close of fact discovery and before -- |
| 02:10 | 22 | and in addition, they have time to depose anybody they |
| 02:10 | 23 | need to depose.  We have to list whoever we're going to |
| 02:10 | 24 | call at trial or we can't call them at trial.  Of |
| 02:10 | 25 | course.  Absolutely of course. |

| | | |
|---|---|---|
| 02:10 | 1 | But this is the first time they've |
| 02:10 | 2 | limited this to who you want to call at trial, |
| 02:10 | 3 | et cetera.  If you look at their position, they're |
| 02:10 | 4 | asking us for every single person who worked, who was |
| 02:10 | 5 | involved in the government research grants that funded |
| 02:11 | 6 | the research leading to these patents.  That is |
| 02:11 | 7 | thousands of people. |
| 02:11 | 8 | THE COURT:  Mr. Shore, when does |
| 02:11 | 9 | discovery end in this case? |
| 02:11 | 10 | MR. SHORE:  November. |
| 02:11 | 11 | THE COURT:  Okay.  Give me just one |
| 02:11 | 12 | second.  I'll be right back. |
| 02:11 | 13 | (Pause in proceedings.) |
| 02:11 | 14 | THE COURT:  Here's what I'm going to do, |
| 02:11 | 15 | primarily because I've dealt with counsel on both sides |
| 02:11 | 16 | of this case for at least 20 years.  I'm going to set a |
| 02:11 | 17 | deadline of the end of July for both sides to identify |
| 02:12 | 18 | everyone they reasonably anticipate has relevant |
| 02:12 | 19 | knowledge in this case.  So the other side has an |
| 02:12 | 20 | opportunity to take their deposition or do discovery. |
| 02:12 | 21 | And if someone needs to be added after |
| 02:12 | 22 | that point, you can -- after that date, you can discuss |
| 02:12 | 23 | it with each other and decide whether or not that's |
| 02:12 | 24 | okay with the opposing counsel.  If it isn't, you can |
| 02:12 | 25 | come in and show good cause why they should be added. |

| | | |
|---|---|---|
| 02:12 | 1 | But I would obviously recommend you do that as soon as |
| 02:12 | 2 | you're aware they need to be added and not wait until |
| 02:12 | 3 | the pretrial conference. |
| 02:12 | 4 | So what is the next issue up? |
| 02:12 | 5 | MR. COHEN:  Thank you, Your Honor. |
| 02:12 | 6 | We're seeking ab order compelling Purdue |
| 02:12 | 7 | to respond fully to Interrogatory No. 3. |
| 02:12 | 8 | And Interrogatory No. 3 asks Purdue to |
| 02:12 | 9 | provide a narrative answer about the role that the |
| 02:12 | 10 | Purdue Research Foundation, that's a nonparty, has with |
| 02:12 | 11 | respect to the claimed inventions and these asserted |
| 02:12 | 12 | patents. |
| 02:13 | 13 | Now, Purdue's response, Your Honor, is |
| 02:13 | 14 | that PRF is a nonprofit foundation that, among other |
| 02:13 | 15 | things, manages intellectual property owned by the |
| 02:13 | 16 | plaintiff.  And from there Purdue relies on Rule 33(d) |
| 02:13 | 17 | to identify several license agreements for the |
| 02:13 | 18 | patents-in-suit and other patents. |
| 02:13 | 19 | The issue, Your Honor, is that Mr. Shore |
| 02:13 | 20 | has represented to the Court and to us that PRF has a |
| 02:13 | 21 | much more substantial role than what is currently being |
| 02:13 | 22 | disclosed in response to Interrogatory No. 3. |
| 02:13 | 23 | And if I might share my screen and just |
| 02:13 | 24 | share with you two quotes, Your Honor, from an earlier |
| 02:13 | 25 | hearing to explain why we believe we need a more |

| | | |
|---|---|---|
| 02:13 | 1 | fulsome narrative answer. |
| 02:13 | 2 | So this is from a hearing earlier this |
| 02:13 | 3 | year, Your Honor, where Mr. Shore represented that the |
| 02:13 | 4 | Purdue Research Foundation maintains the patent |
| 02:13 | 5 | portfolio, supervises licensing activities, supervises |
| 02:14 | 6 | any litigation activities.  And all this is done as an |
| 02:14 | 7 | arm of the university. |
| 02:14 | 8 | Now, Mr. Shore also said -- and I'm going |
| 02:14 | 9 | to share this next -- make sure I can share the next |
| 02:14 | 10 | one here -- that the key thing here is we have the |
| 02:14 | 11 | Purdue Research Foundation which is running this |
| 02:14 | 12 | litigation, they're controlling the litigation. |
| 02:14 | 13 | So the issue we have here, Your Honor, is |
| 02:14 | 14 | that PRF is not a party to the litigation.  But the |
| 02:14 | 15 | only individuals identified are from the PRF, Purdue |
| 02:14 | 16 | Research Foundation. |
| 02:14 | 17 | It's clear that they have a substantial |
| 02:14 | 18 | role and have had a substantial role.  They were in |
| 02:14 | 19 | charge of prosecuting the patent applications, securing |
| 02:14 | 20 | the funding for the DARPA research licensing |
| 02:14 | 21 | activities, and owned the patents up until just before |
| 02:14 | 22 | Purdue filed suit when the patents were transferred to |
| 02:14 | 23 | the university.  And the university filed suit in its |
| 02:14 | 24 | own name. |
| 02:14 | 25 | We think the jury's entitled to a |

—13—

02:14  1   narrative answer or an explanation more than just a

02:15  2   superfluous kind of statement in Rule 33(d).  In

02:15  3   particular, we don't think Rule 33(d) is appropriate.

02:15  4            Mr. Shore is -- Purdue is clearly able to

02:15  5   provide a rather simplistic narrative answer about the

02:15  6   Purdue Research Foundation's role.  And we believe

02:15  7   we're entitled to that answer.

02:15  8            MR. SHORE:  I'm sorry.

02:15  9            THE COURT:  Please, Mr. Shore.

02:15  10           MR. SHORE:  We actually referred them to

02:15  11  the website which explains exactly what the Purdue

02:15  12  Research Foundation does.  It's actually -- we have

02:15  13  referred them to the website that says it's

02:15  14  prf.org/about it tells the story of what the Purdue

02:15  15  Research Foundation does and why it does it.

02:15  16           We also did not just say Rule 33.  We

02:15  17  gave them references to specific Bates numbers that

02:15  18  also explained the role of PRF.  It's not -- it's not

02:15  19  unduly burdensome for them to simply go read the

02:16  20  material.

02:16  21           There's also a statute that creates PRF

02:16  22  or some sort of a regulation.  We've referred them to

02:16  23  that.  I mean, I have no idea -- I guess what they're

02:16  24  saying is they don't want us to use Rule 33(d) even

02:16  25  though we gave them specific Bates numbers.  We gave

—14—

02:16   1   them a website that explains exactly what the Purdue

02:16   2   Research Foundation does.

02:16   3              And the other kind of strange thing about

02:16   4   this is, you know, there's nothing else to tell them.

02:16   5   I mean, I could, I guess, print out the website for

02:16   6   them and cut and paste it into the -- into the answer.

02:16   7   But, I mean, again, this is -- they got every single

02:16   8   thing they asked for and more.  And there's nothing

02:16   9   else that we can add.

02:16  10              And by the way, they can take the

02:16  11   deposition of Kenneth Waite, or they can take the

02:16  12   deposition of Brooke Biere and they can expound upon it

02:16  13   and ask questions, but, you know, it's not up to us to

02:16  14   go and in interrogatory response to basically try to,

02:17  15   you know, figure out what deposition questions they

02:17  16   might ask and go ahead and do this.

02:17  17              They have more than enough to prepare to

02:17  18   take any deposition they want.  They have more than

02:17  19   enough to understand what the Purdue Research

02:17  20   Foundation does.  So I don't even understand why this

02:17  21   is an issue.

02:17  22              THE COURT:  Mr. Cohen?

02:17  23              MR. COHEN:  Briefly, Your Honor.

02:17  24              The interrogatory doesn't ask broadly for

02:17  25   everything that the Purdue Research Foundation does

| | | |
|---|---|---|
| 02:17 | 1 | generally.  It asks specifically for PRF's role with |
| 02:17 | 2 | respect to the patents-in-suit, and for the history of |
| 02:17 | 3 | the inventions and the patents-in-suit. |
| 02:17 | 4 | Mr. Shore, you know, has represented that |
| 02:17 | 5 | PRF is running this litigation, has been responsible |
| 02:17 | 6 | for licensing the patents-in-suit, we believe is |
| 02:17 | 7 | currently responsible for licensing the |
| 02:17 | 8 | patents-in-suit. |
| 02:17 | 9 | And before we take a deposition of PRF, |
| 02:17 | 10 | we believe we're entitled to what is essentially a |
| 02:17 | 11 | brief narrative answer explaining their role with |
| 02:17 | 12 | respect to the patents-in-suit so that we can be |
| 02:17 | 13 | prepared for that deposition. |
| 02:17 | 14 | And the documents that are cited are |
| 02:18 | 15 | more -- typically more general, except for a few of the |
| 02:18 | 16 | license agreements for the patents-in-suit themselves. |
| 02:18 | 17 | MR. SHORE:  Let me jump in there real |
| 02:18 | 18 | quick, Your Honor. |
| 02:18 | 19 | One of the questions is the preparation |
| 02:18 | 20 | and prosecution of the applications leading to the |
| 02:18 | 21 | patent.  That's all privileged, and that's all on our |
| 02:18 | 22 | privilege log.  We also gave them a 28-page |
| 02:18 | 23 | single-spaced privilege log that lists all the |
| 02:18 | 24 | communications on it related to the prosecution of the |
| 02:18 | 25 | patent, all the communications. |

02:18   1          So every single thing that the Purdue

02:18   2   Research Foundation does related to prosecuting the

02:18   3   applications that lead to the patent, it's all

02:18   4   privileged and it's all been logged.  So there's

02:18   5   nothing else we can give them.

02:18   6          And as far as -- I think the other thing

02:18   7   they asked for is PRF's role in regarding obtaining

02:18   8   funding for research.  That's 20 years ago.  There are

02:18   9   no documents.  There's no one at Purdue who still works

02:18   10  there who had anything to do with this DARPA research

02:18   11  grant.

02:18   12          They've got everything we have.  We don't

02:18   13  have any more to give them.  There is nothing else we

02:19   14  can give them.

02:19   15          And if they can't prepare for a

02:19   16  deposition based upon the disclosures that they have,

02:19   17  which, by the way, is about specifically identified 100

02:19   18  or more documents that specifically, by Bates number,

02:19   19  are identified, then I can't help them.  I mean, I

02:19   20  could take a deposition on this blindfolded.

02:19   21          THE COURT:  Mr. Cohen, anything else?

02:19   22          MR. COHEN:  Just briefly, Your Honor.

02:19   23          Again, we're not asking for some

02:19   24  in-depth, you know, dissertation about what PRF does

02:19   25  globally.  We're just asking for a narrative answer

02:19   1    about their role with these specific patents.

02:19   2                    It's not privileged to say that PRF was

02:19   3    responsible for patent prosecution.  It's not

02:19   4    burdensome to say they were responsible for obtaining

02:19   5    the funding.  We just believe we're entitled to that

02:19   6    narrative answer.

02:19   7                    MR. SHORE:  But they're not responsible

02:19   8    for obtaining the funding.  I mean, it's just --

02:19   9                    THE COURT:  Okay.  Thank you.

02:19   10                   (Pause in proceedings.)

02:20   11                   THE COURT:  At this point I'm just -- I'm

02:20   12   going to take Mr. Shore at his word and ST can take

02:20   13   initial depos, corporate representative, or whatever.

02:20   14                   If for some reason ST's counsel finds

02:20   15   that that is inadequate and that they need more

02:20   16   information from Mr. Shore, and between discussions of

02:20   17   counsel you guys can't work out the production of

02:20   18   additional information that Mr. Shore thinks is

02:20   19   appropriate, just come back to me after the deposition

02:21   20   and we'll go from there.

02:21   21                   Mr. Cohen, what's next?

02:21   22                   MR. COHEN:  Interrogatories No. 4 and 5

02:21   23   go to marking, Your Honor.  And specifically

02:21   24   Interrogatory No. 4 asks the plaintiff to identify any

02:21   25   product that has been made according to these patents.

02:21  1          Now, we understand there are license

02:21  2  agreements that were contemplated commercializing the

02:21  3  claimed technology.  In addition, we believe that there

02:21  4  were prototypes made in Dr. Cooper's research lab.

02:21  5          And we believe that Purdue has an

02:21  6  obligation to identify those, or to take a position

02:21  7  that no products have ever been made according to the

02:21  8  asserted claims of the patents-in-suit.

02:21  9          But the answer right now, Your Honor,

02:21  10  simply states that plaintiff, the Purdue research -- or

02:21  11  Purdue University, does not currently contend that

02:21  12  Purdue makes, uses, sells or offers to sell any

02:21  13  products made using the asserted patents.

02:21  14          But that's not really the question,

02:21  15  again, Your Honor.  We just need Purdue to take a

02:21  16  position.  Have there been products made according to

02:22  17  these patents or not?  And to state that.

02:22  18          MR. SHORE:  Your Honor, I feel like I'm

02:22  19  playing Whack-A-Mole.  This is the first time I've ever

02:22  20  heard in all of our discussions that they are looking

02:22  21  for prototypes that were made in a laboratory 20 years

02:22  22  ago.  Never heard that.

02:22  23          It's not in their chart.  They've never

02:22  24  said that to me.  They never e-mailed that to me.  This

02:22  25  is the first time I ever been asked for it.  So I

—19—

02:22   1   haven't asked my client whether they have prototypes

02:22   2   from 20 years ago, because I've never been asked for

02:22   3   it.  But I will.  I'll go ask.

02:22   4            And then they said identify each product

02:22   5   we contend.  We don't --

02:22   6             THE COURT:  Mr. Shore, one second.  My

02:22   7   clerk tells me that it is on the chart of things to

02:22   8   discuss.  So why don't you take a quick look and see if

02:22   9   you can find it?

02:22  10             MR. SHORE:  I apologize.  I didn't

02:22  11   realize -- I guess I didn't realize it was prototypes

02:22  12   by us -- or by Purdue.  Because a prototype is

02:22  13   something that you're doing to sell commercially.

02:22  14   Apologies.

02:22  15            So but anyway, if there are any

02:23  16   prototypes, or whatever you want to call it, from

02:23  17   20 years ago and we can find them, we'll try to find

02:23  18   them.  But I wouldn't hold out any hope for that from

02:23  19   20 years ago.

02:23  20            But otherwise we are not a commercial

02:23  21   entity.  We don't mark because we don't make anything.

02:23  22   Every single -- and we listed and went to a great deal

02:23  23   of trouble --

02:23  24             THE COURT:  Hold on one second.

02:23  25            (Pause in proceedings.)

| | | |
|---|---|---|
| 02:23 | 1 | THE COURT:  Mr. Shore, what I heard you |
| 02:23 | 2 | say but you may not have meant to say, so I want to be |
| 02:23 | 3 | clear, is that you're representing on behalf of your -- |
| 02:23 | 4 | the plaintiff here, that y'all haven't marked anything. |
| 02:23 | 5 | Is that your position? |
| 02:23 | 6 | MR. SHORE:  We don't make anything, so we |
| 02:24 | 7 | don't mark anything. |
| 02:24 | 8 | THE COURT:  So -- |
| 02:24 | 9 | MR. SHORE:  And my colleague has told me |
| 02:24 | 10 | that we did ask and they did look for prototypes from |
| 02:24 | 11 | the lab from 20 years ago, and there are none.  So -- |
| 02:24 | 12 | THE COURT:  Okay.  I got it. |
| 02:24 | 13 | Mr. Cohen, what is it -- I'm at a loss as |
| 02:24 | 14 | to what it is you want, having heard that |
| 02:24 | 15 | representation. |
| 02:24 | 16 | MR. COHEN:  Just a supplemental response |
| 02:24 | 17 | stating in response to Interrogatory No. 4, nothing has |
| 02:24 | 18 | ever been made as far as they know. |
| 02:24 | 19 | THE COURT:  Well, I think you just heard |
| 02:24 | 20 | Mr. Shore say that. |
| 02:24 | 21 | MR. SHORE:  That's not what I said at |
| 02:24 | 22 | all.  And that's not what the interrogatory requests. |
| 02:24 | 23 | The interrogatory requests to identify each product |
| 02:24 | 24 | that we contend has been made. |
| 02:24 | 25 | THE COURT:  And I think you just told me |

02:24  1   no products have been made.  Prototypes maybe, but no

02:24  2   product.

02:24  3                   MR. SHORE:  Right.  Prototypes maybe, but

02:24  4   no product.  And we don't have any prototypes.  And,

02:24  5   again, they don't keep records for 20 years.  They

02:24  6   keep -- there's a five-year record retention policy,

02:24  7   both at the university and the research foundation.

02:25  8                   And we've asked Professor Cooper also

02:25  9   about whether he has any prototypes remaining.  And he

02:25  10  doesn't.  So this has been done.  And we kind of went

02:25  11  beyond the call of duty here.  We not only gave them

02:25  12  every single product that we've accused in this case,

02:25  13  we gave them every single product we accused in

02:25  14  companion litigation in North Carolina against

02:25  15  Wolfspeed.  So I don't know -- there's not anything

02:25  16  else we can do.

02:25  17                   THE COURT:  Okay.  Mr. Cohen, anything

02:25  18  else?

02:25  19                   MR. COHEN:  Yes, Your Honor.

02:25  20                   They have several license agreements

02:25  21  with -- that have contemplated commercializing the

02:25  22  claimed technology.  It's unclear to us if those

02:25  23  licensees had ever made a product according the claims.

02:25  24                   So we believe we're entitled to an answer

02:25  25  as to whether or not those people have.  And if so,

02:25  1   what did Purdue do to ensure compliance with the

02:25  2   marking statute?

02:25  3                THE COURT:  Is that what your

02:25  4   interrogatory asks?  Is for the -- for licensees who

02:25  5   have done marking?

02:25  6                MR. COHEN:  Correct, Your Honor.  For Rog

02:25  7   No. 4, and then further for Rog No. 5 it asks for

02:25  8   Purdue to explain how they've complied with the marking

02:26  9   statute.  And in our dispute chart we specifically

02:26  10  identify the fact that there are several licensees that

02:26  11  have had an obligation to commercialize these patented

02:26  12  inventions.

02:26  13                MR. SHORE:  That's not true.  That's just

02:26  14  not true.  There have been no royalties paid to Purdue

02:26  15  on these patents.  There's one license agreement, I

02:26  16  think, from 19 years ago that -- before silicon carbide

02:26  17  even existed in the marketplace.  It was with a company

02:26  18  called Cree which is now called Wolfspeed.

02:26  19                They never commercialized the product.

02:26  20  They never made a product.  They licensed -- the

02:26  21  patents expired before Cree ever came out with a

02:26  22  silicon carbide product.

02:26  23                THE COURT:  Mr. Shore, I'm not certain

02:26  24  why, then, a response to their interrogatory would be

02:26  25  "there are none."

02:26  1              MR. SHORE:  Well, no.  What we said in

02:26  2   our answer was we do not currently contend that we --

02:26  3   we don't make anything.  And we're not aware of anyone

02:26  4   else -- we're not aware of any past licensee that ever

02:27  5   made anything.

02:27  6              THE COURT:  Mr. Cohen, with that

02:27  7   statement by the plaintiff, why are you concerned?

02:27  8              MR. COHEN:  If that's the statement, we

02:27  9   haven't heard, Your Honor.  That if plaintiff is not

02:27  10  aware of their licensees ever making a product

02:27  11  according to the claims, that's the representation we

02:27  12  were looking for.

02:27  13             THE COURT:  That's what I heard Mr. Shore

02:27  14  say, so I think we can move on to the next discovery

02:27  15  issue.

02:27  16             MR. COHEN:  Thank you, Your Honor.

02:27  17             So the next, we're talking about licenses

02:27  18  and licensing revenue.

02:27  19             And I'm -- specifically Rog No. 10 asks

02:27  20  for Purdue to identify licensing offers for the

02:27  21  patents-in-suit.  We're aware that --

02:27  22             THE COURT:  I lost you there in the

02:27  23  sense, when you say licensing offers, what direction

02:27  24  are you going in?

02:27  25             MR. COHEN:  For Purdue offering a license

| | | |
|---|---|---|
| 02:27 | 1 | to the patents-in-suit. |
| 02:27 | 2 | THE COURT:  Okay.  Got it. |
| 02:27 | 3 | MR. COHEN:  So, again, we're aware of |
| 02:27 | 4 | several license agreements that were actually, you |
| 02:28 | 5 | know, executed. |
| 02:28 | 6 | We're also aware that Mr. Shore has told |
| 02:28 | 7 | us they have an executed term sheet with the third |
| 02:28 | 8 | party and also several licensing offers to the |
| 02:28 | 9 | patents-in-suit that have been made recently.  We |
| 02:28 | 10 | believe we're entitled to a narrative answer that lists |
| 02:28 | 11 | out those licensing offers for the patents-in-suit. |
| 02:28 | 12 | Similarly they've made offers to us.  I |
| 02:28 | 13 | believe they've made offers to Cree/Wolfspeed who's a |
| 02:28 | 14 | defendant in North Carolina.  But we believe we're |
| 02:28 | 15 | entitled to an answer, as that could be relevant for |
| 02:28 | 16 | damages.  Particularly if they're going to be |
| 02:28 | 17 | producing, you know, recently executed sort of |
| 02:28 | 18 | litigation-driven license agreements. |
| 02:28 | 19 | MR. SHORE:  I honestly don't know what |
| 02:28 | 20 | he's talking about.  We gave them -- there's no one at |
| 02:28 | 21 | Purdue or the Purdue Research Foundation that |
| 02:28 | 22 | negotiated any past licenses that he's talking about. |
| 02:28 | 23 | We produced all the e-mails related to the |
| 02:28 | 24 | negotiations.  We produced the license agreements |
| 02:28 | 25 | related to the negotiations.  We produced everything |

02:28   1    related to the negotiations for any license agreement

02:28   2    that exists that we have.  Everything.

02:29   3            And we can't -- we can't give a narrative

02:29   4    response beyond the documents because no one is there

02:29   5    now who was there at the time who did any of the

02:29   6    negotiation.  And we don't know who did it at the time,

02:29   7    other than the people who signed the license

02:29   8    agreements, which we have provided them.

02:29   9            So I have no idea what he wants.

02:29  10            Now, as far as him saying that he wants

02:29  11    to get into and see our negotiations with an ongoing

02:29  12    negotiation with a current defendant in another case,

02:29  13    I've never even heard of that.  That gets into -- that

02:29  14    could get into all kind of mischief.

02:29  15            If we get a signed license agreement, I

02:29  16    have no problem giving them the signed license

02:29  17    agreement and the negotiations leading up to it.  But

02:29  18    to give them basically a window into our licensing

02:29  19    negotiations with another third party before there's a

02:29  20    license agreement so they can, what?  Go and send

02:29  21    subpoenas to them or something like that to interfere

02:29  22    in the negotiation?  That -- I've never even heard of

02:30  23    that being allowed.

02:30  24            THE COURT:  Response?

02:30  25            MR. COHEN:  Your Honor, Mr. Shore's told

| | |
|---|---|
| 02:30 | 1 |
| 02:30 | 2 |
| 02:30 | 3 |
| 02:30 | 4 |

02:30   1    us there is an executed term sheet with a third party.

02:30   2    That term sheet hasn't been produced, nor has there

02:30   3    been a discussion or a disclosure of what those

02:30   4    licensing offers were.

02:30   5              We're aware that there were additional

02:30   6    licensing discussions pre-suit that to the extent

02:30   7    Purdue or PRF is aware of what those offers were to

02:30   8    license these patents-in-suit.  We think we're entitled

02:30   9    to a response.

02:30   10             But in terms of mischief, I'm not aware

02:30   11   of how that would cause any mischief, Your Honor.

02:30   12   Mr. Shore, I believe, has basically told us he's

02:30   13   offered Cree similar licensing deals that he's offered

02:30   14   ST in this case.  So disclosure wouldn't really be much

02:30   15   of a surprise.

02:30   16             It's just a matter that we believe that

02:30   17   we're entitled to see the offers for license agreements

02:30   18   to license these patents-in-suit past and present.

02:30   19             MR. SHORE:  Here's the problem, Your

02:31   20   Honor.  We are deep in negotiations with the third

02:31   21   party who we are not suing.  There's a signed term

02:31   22   sheet and we are exchanging drafts of a license

02:31   23   agreement.  If they were to get ahold of that

02:31   24   information, there would be nothing to stop them from

02:31   25   contacting or sending a subpoena to this third party

02:31   1   and trying to interfere in our ability to get the

02:31   2   license done.  Because that license is at a 3 percent

02:31   3   royalty rate, and it would establish --

02:31   4                   THE COURT:  When do you anticipate the

02:31   5   license being done?

02:31   6                   MR. SHORE:  It'll be done, I believe, by

02:31   7   the end of July.  Maybe sooner.  But whenever it's

02:31   8   done, we'll turn over everything.  But the risk of

02:31   9   them, you know, going in there and interfering with

02:31   10  that to block that precedent from --

02:31   11                  THE COURT:  I got it.  I got it.  When

02:31   12  the license is done, you'll produce it to them under

02:31   13  the protective order.

02:31   14                  MR. SHORE:  Absolutely.

02:31   15                  THE COURT:  Mr. Cohen, what else is it

02:31   16  that you wanted?

02:31   17                  MR. COHEN:  Yeah.  So if we can move on

02:31   18  to No. -- Rog No. 14 is to -- we're asking for license

02:32   19  agreements.  And in particular, what Mr. Shore has

02:32   20  represented, is there was an old license agreement with

02:32   21  Cree that I believe was at a substantially lower rate

02:32   22  of .33 percent.  That license agreement has not been

02:32   23  produced.

02:32   24                  We believe we're entitled to see Purdue

02:32   25  and PRF's licenses for semiconductor technology more

02:32   1    broadly.  In the dispute chart what Purdue has

02:32   2    represented is that they don't believe those license

02:32   3    agreements are technologically comparable which we

02:32   4    believe is putting the cart before the horse.  It

02:32   5    should be that we see the license agreements, take a

02:32   6    look at the patents and our experts can determine or

02:32   7    possibly have a dispute later on whether or not they're

02:32   8    technologically comparable.

02:32   9           We don't believe there's that many

02:32   10   license agreements that this would be overly

02:32   11   burdensome.  There is no objection about technical

02:32   12   comparability in their interrogatory responses.  We

02:32   13   believe that objection would be waived at this point

02:32   14   because it wasn't made.

02:32   15          But again, Your Honor, I think it's

02:32   16   really putting the cart before the horse.  We'd like an

02:33   17   identification and then a disclosure of all the license

02:33   18   agreements for semiconductor technology broadly,

02:33   19   starting with the old Cree agreements that Mr. Shore

02:33   20   has represented did exist, or do exist.

02:33   21          MR. SHORE:  First, the Cree agreement is

02:33   22   19 years ago.  It's not the same patents.  It is a

02:33   23   similar technology, but it's not the same technology

02:33   24   and it's 19 years ago.  We do not have a copy.

02:33   25          Cree, I believe, does have a copy.

02:33   1   Because as we were talking to Cree, they raised that

02:33   2   up.  So if they want to go get it from Cree, they can

02:33   3   go get it from Cree.  But we don't retain records from

02:33   4   19 years ago --

02:33   5                    THE COURT:  I got it.  I got it.  You

02:33   6   don't have it.  I got it.

02:33   7                    MR. SHORE:  We don't have it.

02:33   8                    As far as when he says semiconductor

02:33   9   technology, that is incredibly broad.  That is -- and I

02:33   10  think Mr. Waite's declaration talks about that.

02:33   11  There's semiconductive contact lenses.

02:33   12                    So what we said is, this is a silicon

02:33   13  carbide case.  We will search for and produce every

02:34   14  single silicon carbide MOSFET, IGBT, any type of

02:34   15  silicon carbide power device.  We will -- we will

02:34   16  locate any of them that we can find we will produce

02:34   17  them.

02:34   18                    But to go back in non-computerized

02:34   19  records and ask for anything related to a semiconductor

02:34   20  across a campus where there's been 118,000 engineering

02:34   21  graduates in the period of which they're asking for,

02:34   22  that is way beyond overbroad.  That is -- I mean, it

02:34   23  would be like me saying, okay, well, you know, give me

02:34   24  every single semiconductor document that ST has.

02:34   25  That's the equivalent of what they're asking for.

02:34   1              But what we will -- what we have given

02:34   2    them and what we will continue to search for and give

02:34   3    them, if they need it, is anything related to silicon

02:34   4    carbide power devices which is what this case is about.

02:34   5              And as far as waiving an objection, we

02:34   6    objected to relevance.  So if it's not technically

02:35   7    incompatible, it's not relevant.  And it's not

02:35   8    relevant.

02:35   9              So anything related to silicon carbide

02:35  10    power devices, we will give them, we will search for

02:35  11    them, or we will let them know that we've exhausted all

02:35  12    efforts, which we believe we have.

02:35  13              MR. COHEN:  So if I may, Your Honor?

02:35  14              THE COURT:  Sure.

02:35  15              MR. COHEN:  Yeah.  Starting with

02:35  16    Interrogatory No. 4 asks Purdue to identify license

02:35  17    agreements.  The Cree agreement was not identified.  So

02:35  18    whether they have a copy or not is irrelevant.  They

02:35  19    knew that it existed and so they had an obligation to

02:35  20    identify it and they didn't.  And that's part of the

02:35  21    problem.

02:35  22              The next problem is Purdue, you know,

02:35  23    narrowing the scope of what they view as relevant

02:35  24    technology, comparable technology, to what they view is

02:35  25    silicon carbide, you know, powered semiconductor

02:35   1    technology.

02:35   2                    We believe that discovery should enable

02:35   3    us to look at the license agreements that they have for

02:35   4    other semiconductor technologies and make our own

02:35   5    determination if we believe it's technologically

02:35   6    comparable.

02:35   7                    Nothing in Mr. Waite's declaration and

02:35   8    nothing Mr. Shore has told us says that it's overly

02:36   9    burdensome for them to look at their license

02:36   10   agreements.  We're not talking about all documents for

02:36   11   all semiconductor research.  We're just talking about

02:36   12   semiconductor technology license agreements.  Produce

02:36   13   them all and then we can have a discussion or dispute

02:36   14   about technical comparability later.

02:36   15                    MR. SHORE:  Your Honor, again,

02:36   16   Whack-A-Mole.  In their dispute chart they say silicon

02:36   17   carbide.  And now he says any semiconductor.  So again,

02:36   18   it's way overbroad and it's not even -- it's not even

02:36   19   what he has in his dispute chart.

02:36   20                    Now he wants all semiconductor

02:36   21   technology.  You're talking about thousands of hours to

02:36   22   go back and try to find this stuff.  And it's not

02:36   23   relevant.

02:36   24                    And it's up to them to demonstrate

02:36   25   relevance in their discovery request.  And their own

| | | |
|---|---|---|
| 02:36 | 1 | chart says it's silicon carbide.  It doesn't say all |
| 02:36 | 2 | semiconductors. |
| 02:36 | 3 | MR. COHEN:  Yes, Your Honor.  We tried to |
| 02:36 | 4 | narrow it to silicon carbide.  It's clear that we need |
| 02:36 | 5 | to go beyond simply silicon carbide.  We need to see |
| 02:37 | 6 | their license agreements. |
| 02:37 | 7 | I don't know how many that is.  I don't |
| 02:37 | 8 | believe it can be that many.  Nor do I believe it could |
| 02:37 | 9 | be that burdensome to review and produce license |
| 02:37 | 10 | agreements for semiconductor technology. |
| 02:37 | 11 | MR. SHORE:  And, again, to understand |
| 02:37 | 12 | what semiconductive means, any material that is |
| 02:37 | 13 | semiconductive.  It doesn't mean a chip.  It means any |
| 02:37 | 14 | material that's semiconductive.  It can be a material, |
| 02:37 | 15 | some kind of material that's been invented. |
| 02:37 | 16 | So if we're going to do it at all, it |
| 02:37 | 17 | should be limited to the technology at issue in the |
| 02:37 | 18 | case which is silicon carbide powered semiconductors. |
| 02:37 | 19 | And we're happy to do it.  We've already done it. |
| 02:37 | 20 | THE COURT:  Anything else? |
| 02:37 | 21 | MR. COHEN:  Nothing from me, Your Honor. |
| 02:37 | 22 | (Pause in proceedings.) |
| 02:39 | 23 | THE COURT:  Mr. Cohen, have you all -- by |
| 02:39 | 24 | you all, I mean you and Mr. Shore -- had a discussion |
| 02:39 | 25 | with respect to what you think what you together |

| | | |
|---|---|---|
| 02:39 | 1 | believe the comparable licenses are that ST is going to |
| 02:40 | 2 | produce? |
| 02:40 | 3 | MR. COHEN:  No.  Not yet, Your Honor. |
| 02:40 | 4 | THE COURT:  Okay.  Well, it seems to me |
| 02:40 | 5 | that that's what ought to happen. |
| 02:40 | 6 | Whatever you want -- you know, maybe -- |
| 02:40 | 7 | I'm trying to think of some analogy that's not awful -- |
| 02:40 | 8 | but I'm thinking of a cage with, you know, small |
| 02:40 | 9 | animals in it. |
| 02:40 | 10 | If you all, whatever -- as greedy as |
| 02:40 | 11 | Mr. Shore wants to be and what he's expecting from you, |
| 02:40 | 12 | he's going to know that he's going to be under the same |
| 02:40 | 13 | obligation.  However greedy you want to be from him, |
| 02:40 | 14 | ST's going to be under the same obligation. |
| 02:40 | 15 | Why don't we start with that?  And if |
| 02:40 | 16 | that fails to resolve the argument, then come back to |
| 02:40 | 17 | me and I'll get involved again. |
| 02:40 | 18 | Mr. Cohen, what is your next issue? |
| 02:40 | 19 | MR. COHEN:  The final issue today, Your |
| 02:40 | 20 | Honor, was Interrogatory No. 12, where we had asked for |
| 02:41 | 21 | Purdue to describe their revenue from licensing |
| 02:41 | 22 | semiconductor technology.  Or we tried to narrow it to |
| 02:41 | 23 | just silicon carbide technology. |
| 02:41 | 24 | So just in reference, Your Honor, to give |
| 02:41 | 25 | you some context here, our expectation is that Purdue's |

02:41  1    going to come to the Court and ask the jury for more

02:41  2    money that Purdue and PRF have probably ever licensed

02:41  3    any technology ever, and possibly more than their

02:41  4    entire licensing program for the last few years.

02:41  5            We believe we are entitled to put that

02:41  6    into some context.  And, in particular, to show their

02:41  7    licensing revenue for silicon carbide technology since

02:41  8    the year 2000.

02:41  9            I mean, my understanding from Michael

02:41  10   Shore is that that is minimal to none.  And so if

02:41  11   that's the case, we're entitled to see an answer that

02:41  12   says that their licensing revenue from silicon carbide

02:41  13   is minimal to none.

02:41  14           MR. SHORE:  Wow.  So I -- it's hard to

02:41  15   even respond to that.  So I can't imagine the Court

02:42  16   admitting into evidence that they shouldn't be

02:42  17   reasonably compensated -- somebody shouldn't be

02:42  18   reasonably compensated for the invention before the

02:42  19   Court because they didn't get money for other unrelated

02:42  20   inventions in the past.  That just is mind boggling.

02:42  21           But they're asking for everything back to

02:42  22   2000.  There wasn't even a commercially available sold

02:42  23   silicon carbide power device until 2011.  They're

02:42  24   asking for information that goes back more than a

02:42  25   decade before any device at issue in this case even

02:42  1  existed.

02:42  2          We are happy to give them any revenue --

02:42  3  and we have -- given them a record of any revenue

02:42  4  related to silicon carbide MOSFET technology.  And the

02:42  5  reason why there is no revenue -- or I don't believe

02:42  6  there's any revenue or it's scant revenue -- is because

02:42  7  that's why we're suing everybody who makes silicon

02:42  8  carbide MOSFETs, because they're not paying royalties.

02:42  9          So, again, if they want -- I guess this

02:42  10  is the goose and gander again.  If they want to give

02:42  11  us -- but I don't want it.  I don't want all of their

02:43  12  license agreements and all the royalties they've paid

02:43  13  for the last 20 years on unrelated technology.  I don't

02:43  14  want that.  Because it's not relevant.  It'll never get

02:43  15  into evidence.  It has nothing to do with the case.

02:43  16          But silicon carbide power semiconductor

02:43  17  technology is the technology here.  To the extent that

02:43  18  we have any licenses or obtained any licenses, we will

02:43  19  absolutely give them an accounting of those licenses

02:43  20  which we have.

02:43  21          And if there's any revenue that's been

02:43  22  derived from those licenses, I don't know that the

02:43  23  actual revenue matters as much as the royalty rate and

02:43  24  the terms of the license.  Because when you do a

02:43  25  Georgia-Pacific analysis, it's not -- you don't look at

—36—

| | | |
|--|--|--|
| 02:43 | 1 | how much revenue was done.  You look at what are the |
| 02:43 | 2 | terms of the license. |
| 02:43 | 3 | And if the terms of the license for one |
| 02:43 | 4 | company ends up being $100,000 in revenue and the exact |
| 02:43 | 5 | same terms for another company ends up being |
| 02:43 | 6 | $50 million in revenue, that doesn't matter.  Because |
| 02:43 | 7 | the license is executed and the terms of the license |
| 02:43 | 8 | are what's key. |
| 02:43 | 9 | So, again, we'll give them anything |
| 02:44 | 10 | related to silicon carbide power semiconductor |
| 02:44 | 11 | technology.  That's what we're -- that's what we will |
| 02:44 | 12 | agree to only ask them for, their own license |
| 02:44 | 13 | agreements or contracts or other things related to |
| 02:44 | 14 | silicon carbide MOSFETs.  That's all -- that's what the |
| 02:44 | 15 | case is about. |
| 02:44 | 16 | And I don't have any idea -- I have no |
| 02:44 | 17 | idea why they want to expand this to a universe that |
| 02:44 | 18 | has nothing to do with the case, that will never get in |
| 02:44 | 19 | front of the jury, that'll never be part of an expert |
| 02:44 | 20 | report, because it's completely irrelevant. |
| 02:44 | 21 | THE COURT:  Mr. Cohen? |
| 02:44 | 22 | MR. COHEN:  Yes, Your Honor.  I believe |
| 02:44 | 23 | Purdue and PRF's model for licensing in the past is |
| 02:44 | 24 | very relevant and is going to come up again and again. |
| 02:44 | 25 | I see Mr. Shore doesn't want us to get into licensing |

02:44    1    revenue and what people have actually paid.

02:44    2                    But, again, I think we're entitled for

02:44    3    this interrogatory as a response.  It's limited to

02:44    4    silicon carbide.  But as Mr. Shore -- it appears to

02:44    5    kind of keep shifting the definition of its silicon

02:44    6    carbide power devices or silicon carbide power MOSFET

02:45    7    devices.

02:45    8                    We would like a response that identifies

02:45    9    their licensing revenue, discrete from their total

02:45   10    licensing revenue which is public, on what is silicon

02:45   11    carbide technology.  Or at least with an explanation of

02:45   12    what Mr. Shore is going to limit that to, so that we

02:45   13    have an answer on what it is they've licensed for this

02:45   14    technology for these agreements related to silicon

02:45   15    carbide.

02:45   16                    MR. SHORE:  Your Honor, silicon carbide

02:45   17    is a element, or it's a compound.  It appears in many

02:45   18    hundreds, if not thousands, of things other than

02:45   19    semiconductors.  So what they're asking for is

02:45   20    completely unrelated items, unrelated products,

02:45   21    unrelated technologies that have not even anything to

02:45   22    do with semiconductors.  They want everything to do

02:45   23    with silicon carbide.  That's like asking for

02:45   24    everything related to oxygen.  It's ridiculous.

02:45   25                    We will give them and have given them

| | | |
|---|---|---|
| 02:45 | 1 | everything related to the technology at issue.  Silicon |
| 02:45 | 2 | carbide power MOSFETs, silicon carbide IGBTs, silicon |
| 02:46 | 3 | carbide -- any kind of FET, any kind of power device, |
| 02:46 | 4 | anything related to power devices that are made of |
| 02:46 | 5 | silicon carbide we're happy to give them.  And that's |
| 02:46 | 6 | all we're going to ask for from them because that's all |
| 02:46 | 7 | that's relevant. |
| 02:46 | 8 | THE COURT:  Anything else, Mr. Cohen? |
| 02:46 | 9 | MR. COHEN:  No, Your Honor.  Just that we |
| 02:46 | 10 | would like, like I said, a narrative answer about their |
| 02:46 | 11 | licensing revenue for silicon carbide power devices, if |
| 02:46 | 12 | that's what Mr. Shore's willing to agree to. |
| 02:46 | 13 | THE COURT:  Mr. Shore? |
| 02:46 | 14 | MR. SHORE:  I tell you what, if they give |
| 02:46 | 15 | me a narrative answer for all of my financial questions |
| 02:46 | 16 | instead of referring me to documents, absolutely. |
| 02:46 | 17 | Yeah.  Let's do goose and gander on that too. |
| 02:46 | 18 | Because they haven't produced -- they |
| 02:46 | 19 | produced nothing.  And guess we'll be here in a couple |
| 02:46 | 20 | weeks, we're still working out with them. |
| 02:46 | 21 | But if what he's saying is that any |
| 02:46 | 22 | question about financial results, financial reporting, |
| 02:46 | 23 | anything like that has to the be in narrative response, |
| 02:46 | 24 | okay.  Let's do it for both sides. |
| 02:46 | 25 | THE COURT:  Okay.  I'll be back in a few |

| | |
|---|---|
| 02:46 | 1 |
| 02:46 | 2 |
| 02:54 | 3 |
| 02:54 | 4 |
| 02:54 | 5 |
| 02:54 | 6 |
| 02:54 | 7 |
| 02:54 | 8 |
| 02:54 | 9 |
| 02:54 | 10 |

seconds.

                    (Pause in proceedings.)

                    THE COURT:  Okay.  Let's go back on the
record.

                    So I'm going to give you all two options.
As I said yesterday to a group -- well, at the end of
the day yesterday I made them watch a Disney film at
the end of the day that was a happy Disney film,
because they were unhappy through the whole hearing,
with each other.

                    But I'm going to give you two options.
And I'm going to remain optimistic that you can do the
first one, but if you can't, then...

                    The first option is after we're done here
you go back to the drawing board and try and do mutual
or bilateral parameters for what's going to be
produced.  Assuming that is not -- that you all can't
do that -- and I say it's okay for you to do that,
because the next one's going to take a lot more work.
And I'm not requiring you to do the next one unless you
can't go back and work things out.

                    What I am going to do is have you each go
through, and whatever -- Mr. Shore, how many patents
are being asserted?

                    MR. SHORE:  Two, Your Honor.

—40—

02:55  1          THE COURT:  Okay.  And my law clerk, who

02:55  2    was a patent examiner, tells me -- and I think I knew

02:55  3    this before -- that each of those patents, as they're

02:56  4    being prosecuted, would have been assigned to a certain

02:56  5    technology group at the USPTO, correct?

02:56  6          MR. SHORE:  Yes, sir.

02:56  7          THE COURT:  So that if you all cannot

02:56  8    come up with an agreement without doing this, then your

02:56  9    homework will be that any license that you have,

02:56  10   Mr. Shore, just because you're in my camera, that has

02:56  11   any license that has patents in it that were prosecuted

02:56  12   in the same section that the two patents you're

02:56  13   asserting are in, if a license covers those, you turn

02:56  14   that license over.

02:56  15          Same obviously for ST.  If they have

02:56  16   licenses that cover products of theirs that were

02:56  17   prosecuted in the same section --

02:56  18          Actually, I guess there wouldn't be

02:56  19   patents for that then, would there, Regan?

02:56  20          (Off-the-record discussion.)

02:56  21          THE COURT:  Well, let me say, Mr. Shore,

02:56  22   what is it that you would want back from ST?  That's

02:56  23   what I'm trying to figure out here.

02:57  24          MR. SHORE:  The only thing that we think

02:57  25   is relevant that we want is we want everything related,

```
02:57   1   any license agreements, any -- basically anything in
02:57   2   the universe at ST that is related to silicon carbide
02:57   3   MOSFETs or other FET power devices.
02:57   4                THE COURT:  The problem with my solution
02:57   5   is that they may have products that aren't covered by
02:57   6   patents.  And so that -- my solution might not work in
02:57   7   that direction.  It works in your direction because you
02:57   8   know which sections those were.  But I'm not sure what
02:57   9   the solution is -- give me one more second.  I'll be
02:57  10   back.
02:58  11                (Pause in proceedings.)
03:00  12                THE COURT:  Okay.  We're going to start
03:00  13   over.
03:00  14                And what I'm going to order is the
03:00  15   production by both sides of any licenses that cover
03:00  16   products that have power FETs, F-E-Ts, or silicon
03:00  17   carbide transistors.
03:00  18                So after a long and arduous journey,
03:00  19   that's where we're at.
03:00  20                Mr. Cohen, anything else?
03:00  21                MR. COHEN:  Nothing from ST, Your Honor.
03:00  22   Thank you very much.
03:01  23                THE COURT:  Mr. Shore?
03:01  24                MR. SHORE:  Nothing at this time, Your
03:01  25   Honor.
```

```
03:01   1                    THE COURT:  Okay.  Very good.
03:01   2                    Thank you all, have a good afternoon.  If
03:01   3    you get a chance, go watch a happy Disney movie
03:01   4    tonight.  Or better yet, if you haven't seen Top Gun 2,
03:01   5    go watch Top Gun -- or the new Top Gun.
03:01   6                    So I hope to see some of you in person in
03:01   7    the future.  Take care.
03:01   8                    (Hearing adjourned.)
        9
       10
       11
       12
       13
       14
       15
       16
       17
       18
       19
       20
       21
       22
       23
       24
       25
```

—43—

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS     )

3

4     I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of

6   Texas, do certify that the foregoing is a correct

7   transcript from the record of proceedings in the

8   above-entitled matter.

9     I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial

11   Conference of the United States.

12     Certified to by me this 30th day of June 2022.

13

14                              /s/ Kristie M. Davis
                                KRISTIE M. DAVIS
15                              Official Court Reporter
                                800-Franklin Avenue
16                              Waco, Texas 76701
03:01                           (254) 340-6114
17                              kmdaviscsr@yahoo.com

18

19

20

21

22

23

24

25