—1—

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
2                              WACO DIVISION

3    THE TRUSTEES OF PURDUE   *
        UNIVERSITY            *      July 11, 2022
4                             *
     VS.                      *
5                             *  CIVIL ACTION NO. W-21-CV-727
     STMICROELECTRONICS N.V.  *
6       ET AL                 *

7              BEFORE THE HONORABLE ALAN D ALBRIGHT
                    DISCOVERY HEARING (via Zoom)
8
     APPEARANCES:
9
     For the Plaintiff:   Michael W. Shore, Esq.
10                        Raphael Chabaneix, Esq.
                          Mu Lin Hsu, Esq.
11                        Shore Chan DePumpo LLP
                          901 Main Street, Suite 3300
12                        Dallas, TX 75202

13   For the Defendant:   Justin S. Cohen, Esq.
                          Dina W. McKenney, Esq.
14                        Bruce S. Sostek, Esq.
                          Nadia Elena Haghighatian, Esq.
15                        Thompson & Knight, LLP
                          1722 Routh Street, Suite 1500
16                        Dallas, TX 75201

17                        Massimo Ciccarelli, Esq.
                          Ciccarelli Law Firm
18                        750 N. St. Paul St., Suite 200
                          Dallas, TX 75201
19
     Court Reporter:      Kristie M. Davis, CRR, RMR
20                        PO Box 20994
                          Waco, Texas 76702-0994
21                        (254) 340-6114

22      Proceedings recorded by mechanical stenography,

23   transcript produced by computer-aided transcription.

24

25

| | | |
|---|---|---|
| 01:44 | 1 | (Hearing begins.) |
| 01:44 | 2 | DEPUTY CLERK:  A civil action in Case |
| 01:44 | 3 | 6:21-CV-727, the Trustees of Purdue University versus |
| 01:44 | 4 | STMicroelectronics NV, et al.  Case called for a |
| 01:44 | 5 | discovery hearing. |
| 01:44 | 6 | THE COURT:  Announcements from counsel, |
| 01:44 | 7 | starting with Mr. Shore. |
| 01:44 | 8 | MR. SHORE:  Michael Shore for Purdue |
| 01:44 | 9 | University.  Also with me today are Raphael Chabaneix, |
| 01:44 | 10 | Halima Shukri Ndai and Chris Hsu from our firm, as well |
| 01:44 | 11 | as client representative, Kenneth Waite. |
| 01:44 | 12 | THE COURT:  Welcome to all of you, |
| 01:44 | 13 | especially your client representative. |
| 01:44 | 14 | And I see Mr. Ciccarelli. |
| 01:44 | 15 | MR. CICCARELLI:  Good afternoon, Your |
| 01:44 | 16 | Honor.  Max Ciccarelli representing STMicroelectronics. |
| 01:45 | 17 | With me also is Justin Cohen and also our client |
| 01:45 | 18 | representative, Mr. Andrew Mayo who is in-house counsel |
| 01:45 | 19 | at ST. |
| 01:45 | 20 | THE COURT:  And welcome to all of you and |
| 01:45 | 21 | your client representative as well. |
| 01:45 | 22 | Give me one second. |
| 01:45 | 23 | I have that -- first I have Purdue seeks |
| 01:45 | 24 | complete responses to Request for Admission 1 and |
| 01:45 | 25 | Request for Productions 1, 2, 3, 4 and 5. |

| | | |
|---|---|---|
| 01:45 | 1 | I'm happy to hear from Purdue. |
| 01:45 | 2 | Mr. Shore? |
| 01:45 | 3 | MR. SHORE:  Sorry.  I was on mute. |
| 01:45 | 4 | Okay.  So Request for Admission No. --  I |
| 01:45 | 5 | guess, yeah, we can start for request for admissions. |
| 01:46 | 6 | They're a little easier, I guess. |
| 01:46 | 7 | Hold on a second.  I had prepared to do |
| 01:46 | 8 | the interrogatories first, so I'm missing some -- I've |
| 01:46 | 9 | got some pages out of order. |
| 01:46 | 10 | Okay.  All right.  So Request for |
| 01:46 | 11 | Admission No. 1 was simply whether or not the products |
| 01:46 | 12 | are MOSFETs, admit it or deny it.  Very simple, |
| 01:46 | 13 | straightforward. |
| 01:46 | 14 | They call all of these products MOSFETs |
| 01:46 | 15 | on the data sheets.  They call them MOSFETs in the |
| 01:46 | 16 | marketing material.  They call them MOSFETs on their |
| 01:46 | 17 | website.  And we're simply asking them to admit whether |
| 01:46 | 18 | or not they're MOSFETs.  Very simple, straightforward |
| 01:47 | 19 | request. |
| 01:47 | 20 | THE COURT:  In your request do you use |
| 01:47 | 21 | the word, are all your products MOSFETs?  Or do you |
| 01:47 | 22 | identify specific products by serial number?  Or how |
| 01:47 | 23 | did you frame the RFA? |
| 01:47 | 24 | MR. SHORE:  We actually have it -- we |
| 01:47 | 25 | refer them to Interrogatory No. 8 which has a list of |

4

01:47  1    product codes which are the actual product numbers.

01:47  2    And we say admit that each product code listed in

01:47  3    Interrogatory No. 8 in this document corresponds to a

01:47  4    product that is or includes a MOSFET.

01:47  5              So they know exactly what we're talking

01:47  6    about down to product number, by their own product

01:47  7    number.  They won't answer.  I mean, this is as

01:47  8    straightforward as it can possibly be.  Is the product

01:47  9    that you call a MOSFET?  Is a product that your data

01:47  10   sheet calls a MOSFET?  Is a product that your marketing

01:47  11   material calls a MOSFET?  Are those products MOSFETs?

01:47  12             THE COURT:  Is there an agreement between

01:47  13   the parties and the experts as to what a MOSFET is?

01:48  14             MR. SHORE:  It was an issue in claims

01:48  15   construction.  They asked that the term "MOSFET" be

01:48  16   limiting in the preamble.  The Court said yes to that.

01:48  17   We haven't got the final detailed opinion yet.

01:48  18             But the question arose when they asked

01:48  19   that the preamble be limiting.  The preamble says a

01:48  20   silicon carbide MOSFET.  That's the preamble.

01:48  21             And so we're simply asking a very

01:48  22   straightforward question, are these MOSFETs?  And we're

01:48  23   telling them exactly what products we're talking about.

01:48  24             And they -- and the strange thing about

01:48  25   this, Your Honor, is they already call every one of

| | | |
|---|---|---|
| 01:48 | 1 | these products MOSFETs repeatedly on their website, |
| 01:48 | 2 | data sheets, marketing materials.  So we didn't think |
| 01:48 | 3 | that this should be any type of hard thing for them to |
| 01:48 | 4 | answer. |
| 01:48 | 5 | THE COURT:  I think you're done.  If |
| 01:48 | 6 | you're not, let me know if you want to say -- |
| 01:48 | 7 | MR. SHORE:  I am, Your Honor.  I'm sorry. |
| 01:48 | 8 | THE COURT:  A response? |
| 01:49 | 9 | MR. CICCARELLI:  Yes, Your Honor. |
| 01:49 | 10 | So first of all, in terms of claim |
| 01:49 | 11 | language, the claim language that was at issue during |
| 01:49 | 12 | claim construction was not the word "MOSFET."  It was |
| 01:49 | 13 | the written out term, "metal oxide semiconductor field |
| 01:49 | 14 | effect transistor." |
| 01:49 | 15 | That's not what this request is asking |
| 01:49 | 16 | about.  This request is asking about just MOSFET, |
| 01:49 | 17 | letters M-O-S-F-E-T.  They are in another -- they're in |
| 01:49 | 18 | some different claims. |
| 01:49 | 19 | And because it is a claim term, what we |
| 01:49 | 20 | told them was that, you know, subject to the |
| 01:49 | 21 | objections, without making any admissions regarding |
| 01:49 | 22 | whether the products meet a claim element, ST, Inc. |
| 01:49 | 23 | admits that the term "MOSFET" has been used in |
| 01:49 | 24 | conjunction with the products listed in Interrogatory |
| 01:49 | 25 | No. 8. |

01:49   1          In response to Interrogatory No. 8, or in

01:49   2   one of those rogs, we also pointed them to the

01:49   3   documents where we use that term so that they can see

01:49   4   the term in context and determine whether it is the way

01:49   5   that they're using the term or not.

01:49   6          MR. SHORE:  Your Honor, there's only one

01:49   7   way to use the term.  MOSFET is a term of art.  It

01:50   8   means metal oxide semiconductor field effect

01:50   9   transistor.  That's what a MOSFET is.

01:50   10          And so when they say, yes, we use this

01:50   11   term to refer to our products, but they won't say

01:50   12   whether their products are the term that they use to

01:50   13   refer to them, this is pure gamesmanship.

01:50   14          THE COURT:  I'll be back in just a

01:50   15   second.

01:50   16          (Pause in proceedings.)

01:52   17          THE COURT:  Mr. Ciccarelli, perhaps you

01:52   18   can help me here -- if we can go back on the record.

01:52   19          I can't tell whether or not in the case

01:52   20   there is a dispute on your -- on -- either from you or

01:52   21   Mr. Shore.  He indicates there's not.  If there's some

01:53   22   legal -- I mean, I get that this is a more technical

01:53   23   term, but at least to me listening to it, it's like if

01:53   24   he were asking you to say are these circuits?  I mean,

01:53   25   if you're selling circuits and you told the world

01:53  1    you're selling circuits.

01:53  2                On the other hand, if there is a reason

01:53  3    why there is a legal dispute in the case over whether

01:53  4    or not these are what he wants you to say are MOSFETS,

01:53  5    whether they are not, then I'd like to hear that now.

01:53  6                Otherwise I'm not sure why you're

01:53  7    resisting the request for admission.

01:53  8                MR. CICCARELLI:  We call them MOSFETs,

01:53  9    Your Honor.  The data sheets on the very first page

01:53  10   refer to them as MOSFETs.  And we said as much in our

01:53  11   response, right?  We're not going to shy away from

01:53  12   that.  Our website calls them MOSFETs.  That's not the

01:53  13   issue.

01:53  14               The issue is that I think Purdue is

01:54  15   trying to combine the meaning of that term with the

01:54  16   meaning of another term and another claim which is

01:54  17   metal oxide semiconductor field effect transistor,

01:54  18   spelled out.  And there may be a dispute as to what

01:54  19   that means.

01:54  20               And so because we know that there is a

01:54  21   potential issue, we wanted to be clear and acknowledge

01:54  22   that, yet point him to the documents that show how we

01:54  23   refer to the product.  And we also pointed him to the

01:54  24   technical documents from which he can look at the

01:54  25   products and decide whether it is a MOSFET or not.

8

| 01:54 | 1 | They are MOSFETs.  We advertise them as |
| 01:54 | 2 | such and we're not going to shy away from that. |
| 01:54 | 3 | MR. SHORE:  Your Honor, what he's saying |
| 01:54 | 4 | is if I ask -- I'm in Indianapolis today -- if I ask |
| 01:54 | 5 | the Indianapolis Colts whether they were members of the |
| 01:54 | 6 | National Football League because they have NFL on their |
| 01:54 | 7 | logo and they say, wow, I don't know.  I don't know |
| 01:54 | 8 | what you mean by National Football League. |
| 01:54 | 9 | This is -- we need to know -- we need to |
| 01:54 | 10 | know if they're going to contend that these are not |
| 01:54 | 11 | MOSFETs.  If they're going to contend they're not |
| 01:55 | 12 | MOSFETs, that's a whole other avenue discovery.  That's |
| 01:55 | 13 | a whole other avenue of -- |
| 01:55 | 14 | We never thought this was an issue.  We |
| 01:55 | 15 | never believed it was at issue.  And somehow they're |
| 01:55 | 16 | saying maybe it's at issue.  But we're not sure if it's |
| 01:55 | 17 | at issue.  They need to tell us whether it's at issue. |
| 01:55 | 18 | And if they are going to refuse to admit |
| 01:55 | 19 | that they're MOSFETs, then obviously then we need to go |
| 01:55 | 20 | into that. |
| 01:55 | 21 | THE COURT:  Anything else, |
| 01:55 | 22 | Mr. Ciccarelli? |
| 01:55 | 23 | MR. CICCARELLI:  Your Honor, we point |
| 01:55 | 24 | them to documents where we call them MOSFETs.  If he's |
| 01:55 | 25 | using MOSFETs the same way we're using it, then we |

01:55    1    don't have an issue.

01:55    2                    MR. SHORE:  There's only one way to use

01:55    3    it.

01:55    4                    MR. CICCARELLI:  And our response says as

01:55    5    much.  So I think we've pointed him to all the right

01:55    6    information.

01:55    7                    THE COURT:  Okay.  I'll be back in a

01:55    8    second.

01:56    9                    (Pause in proceedings.)

01:57   10                    THE COURT:  If we can go back on the

01:57   11    record.

01:57   12                    The Court is going to order ST to admit

01:57   13    or deny Request for Admission No. 1.

01:57   14                    Next up is Request for Production No. 1.

01:57   15    Mr. Shore, if you would explain this one to me.

01:57   16                    MR. SHORE:  I think Mr. Ciccarelli, in

01:57   17    correspondence with us, has agreed to fully answer this

01:57   18    request for production by supplying all of the

01:57   19    organizational charts for each one of those distinct

01:57   20    areas, product design, process engineering, program

01:57   21    management, regulatory affairs, et cetera.

01:57   22                    However, you know, it's been 30 days

01:57   23    since these were first answered.  We can't get a date

01:57   24    out of them to supplement.  We can't get a date out of

01:57   25    them.  This is going to be a recurring theme.  We get a

| | | |
|---|---|---|
| 01:57 | 1 | lot of promises, we get no -- nothing.  We get no |
| 01:58 | 2 | dates, we get no end point. |
| 01:58 | 3 | So here all I think I we need, unless |
| 01:58 | 4 | Mr. Ciccarelli is going to, I think, change his |
| 01:58 | 5 | position that they're not going to fully respond to us |
| 01:58 | 6 | on this, I just need a date certain.  And that date |
| 01:58 | 7 | certain, I think, should be July 15th.  This has been |
| 01:58 | 8 | hanging out there.  We've been conferencing on this for |
| 01:58 | 9 | a month since we got their responses.  And I'm told I'm |
| 01:58 | 10 | going to get something and I never get it. |
| 01:58 | 11 | THE COURT:  Mr. Ciccarelli, do you have a |
| 01:58 | 12 | date for him? |
| 01:58 | 13 | MR. CICCARELLI:  Yeah.  So, Your Honor, |
| 01:58 | 14 | we can produce the claim charts that we offered to |
| 01:58 | 15 | produce him next week.  We offered some specific claim |
| 01:58 | 16 | charts -- claim charts.  Sorry. |
| 01:58 | 17 | MR. SHORE:  Organizational. |
| 01:58 | 18 | MR. CICCARELLI:  Organizational charts |
| 01:58 | 19 | that we think provides that kind of information.  And |
| 01:58 | 20 | we can provide them by next week. |
| 01:58 | 21 | And by the way, in terms of Mr. Shore's |
| 01:58 | 22 | accusations, we never -- he never asked me for a date |
| 01:58 | 23 | for these.  We've been talking about -- |
| 01:58 | 24 | THE COURT:  I've got it.  That all goes |
| 01:59 | 25 | over my head. |

—11—

| | |
|---|---|
| 01:59 | 1 |
| 01:59 | 2 |

So it looks like we're done with No. 1.

Mr. Shore, Request for Production No. 2?

MR. SHORE:  Yes, Your Honor.  Request for Production No. 2 is, we asked that for each of the following product codes and any other product codes responsive to Interrogatory No. 2, produce three physical specimens of the product corresponding.

We -- there are probably here 40 or 50 products that we're asking for exemplars.  What we really want is an exemplar for each die, and to know which of the products share the die.

And, again, we actually agreed to pay for them and to pay for the cost of shipping them to us. We haven't received any timeline when we're going to get these.  Same problem as before.  And we also did not get an agreement that they would produce all of them.

So what we -- if it's an accused product, we think that we're entitled to an exemplar.  We are willing to limit that to one exemplar per die.

And to give you a little bit of background information, Your Honor, these semiconductors are made on wafers.  The wafers are then sliced into little pieces called die.  The die for different parts can be identical.  The only difference

02:00  1    being the packaging, some may go into what's called a

02:00  2    TO-220 package.  Some may go into a TO-247 package.

02:00  3    Some may be especially numbered for a particular

02:00  4    customer.  But if they all share the same die, they

02:00  5    will all be identical.

02:00  6              So what we've told them is we don't

02:00  7    really want one for each and every part.  What we want

02:00  8    is one exemplar die or some -- or three exemplars of

02:00  9    each die, each unique die, and some identification over

02:01  10   which parts apply to that die.

02:01  11             And, again, we have asked for dates.

02:01  12   We've asked for them to produce these things by

02:01  13   June 13th.  We are -- I'm still not sure what

02:01  14   Mr. Ciccarelli is offering to --

02:01  15             THE COURT:  You mean July 13th?

02:01  16             MR. SHORE:  I'm sorry.  Yes, July 15th,

02:01  17   actually.  And I'm not sure what Mr. Ciccarelli's

02:01  18   offering to give us.  It's very hard to nail it down.

02:01  19             THE COURT:  Well, let's find out.

02:01  20             Mr. Ciccarelli?

02:01  21             MR. CICCARELLI:  Your Honor, thank you.

02:01  22             Interestingly, Mr. Shore has been asking

02:01  23   for three exemplars of every single product.  I

02:01  24   suggested to him that instead of every single product,

02:01  25   that we give him three exemplars that use each of the

| | | |
|---|---|---|
| 02:01 | 1 | die in question. |
| 02:01 | 2 | I have yet, until I heard it from his |
| 02:01 | 3 | mouth right now from him that he's okay with that |
| 02:01 | 4 | proposal.  So I'm glad that he's finally accepted the |
| 02:02 | 5 | proposal.  And so that should not be an issue. |
| 02:02 | 6 | Now, let me share my screen so I can |
| 02:02 | 7 | address some of the other issues. |
| 02:02 | 8 | So, Your Honor, one of the issues that |
| 02:02 | 9 | we've had is the scope of products that are relevant |
| 02:02 | 10 | and that we should produce information for in this |
| 02:02 | 11 | litigation. |
| 02:02 | 12 | Purdue accused a small handful of |
| 02:02 | 13 | products, and what we did initially, and we told that |
| 02:02 | 14 | to them right away in our responses to their |
| 02:02 | 15 | interrogatories, we said we're going to produce |
| 02:02 | 16 | information not just for those accused products but for |
| 02:02 | 17 | all the other products that use the same die. |
| 02:02 | 18 | And that's what I'm showing here in the |
| 02:02 | 19 | yellow circle.  The red circle are just the products |
| 02:02 | 20 | that they accused.  The yellow circle are the products |
| 02:02 | 21 | made with the same die as the die that they accused. |
| 02:02 | 22 | That's what we told them we were responding on. |
| 02:02 | 23 | We have been trying to get parts for |
| 02:02 | 24 | those, and we've obtained a lot of those.  I think we |
| 02:03 | 25 | may be missing maybe one or two. |

—14—

02:03  1              But Mr. Shore's not happy with that scope

02:03  2     of production.  He has instead been wanting all silicon

02:03  3     carbide MOSFETs that ST makes and some other things

02:03  4     that we'll talk about in a minute.

02:03  5              And so rather than continue with that

02:03  6     fight, we told him, fine, Mr. Shore.  We're going to

02:03  7     extend the scope of discovery to all silicon carbide

02:03  8     MOSFETs.  And so we're also -- now, that is a larger

02:03  9     set of products that have not been at play until we

02:03  10    recently made that proposal to him.

02:03  11             And so we are proposing to go ahead and

02:03  12    try to obtain three samples for each of the die that

02:03  13    are used in those products.  But that naturally is

02:03  14    going to take time, because first we have to find out

02:03  15    the universe of those products, figure out which of

02:03  16    those products use which die and things of that nature.

02:03  17             But in the meantime we have obtained some

02:03  18    products that we are ready to give to him next week.

02:04  19    And it covers, I think, all but one -- but I have to

02:04  20    check -- of the die that he originally accused.

02:04  21             And then we will keep working forward to

02:04  22    collect products for the other die that are going to

02:04  23    come into play, given that we have broadened out the

02:04  24    scope of discovery.

02:04  25             MR. SHORE:  Your Honor, this has not

| | | |
|---|---|---|
| 02:04 | 1 | been -- this was not an issue.  The Court ruled at the |
| 02:04 | 2 | last discovery hearing that discovery covered all SiC |
| 02:04 | 3 | FETs and transistors.  That was the Court's ruling. |
| 02:04 | 4 | This is discovery.  This is not confirmation of what we |
| 02:04 | 5 | already know. |
| 02:04 | 6 | THE COURT:  I think he just said he's |
| 02:04 | 7 | giving all this to you. |
| 02:04 | 8 | MR. SHORE:  Well, yes.  He did say he's |
| 02:04 | 9 | giving it all to me and -- |
| 02:04 | 10 | THE COURT:  So why are you continuing to |
| 02:04 | 11 | argue? |
| 02:04 | 12 | MR. SHORE:  Well, the only reason why I'm |
| 02:04 | 13 | continuing to argue is he says he's giving us a very, |
| 02:04 | 14 | very limited amount next week, and we have no idea when |
| 02:04 | 15 | we're going to get the rest.  There's no -- |
| 02:04 | 16 | THE COURT:  I think what he said is he |
| 02:04 | 17 | was going to give you everything he has and they're |
| 02:04 | 18 | going to continue to work in good faith producing them. |
| 02:05 | 19 | But let me find out from Mr. Ciccarelli |
| 02:05 | 20 | when he thinks production of these -- production of |
| 02:05 | 21 | these dies or whatever it is you're producing will be |
| 02:05 | 22 | complete. |
| 02:05 | 23 | MR. CICCARELLI:  It's hard to tell, Your |
| 02:05 | 24 | Honor, because what we have to do first is we have to |
| 02:05 | 25 | figure out all the products and all the die that they |

| | | |
|---|---|---|
| 02:05 | 1 | involve.  And then we have to go to the various |
| 02:05 | 2 | different parts of the organization to try to see who |
| 02:05 | 3 | has parts on hand.  Because we don't always have parts |
| 02:05 | 4 | on hand. |
| 02:05 | 5 | Now, there are distributors that have a |
| 02:05 | 6 | lot of these parts.  And Mr. Shore could get them from |
| 02:05 | 7 | there if he needs them more quickly. |
| 02:05 | 8 | But, Your Honor, what we've already |
| 02:05 | 9 | provided to him is that correlation information that he |
| 02:05 | 10 | was talking about.  So for the products that he |
| 02:05 | 11 | accused, we have told them which products use which die |
| 02:05 | 12 | so that he has that information already handy.  And |
| 02:05 | 13 | we've also told him which of our documents relate to |
| 02:05 | 14 | each of those die. |
| 02:06 | 15 | So the question was when can we get |
| 02:06 | 16 | those?  I can't tell you right now, Your Honor.  All I |
| 02:06 | 17 | can tell you is I can work as quickly as I can to get |
| 02:06 | 18 | them.  And if that's not fast enough for Mr. Shore, he |
| 02:06 | 19 | can get them from our distributors. |
| 02:06 | 20 | MR. SHORE:  Your Honor, that's not true. |
| 02:06 | 21 | We've tried to get them from distributors and the |
| 02:06 | 22 | distributors say they're on back order and we can't get |
| 02:06 | 23 | them. |
| 02:06 | 24 | And the other thing is there's 35 parts, |
| 02:06 | 25 | which we'll get this when we get into the |

02:06   1    interrogatories, there's 35 accused parts that they
02:06   2    have not provided us any information on what die.
02:06   3            This is not hard for them.  All they have
02:06   4    to do to know what parts to get is go to their website,
02:06   5    click on SiC MOSFETs and give me every single thing
02:06   6    related to SiC MOSFETs.  And it's on their website.
02:06   7    The list of products is on their website.  So for him
02:06   8    to say he can't figure out what I'm looking for, that's
02:06   9    just not true.
02:06   10           THE COURT:  Mr. Shore, we're -- he's
02:06   11   already said he's producing all of these.  I don't know
02:06   12   why you keep going back to that.
02:06   13           MR. SHORE:  Well, I keep going back to it
02:06   14   because we're going to start -- I'm sorry.
02:06   15           THE COURT:  No, no, no, no, no.  I'm
02:07   16   trying to be as patient as I can, but you're wasting a
02:07   17   lot of time talking about stuff that opposing counsel's
02:07   18   already said.  And I don't need to hear it.  I mean,
02:07   19   we're going to get through this stuff and he's
02:07   20   represented to you he's going to get them as soon as he
02:07   21   can.
02:07   22           If you get to the point where you feel
02:07   23   it's prejudiced you in some way, come back to me and I
02:07   24   will -- we'll -- I'll figure out a way to level the
02:07   25   playing field.

02:07    1             But he's told you that he's giving you

02:07    2   what he has.  They're working to get you more and that

02:07    3   if that's not fast enough, there's an alternative way

02:07    4   to get it.  That's the best he can do.

02:07    5             If we get to the point where that begins

02:07    6   to prejudice you, I'll deal with it then.

02:07    7             I'm going to move on to No. 3.  If you

02:07    8   want to take this up, Mr. Shore.

02:07    9             MR. SHORE:  We're asking for all versions

02:07   10   of the data sheets.  They are saying that they're only

02:07   11   going to give us the versions as they currently exist.

02:07   12   And we just want the data sheet -- this case goes back,

02:08   13   you know, the damages period goes back several years.

02:08   14   And so we're entitled to the data sheets for every

02:08   15   product that was sold during the damages period.

02:08   16             And what they basically --

02:08   17             THE COURT:  I think what you're saying is

02:08   18   you're entitled -- tell me if I'm wrong.  I think what

02:08   19   you're saying is you're entitled to every version of

02:08   20   the data sheet.

02:08   21             MR. SHORE:  Yes.  Yes, sir.

02:08   22             THE COURT:  Got it.  So -- and I

02:08   23   understand why you'd want that.

02:08   24             Let me hear from Mr. Ciccarelli as to

02:08   25   whether or not those exist and whether or not those can

| | | |
|---|---|---|
| 02:08 | 1 | be produced. |
| 02:08 | 2 | MR. CICCARELLI:  So, Your Honor, what we |
| 02:08 | 3 | offered is let us give you the latest version.  Each |
| 02:08 | 4 | one has a revision history that tells you what changes |
| 02:08 | 5 | have been made.  Most changes, most of the time, are |
| 02:08 | 6 | totally and completely irrelevant to the subject matter |
| 02:08 | 7 | of this litigation. |
| 02:08 | 8 | What I told him is if you see some |
| 02:08 | 9 | changes that might be relevant, tell me.  We'll get you |
| 02:08 | 10 | those other versions. |
| 02:08 | 11 | I don't see the point of having to send |
| 02:08 | 12 | somebody to dig through to get 10, 12, 15 versions for |
| 02:08 | 13 | each data sheet that make absolutely no difference to |
| 02:08 | 14 | this case, when he can look at what we're going to |
| 02:09 | 15 | produce to him and see if there's a revision that might |
| 02:09 | 16 | be relevant, in which case we'll go get it for him. |
| 02:09 | 17 | MR. SHORE:  Your Honor, version control |
| 02:09 | 18 | just tells you that they made a change on that date. |
| 02:09 | 19 | We don't know what the change was.  And we don't know |
| 02:09 | 20 | what they said. |
| 02:09 | 21 | So, I mean, I believe that |
| 02:09 | 22 | Mr. Ciccarelli's clients may be telling him that none |
| 02:09 | 23 | of the changes are relevant.  But unless he has seen |
| 02:09 | 24 | every version of the data sheet, which I don't think he |
| 02:09 | 25 | has, he can't tell you that there's nothing relevant. |

—20—

02:09   1    You have to have the data sheets to see that.

02:09   2                    MR. CICCARELLI:  What I have done, Your

02:09   3    Honor, is I've actually looked at a few of those data

02:09   4    sheets and looked through the version history control.

02:09   5    And the types of changes that they describe there, to

02:09   6    me, sound totally irrelevant.

02:09   7                    And I welcome Mr. Shore to take a look at

02:09   8    that.  If that's not enough, we can talk about getting

02:09   9    prior versions.  It just doesn't seem like a productive

02:09   10   use of anybody's time to go digging up all those

02:09   11   versions.

02:09   12                    THE COURT:  So if I understood you,

02:09   13   Mr. Ciccarelli, you have -- you've been through them

02:10   14   and you don't believe there's anything that would be

02:10   15   responsive in those prior versions.  But if Mr. Shore

02:10   16   goes through them and identifies something, you're

02:10   17   happy to get those revisions or --

02:10   18                    MR. CICCARELLI:  Yes, Your Honor.

02:10   19                    THE COURT:  -- earlier versions for him.

02:10   20                    MR. CICCARELLI:  Yes, Your Honor.

02:10   21                    MR. SHORE:  I don't know -- the revision

02:10   22   history that I have seen in other documents simply

02:10   23   tells you the date they were edited.  That's all.  It

02:10   24   doesn't tell you what was changed.

02:10   25                    So if Mr. Ciccarelli has looked at them,

02:10  1    that means he has them.  If he has them, he can produce

02:10  2    them.  So I don't understand how we are supposed to,

02:10  3    as, you know, a university, are supposed to try to

02:10  4    figure out what revisions were made by who when, and

02:10  5    whether or not there's different versions of the data

02:10  6    sheet and what they say.

02:10  7                 Telling me that there's other versions

02:10  8    and telling me the date when those versions changed

02:10  9    doesn't tell me what they say.

02:10  10                MR. CICCARELLI:  To be clear, I looked at

02:10  11   the latest version of a handful of them, right?  The

02:10  12   latest version tells me the history.  I looked at the

02:11  13   history, and the changes were not relevant changes.

02:11  14   But again, if to the extent once you -- once Mr. Shore

02:11  15   gets them he needs more versions, we'd be more than

02:11  16   happy to go dig them up at that point.

02:11  17                THE COURT:  I'll be back in a second.

02:11  18                (Pause in proceedings.)

02:12  19                THE COURT:  I'm going to deny the motion

02:12  20   for production at this time without prejudice to

02:12  21   Mr. Shore, coming back, and if you identify something

02:12  22   he believes is relevant, asking ST to produce it.

02:13  23                Request for Production No. 4, Mr. Shore,

02:13  24   I'm happy to take that one up.

02:13  25                MR. SHORE:  That one we can skip, Your

02:13   1    Honor.  I think that one's been covered.

02:13   2                    THE COURT:  Then let's move to No. 5.

02:13   3                    MR. SHORE:  All right.  No. 5.  This is

02:13   4    important.  I mean, the -- our final infringement

02:13   5    contentions are due this Friday, which we're going to

02:13   6    have to ask for an extension on which I'm going to sort

02:13   7    of preview for the Court.  One of the reasons is

02:13   8    obviously what we've talked about, they haven't even

02:13   9    produced all of the silicon carbide MOSFET process

02:13   10   flows.  They haven't produced all the silicon -- you

02:13   11   know, there's no way that we can have final contentions

02:13   12   for things that we don't have or the things that they

02:14   13   haven't produced.

02:14   14                    But what we have here in No. 5 is most of

02:14   15   the process flowcharts are pretty void of any useful

02:14   16   information.  They're written in code words that we

02:14   17   cannot decipher.  A control flow plan should be

02:14   18   produced to identify the devices and routes that

02:14   19   correspond to each device.  The process flows should be

02:14   20   in English, not Italian, and should include a process

02:14   21   description what occurs at each stage of the process.

02:14   22                    We have an interrogatory which we may or

02:14   23   may not get to -- hopefully today we'll get to it --

02:14   24   where we asked them to describe in detail each -- the

02:14   25   process by which these are made.  And they referred us

| | | |
|---|---|---|
| 02:14 | 1 | to these same documents which are in Italian. |
| 02:14 | 2 | There's 42 cases that have addressed the |
| 02:14 | 3 | issue of whether Rule 33(d) can be used to refer to |
| 02:14 | 4 | documents that are not in English.  You can't.  You |
| 02:14 | 5 | can't do that. |
| 02:14 | 6 | So we either need for every single |
| 02:14 | 7 | silicon carbide MOSFET process flows with English |
| 02:15 | 8 | translations, since this is a U.S. court, proceedings |
| 02:15 | 9 | are in English, you can't refer to us Italian |
| 02:15 | 10 | documents.  But we don't have that.  And we don't have |
| 02:15 | 11 | it even for all of the parts we've accused -- actually |
| 02:15 | 12 | accused.  We don't have it. |
| 02:15 | 13 | So, again, this is pretty basic |
| 02:15 | 14 | fundamental information. |
| 02:15 | 15 | THE COURT:  A response? |
| 02:15 | 16 | MR. CICCARELLI:  Sure, Your Honor.  I |
| 02:15 | 17 | think Mr. Shore may be thinking about something |
| 02:15 | 18 | different.  Request for Production No. 5, I have it on |
| 02:15 | 19 | the screen.  It relates to two ST prior art products, |
| 02:15 | 20 | the PP-26 die and the products that use the EZ-67 die. |
| 02:15 | 21 | And for those we've already told him |
| 02:15 | 22 | these are products that are more than 20 years old.  We |
| 02:15 | 23 | have produced the process flows that we've been able to |
| 02:15 | 24 | find for those products and all the other information |
| 02:15 | 25 | that we have been able to find. |

| | | |
|---|---|---|
| 02:15 | 1 | So for these, unfortunately, as we told |
| 02:15 | 2 | him and as I think our dispute chart sets forth, we |
| 02:16 | 3 | don't have any of the documents.  We're continuing to |
| 02:16 | 4 | look, but when you have stuff that's 22-plus years old, |
| 02:16 | 5 | it's hard. |
| 02:16 | 6 | THE COURT:  Mr. Ciccarelli, when a lawyer |
| 02:16 | 7 | says we produced everything we have, I usually turn to |
| 02:16 | 8 | the other side and ask what they would like me to do. |
| 02:16 | 9 | MR. SHORE:  Your Honor, if that's all |
| 02:16 | 10 | they have, then they can't prove their invalidity case, |
| 02:16 | 11 | and I guess there's nothing else we can do.  Because |
| 02:16 | 12 | what they've produced definitely does not invalidate |
| 02:16 | 13 | anything.  You can't even understand it.  So okay. |
| 02:16 | 14 | THE COURT:  Okay.  Now I have in front of |
| 02:16 | 15 | me -- that exhausts the list I have. |
| 02:16 | 16 | But, Mr. Shore, you just mentioned an |
| 02:16 | 17 | interrogatory.  Is that on a -- maybe on a different |
| 02:16 | 18 | piece of paper.  Let me look.  Give me one second. |
| 02:16 | 19 | MR. SHORE:  Yeah.  There's a different |
| 02:16 | 20 | dispute chart, Your Honor. |
| 02:16 | 21 | THE COURT:  Got it.  Here we go.  It's |
| 02:17 | 22 | coming up. |
| 02:17 | 23 | Okay.  I'll take up Interrogatory No. 1. |
| 02:17 | 24 | MR. SHORE:  In Interrogatory No. 1 we're |
| 02:17 | 25 | asking for all agreements that are related to or |

02:17  1    concerning ST supplying of silicon carbide ST power

02:17  2    parts, MOSFETs.

02:17  3                    They have produced only -- they produced

02:17  4    two internal agreements between ST NV and ST, Inc. from

02:17  5    the 1980s.  They've also produced four distributor

02:17  6    agreements with four distributors.  That's it.

02:17  7                    So they haven't produced any purchase

02:17  8    orders.  They haven't produced any master supply

02:17  9    agreements of customers.  There's not a single

02:17  10   agreement with customers that has been produced.

02:17  11                   So, again, we don't know what the terms

02:18  12   and conditions of sale are.  The reason why this is

02:18  13   important is many times these agreements or purchase

02:18  14   orders will have a delivery location.  And if that's

02:18  15   the United States, obviously that's important as to who

02:18  16   was the importer.

02:18  17                   You can also have things about where

02:18  18   payments are to be made.  Are they to be made in the

02:18  19   United States?  To or from the United States?  There's

02:18  20   all kinds of things in these agreements that you can

02:18  21   use to establish a U.S. sale or a nexus to the United

02:18  22   States.

02:18  23                   It also gives terms and conditions for

02:18  24   the sale and returns and things like that.  These are

02:18  25   very fundamental agreements.

02:18  1          What we asked them for was to give us, by

02:18  2  a date certain which we don't have, to ask them to give

02:18  3  us at least one version of every purchase order with

02:18  4  every customer, every supply agreement where there is a

02:18  5  supply agreement with any customer.  As well as the

02:18  6  other -- I think the bigger issue is that we also asked

02:18  7  them for their agreements with Wolfspeed.

02:19  8          Wolfspeed is another defendant on these

02:19  9  same patents in North Carolina.  Wolfspeed has a

02:19 10  agreement where they have supplied ST.  Well, there's

02:19 11  one press release saying $800 million supply agreement

02:19 12  for silicon carbide wafers, substrates.  And another

02:19 13  one says that agreement has been expanded to

02:19 14  $1.5 billion.

02:19 15          So those -- obviously those agreements

02:19 16  are critically important because they tell us how much

02:19 17  capacity and forecast ST is buying starting material

02:19 18  for.  So if you go to your supplier and you say I need

02:19 19  $1.5 billion worth of starting material, that probably

02:19 20  means that you're going to use $1.5 billion of starting

02:19 21  material to create parts that are probably in the five

02:19 22  to $7 billion range of sales.

02:19 23          So we think that those agreements -- any

02:19 24  agreement concerning their supply of silicon carbide

02:20 25  MOSFETs should be produced.  Including agreements with

—27—

02:20   1    Cree/Wolfspeed and agreements with their customers.

02:20   2                    And I think Mr. Ciccarelli did agree that

02:20   3    they would provide example purchase orders.  He has not

02:20   4    agreed -- or at least I think he's -- he's either not

02:20   5    agreed or says he can't find any agreements with

02:20   6    customers.

02:20   7                    No customer supply agreements.  Which is

02:20   8    very weird in this industry, which I'm very familiar

02:20   9    with.  Because no customer is going to use a supplier

02:20   10   where they don't have certainty of supply over a

02:20   11   certain period of time.  Because you can't have your

02:20   12   supply chain be not secure as far as supply.

02:20   13                    But to me, this is very simple.  We want

02:20   14   at least one exemplar purchase order for every

02:20   15   customer.  We want any contracts between them and

02:20   16   customers.  And we want their supply agreements with

02:20   17   Cree/Wolfspeed because that's going to tell us a lot

02:20   18   about what their forecasts are going forward for future

02:20   19   sales.

02:21   20                    THE COURT:  Response?

02:21   21                    MR. CICCARELLI:  Certainly, Your Honor.

02:21   22                    So there's two different issues here and

02:21   23   if I could break them up that way.  One is the

02:21   24   agreements with the customers which is what the request

02:21   25   is directed to.  And then the other is this agreement

02:21  1    with the suppliers which is not covered.  And I'll

02:21  2    address that second.

02:21  3                Talking about our customer agreements,

02:21  4    again, we already, as he acknowledges, have given him

02:21  5    already four agreements with our customers, our

02:21  6    distributor customers, who were for the accused

02:21  7    products, the largest, if not -- one of, if not the

02:21  8    largest customers for these products.  So we already

02:21  9    gave him customer agreements for the products that were

02:21  10   accused.

02:21  11               What I offered to Mr. Shore is we're now

02:21  12   broadening out the scope of the discovery to all

02:21  13   silicon carbide MOSFETs.  We're going to get him a

02:21  14   sales report that identifies all those products sold

02:21  15   during the damages period.  We're going to -- and it's

02:21  16   also going to identify the customers for those

02:22  17   products.

02:22  18               We're going to get him contracts, if we

02:22  19   have them, with those customers.  And if we don't have

02:22  20   a contract with a customer, as Mr. Shore and I were

02:22  21   discussing, we will get him a purchase order so he can

02:22  22   see what the purchase orders for that customer

02:22  23   generally look like.

02:22  24               What we -- what I'd asked Mr. Shore was,

02:22  25   let's put some kind of cap so we're not running around

| | | |
|---|---|---|
| 02:22 | 1 | chasing the insignificant customers.  So I offered to |
| 02:22 | 2 | get him agreements for the top 99.9 percent of the |
| 02:22 | 3 | revenue -- customers for the top 99.9 percent of the |
| 02:22 | 4 | revenue. |
| 02:22 | 5 | So we're agreeing to give him those |
| 02:22 | 6 | contracts if they exist.  And if they -- an agreement |
| 02:22 | 7 | does not exist, then we'll get him the -- a purchase |
| 02:22 | 8 | order so he can see what those terms and conditions |
| 02:22 | 9 | look like. |
| 02:22 | 10 | That's where we are on that.  And as soon |
| 02:22 | 11 | as we generate the sales report, we'll know who the |
| 02:22 | 12 | customers are and we'll start pulling those agreements |
| 02:22 | 13 | and get them to Mr. Shore. |
| 02:22 | 14 | MR. SHORE:  Your Honor, let me again give |
| 02:23 | 15 | you a little background information.  I'm very familiar |
| 02:23 | 16 | with this industry.  This silicon carbide is a |
| 02:23 | 17 | replacement technology.  It is a relatively new |
| 02:23 | 18 | technology.  It is a technology that is in an -- in |
| 02:23 | 19 | what we would call an adoption phase.  And it can take |
| 02:23 | 20 | two or three years to get a customer to design your |
| 02:23 | 21 | product into their end product device. |
| 02:23 | 22 | So during that two to three years that |
| 02:23 | 23 | you may be working with someone to try to get designed |
| 02:23 | 24 | into a device, you will supply them samples for very |
| 02:23 | 25 | low quantities of products, probably in the |

| | |
|---|---|
| 02:23 | 1 |
| 02:23 | 2 |
| 02:23 | 3 |
| 02:23 | 4 |
| 02:23 | 5 |
| 02:23 | 6 |
| 02:23 | 7 |
| 02:24 | 8 |
| 02:24 | 9 |
| 02:24 | 10 |
| 02:24 | 11 |
| 02:24 | 12 |
| 02:24 | 13 |
| 02:24 | 14 |
| 02:24 | 15 |
| 02:24 | 16 |
| 02:24 | 17 |
| 02:24 | 18 |
| 02:24 | 19 |
| 02:24 | 20 |
| 02:24 | 21 |
| 02:24 | 22 |
| 02:24 | 23 |
| 02:24 | 24 |
| 02:24 | 25 |

.1 percent -- these customers would probably be the smallest customers you would have because they are buying in small quantities as they qualify your products.

However, once you get the design win, the design win can result in hundreds of millions of dollars in sales.  For example, if you are providing Apple with 100 parts that they're buying as samples to analyze whether or not they're going into the next iPhone or the next iPad or iMac, that is incredibly important information to us.  Because we can look and see, oh, they're supplying small quantities to Apple. They're supplying small quantities to Samsung or IBM or whoever it might be.

That is incredibly important information. That is critically important information in determining how successful their product roll-out is going to be.

It also allows you to go and subpoena those customers or to ask in depositions of ST. Because generally when you're giving people samples or you're supplying them with samples or low quantities, you're doing that with the understanding and knowledge that this will lead to a significant piece of business. Again, very relevant to the future.

I don't understand why, if he's going to

| | | |
|---|---|---|
| 02:24 | 1 | run a sales report, why would you cut it off at the |
| 02:24 | 2 | smallest customers.  There's no reason to. |
| 02:24 | 3 | MR. CICCARELLI:  Let me -- |
| 02:25 | 4 | MR. SHORE:  Hang on.  Mr. Ciccarelli, can |
| 02:25 | 5 | you hang on? |
| 02:25 | 6 | So what we're talking about is a report |
| 02:25 | 7 | from an ERP system where they simply plug in the part |
| 02:25 | 8 | numbers and they print out a report of all the |
| 02:25 | 9 | customers, which he's been promising me for two weeks |
| 02:25 | 10 | which I've seen nothing. |
| 02:25 | 11 | So every single customer should be |
| 02:25 | 12 | disclosed, because those small customers can often end |
| 02:25 | 13 | up being the biggest customers you will ever have. |
| 02:25 | 14 | MR. CICCARELLI:  Your Honor, what I |
| 02:25 | 15 | explained to Mr. Shore is the sales report will have |
| 02:25 | 16 | all sales and all customers.  The issue with the limit |
| 02:25 | 17 | was to avoid chasing down small agreements or purchase |
| 02:25 | 18 | orders with small clients.  But what I also told |
| 02:25 | 19 | Mr. Shore, and it's reflected in our dispute chart, is |
| 02:25 | 20 | once he sees the list of all the customers, if there |
| 02:25 | 21 | are some customers that fall below that threshold that |
| 02:25 | 22 | he thinks may be relevant, if he sees an Apple on there |
| 02:25 | 23 | or whatever, I said, come back to us and we'll go get |
| 02:25 | 24 | that agreement for you. |
| 02:26 | 25 | So it's a nonissue.  The report will have |

02:26  1   all customers.  We're going to get -- we're going to

02:26  2   pull all the agreements, hopefully down to some

02:26  3   threshold.  And if after he sees them, he needs the

02:26  4   ones below the threshold, we're willing to go get those

02:26  5   as well.

02:26  6                    THE COURT:  Anything else?

02:26  7                    MR. SHORE:  Just that discovery closes in

02:26  8   November, and we're taking depositions in Sicily in

02:26  9   September.  And I'm not sure I'm going to have time to

02:26  10  come back.

02:26  11                   THE COURT:  I'll be back in a second.

02:26  12                   (Pause in proceedings.)

02:28  13                   THE COURT:  If we can go back on the

02:28  14  record.

02:28  15                   The Court is not going to grant any

02:28  16  additional relief at this time under Interrogatory

02:28  17  No. 1.

02:28  18                   Mr. Shore, I'm happy to hear from you

02:28  19  with respect to Interrogatory No. 2.

02:28  20                   MR. SHORE:  Your Honor, as a

02:28  21  clarification, you are going to enforce the agreement

02:28  22  that he made to produce everything related to silicon

02:28  23  carbide MOSFETs?

02:28  24                   THE COURT:  He made the agreement.  I

02:28  25  don't think I'm going to need to.  If you find he

| | | |
|---|---|---|
| 02:28 | 1 | doesn't, certainly come back to me and I will get |
| 02:28 | 2 | involved. |
| 02:28 | 3 | MR. SHORE:  Okay.  And then the only |
| 02:28 | 4 | other thing I'd ask is that we get some kind of date by |
| 02:28 | 5 | which this is going to happen, because again, we've |
| 02:28 | 6 | been waiting for two weeks and we have final |
| 02:28 | 7 | infringement contentions and other things coming up. |
| 02:29 | 8 | But... |
| 02:29 | 9 | Okay.  Let's -- moving to Interrogatory |
| 02:29 | 10 | No. 2, they just didn't answer it.  Just flat out |
| 02:29 | 11 | didn't answer it. |
| 02:29 | 12 | They -- the meaning -- we asked for the |
| 02:29 | 13 | meaning of the letters, numbers and symbols used in the |
| 02:29 | 14 | product codes.  They just didn't answer it. |
| 02:29 | 15 | The approximate date, day, month and year |
| 02:29 | 16 | each product became available for distribution or sale |
| 02:29 | 17 | in the United States.  They just didn't answer it. |
| 02:29 | 18 | And matching the data sheets to the |
| 02:29 | 19 | product numbers.  They didn't answer it. |
| 02:29 | 20 | So what they did was they gave us a list |
| 02:29 | 21 | of products that they -- and of course they limited it |
| 02:29 | 22 | again to only those that share die.  So his agreement |
| 02:29 | 23 | that they're now going to give us for all SiC MOSFETs, |
| 02:29 | 24 | I would like to make sure that that is somewhere in the |
| 02:29 | 25 | record that that agreement was made and will be |

02:29  1    enforced.

02:29  2                    But the other thing is, we don't -- we

02:29  3    need to know -- and it's not equally burdensome.  When

02:30  4    you're looking at a part called an SCT 011 H75 G3AG, we

02:30  5    would like to know what all of those letters and

02:30  6    numbers mean.  That is internal to them.  That is their

02:30  7    information.  It is not equally -- equally burdensome

02:30  8    for us to go and suss out what stuff means.

02:30  9                    We'd like to know the first date each one

02:30  10   of those was sold in the United States.  We would also

02:30  11   like to have a data sheet matched -- you know, the

02:30  12   numbered data sheet matched to the product or to the

02:30  13   part.

02:30  14                    They just did not answer any of that

02:30  15   information.

02:30  16                    THE COURT:  Mr. Ciccarelli?

02:30  17                    MR. CICCARELLI:  Yes, Your Honor.

02:30  18                    So this interrogatory asks for a list of

02:30  19   products.  And the products that we listed were the

02:30  20   products that, as I discussed earlier, at the time we

02:30  21   were considering the scope of production -- of

02:30  22   discovery, as we told Mr. Shore, to be the accused

02:31  23   products and all products made with those die.

02:31  24                    We provided him the list of those

02:31  25   products.  We are now agreeing to go broader and to go

02:31  1    to all silicon carbide MOSFETs.

02:31  2                    When Mr. Shore told us he was having

02:31  3    issues, what we went ahead and provided to him was

02:31  4    information -- and I'm showing it on the screen --

02:31  5    showing exactly which products use which die.  And then

02:31  6    for each die we pointed him to the documents that we

02:31  7    produced to them that describe how that die is made.

02:31  8    So he has all that information.

02:31  9                    The data sheets also tell him exactly

02:31  10   what that product is.  Nevertheless, we have found a

02:31  11   document that actually tells him what each of those

02:31  12   characters usually stands for.  And it's not always

02:31  13   consistent, but we found a document that describes

02:31  14   that.  And we will produce that document to him as

02:31  15   well.

02:31  16                    And as soon as we generate this sales

02:32  17   report according to this new agreement of this broader

02:32  18   scope, we will supplement of course Interrogatory 2 to

02:32  19   list all the products.

02:32  20                    One area of dispute that I think does

02:32  21   remain is we are focusing on the products that existed

02:32  22   and were sold during the damages period.  Mr. Shore

02:32  23   wants that list of products to go all the way back to

02:32  24   2009.

02:32  25                    We don't understand why we have to dig up

| | | |
|---|---|---|
| 02:32 | 1 | that list, so we propose to start and to make it during |
| 02:32 | 2 | the damages period.  That, I think, is really the last |
| 02:32 | 3 | remaining issue of dispute. |
| 02:32 | 4 | I think that answers the questions, but |
| 02:32 | 5 | I'll gladly answer any questions the Court may have. |
| 02:32 | 6 | THE COURT:  Mr. Shore, anything else? |
| 02:32 | 7 | MR. SHORE:  Your Honor, the only issue |
| 02:32 | 8 | with it is this is an interrogatory.  And we still |
| 02:32 | 9 | don't have a verification.  We don't have anything that |
| 02:32 | 10 | we can put in front of the jury and say this is a sworn |
| 02:32 | 11 | answer to this interrogatory. |
| 02:32 | 12 | So I don't know what this document is. |
| 02:32 | 13 | This is the first time I've ever heard that there's a |
| 02:32 | 14 | document that has some kind of a key to what all these |
| 02:33 | 15 | symbols mean.  First time I've heard it is today. |
| 02:33 | 16 | But this is a very simple, |
| 02:33 | 17 | straightforward interrogatory.  It needs to be answered |
| 02:33 | 18 | as an interrogatory.  And if he wants to refer us to a |
| 02:33 | 19 | document under 33(d) by Bates number, that's fine.  But |
| 02:33 | 20 | it needs to be in an interrogatory response.  And it |
| 02:33 | 21 | needs to be under oath. |
| 02:33 | 22 | MR. CICCARELLI:  I can address that.  So |
| 02:33 | 23 | I believe that our rog did list the products.  And we |
| 02:33 | 24 | will supplement the rog with a list of products as soon |
| 02:33 | 25 | as we run the sales report so that we know what |

| | | |
|---|---|---|
| 02:33 | 1 | products to put in there. |
| 02:33 | 2 | In terms of the verification, Your Honor, |
| 02:33 | 3 | of course we will verify these before they take |
| 02:33 | 4 | depositions.  Purdue has not been verifying their rog |
| 02:33 | 5 | responses.  I'm sure they will before we start taking |
| 02:33 | 6 | their depositions. |
| 02:33 | 7 | And given that one of their depositions |
| 02:33 | 8 | is tomorrow, I assume they're going to give us verified |
| 02:33 | 9 | rog responses tonight so we can use them with their |
| 02:33 | 10 | witness.  But of course we will.  It's just since we're |
| 02:33 | 11 | going to be supplementing, we didn't think it was smart |
| 02:33 | 12 | use of our time to do that right now. |
| 02:34 | 13 | THE COURT:  I'll be back in a second. |
| 02:34 | 14 | (Pause in proceedings.) |
| 02:35 | 15 | THE COURT:  The Court is going to order |
| 02:35 | 16 | ST to supplement Interrogatory No. 2. |
| 02:35 | 17 | My question to Mr. Ciccarelli is:  What |
| 02:35 | 18 | is a reasonable ETA for you to get that done? |
| 02:35 | 19 | MR. CICCARELLI:  I'm -- we have -- I'm |
| 02:35 | 20 | hoping to get the sales report next week.  And so I |
| 02:35 | 21 | think the first few days of the week after that I |
| 02:35 | 22 | should be able to give him the list. |
| 02:35 | 23 | THE COURT:  Okay.  Let's make that the |
| 02:35 | 24 | date then. |
| 02:35 | 25 | MR. CICCARELLI:  Okay.  And, Your Honor, |

02:35  1    are you deciding or deciding not to decide the issue

02:35  2    regarding the going back to 2009 as opposed to only

02:35  3    during the damages period?

02:35  4                THE COURT:  I think going back to 2009

02:35  5    sounds reasonable.  So I'm going to order that as well.

02:35  6                Mr. Shore, Interrogatory No. 3?

02:36  7                MR. SHORE:  All right.  This one, Your

02:36  8    Honor, is this is the guts of the case.  So what

02:36  9    they've tried to do here is they've tried to tell us

02:36  10   that if they just give us a bunch of process documents,

02:36  11   that we can figure out for ourselves the answer to all

02:36  12   of these interrogatory subparts.

02:36  13               They're the ones who make these parts.

02:36  14   They're the ones who have engineers who design the

02:36  15   parts.  They're the ones who manufacture the parts.

02:36  16   They're the ones who do destructive reverse engineering

02:36  17   and testing of the parts.  They're the ones who do

02:36  18   short loops on each individual aspect of the parts.

02:36  19   They can answer these questions for each of these

02:36  20   silicon carbide MOSFETs.

02:36  21               It is -- this is very, very discrete

02:36  22   clear information.  Let me just give you an example.

02:36  23   The dimension of the MOSFET die, including the

02:36  24   dimensions of the front surface, the dimensions of the

02:36  25   rear surface and the thickness, distance between front

02:36  1    and rear surfaces.  Any engineer at ST who deals with

02:37  2    these could sit down and answer that question for each

02:37  3    one of these MOSFET dies in 30 seconds.  It's not hard.

02:37  4              The name of each functionally and

02:37  5    chemically distinct layer region in the MOSFET and the

02:37  6    dimensions, material composition, conductivity.  Any

02:37  7    engineer at ST who works with these parts can do this

02:37  8    in five minutes.  Well, five minute for each part.

02:37  9              So the idea that we're asking them what

02:37  10   are the individual discrete regions, how large are

02:37  11   they, what are they made of, et cetera, and asking them

02:37  12   to identify that, that is the case.

02:37  13             And it is not substantially equal burden

02:37  14   for someone who does not manufacture parts, who does

02:37  15   not manufacture these parts, who did not design these

02:37  16   parts, to answer these questions.

02:37  17             I mean, this set of questions under oath

02:37  18   is going to be the case.  This is it.  So this is

02:38  19   critically important, especially if we have

02:38  20   infringement contentions, you know, coming up due.

02:38  21             You know, like I said, I could pull out

02:38  22   MOSFETs, super junction MOSFETs, from an old case

02:38  23   between us and ST, and I could do this, you know, based

02:38  24   upon those old parts.  So the idea that this is equally

02:38  25   burdensome to them as to us is just unfathomable.

| | | |
|---|---|---|
| 02:38 | 1 | THE COURT:  Mr. Ciccarelli? |
| 02:38 | 2 | MR. CICCARELLI:  Thank you, Your Honor. |
| 02:38 | 3 | We have a couple of different issues here. |
| 02:38 | 4 | One is -- and I have the interrogatory up |
| 02:38 | 5 | on the screen -- the number of very different type of |
| 02:38 | 6 | information that Mr. Shore's seeking, right?  If we're |
| 02:38 | 7 | going to get to the point where we actually have to |
| 02:38 | 8 | respond to these, I think they're separate |
| 02:39 | 9 | interrogatories. |
| 02:39 | 10 | But I don't even want to go there because |
| 02:39 | 11 | some of the information that it seeks is not as |
| 02:39 | 12 | straightforward as Mr. Shore states.  For example, the |
| 02:39 | 13 | arrangement of the drain in relation to the rear |
| 02:39 | 14 | surface.  Is he talking about horizontally?  Is he |
| 02:39 | 15 | talking about vertically? |
| 02:39 | 16 | The arrangement of each source region |
| 02:39 | 17 | within the MOSFET die. |
| 02:39 | 18 | THE COURT:  Mr. Ciccarelli, can you give |
| 02:39 | 19 | me just one second? |
| 02:39 | 20 | (Pause in proceedings.) |
| 02:40 | 21 | THE COURT:  I'm going to deny any relief |
| 02:40 | 22 | on Interrogatory No. 3. |
| 02:40 | 23 | Interrogatory No. 4, Mr. Shore, I'm happy |
| 02:40 | 24 | to hear from you. |
| 02:40 | 25 | Mr. Shore, if you're talking, I can't |

—41—

02:40    1    hear you.

02:40    2                    MR. SHORE:  Apologies.

02:40    3                    Interrogatory No. 4 is, again, they refer

02:40    4    us to Rule 33(d) but they don't match any documents by

02:40    5    Bates number to any specific device.  Many of these

02:40    6    documents, again, are in Italian, and you can't

02:40    7    reference foreign documents in a Rule 33(d) response.

02:40    8                    The correlation information that they say

02:40    9    they correlated data sheets or correlated process flows

02:40   10    to parts, we found 35 of the parts that we've already

02:40   11    accused.  35 where there's no correlation at all.

02:40   12                    So again, we have to -- you know,

02:41   13    especially if the Court is not going to, you know, make

02:41   14    them answer Interrogatory No. 3, at the very least in

02:41   15    answering Interrogatory No. 4, if they're going to

02:41   16    refer us to process flows, GDS files and other

02:41   17    documents and materials, they have to match them to the

02:41   18    individual parts by Bates numbers so that we can go

02:41   19    back and spend hundreds and maybe thousands of hours

02:41   20    doing what needs to be done for Interrogatory No. 3.

02:41   21                    So if you're not going to make them do

02:41   22    Interrogatory No. 3, the very least, please, Your

02:41   23    Honor, you have to make them do, is give us the GDS

02:41   24    files, the process flows, the data sheets, and

02:41   25    correspond by Bates number to the individual parts.

| | | |
|---|---|---|
| 02:41 | 1 | And to the extent any of those documents are in |
| 02:41 | 2 | Italian, they have to give us a certified translation |
| 02:41 | 3 | because we do not speak Italian. |
| 02:41 | 4 | And, you know, it's not equally |
| 02:41 | 5 | burdensome for us to go through documents in Italian to |
| 02:42 | 6 | try to figure out what their parts look like. |
| 02:42 | 7 | MR. CICCARELLI:  Your Honor, I think I |
| 02:42 | 8 | can address that.  So as I described earlier for each |
| 02:42 | 9 | product, I didn't even wait to supplement the rog |
| 02:42 | 10 | responses.  I sent Mr. Shore an e-mail with this |
| 02:42 | 11 | correlation information:  For each of the products they |
| 02:42 | 12 | have accused I went in and provided the die that that |
| 02:42 | 13 | product uses. |
| 02:42 | 14 | And then for that -- for each of those |
| 02:42 | 15 | die I gave him the Bates numbers of the process flow |
| 02:42 | 16 | for the wafer, the process flow for the front end, the |
| 02:42 | 17 | GDS data, the mask information.  I gave him that |
| 02:42 | 18 | information so that he can do that analysis. |
| 02:42 | 19 | Some of the process -- the process flows |
| 02:42 | 20 | do have a column that has the description of the |
| 02:42 | 21 | processes in Italian.  And so what I also gave him was |
| 02:42 | 22 | a list translating those Italian words into English so |
| 02:42 | 23 | that he didn't even have to go to Google to do it. |
| 02:42 | 24 | So we have given the correlation that he |
| 02:42 | 25 | was looking for.  We gave it to him right away.  We |

| | | |
|--|--|--|
| 02:42 | 1 | gave him the other information.  And we will of course |
| 02:43 | 2 | add this information to our next supplementation of the |
| 02:43 | 3 | interrogatories. |
| 02:43 | 4 | And we've done it for the products that |
| 02:43 | 5 | were accused and we're now going to do it also for all |
| 02:43 | 6 | the other silicon carbide MOSFETs. |
| 02:43 | 7 | MR. SHORE:  Well, that's not accurate. |
| 02:43 | 8 | They didn't give us for 35 of the products that are |
| 02:43 | 9 | accused which we listed in our dispute chart.  But, |
| 02:43 | 10 | again, all I can ask, Your Honor, is to give us a fair |
| 02:43 | 11 | shot. |
| 02:43 | 12 | THE COURT:  I'll be back in a few |
| 02:43 | 13 | seconds. |
| 02:43 | 14 | (Pause in proceedings.) |
| 02:47 | 15 | THE COURT:  If we could go back on the |
| 02:47 | 16 | record. |
| 02:47 | 17 | The Court is going to deny the relief |
| 02:47 | 18 | sought by plaintiff on supplementing Interrogatory |
| 02:47 | 19 | No. 4. |
| 02:47 | 20 | We'll turn to Interrogatory No. 5.  I'll |
| 02:47 | 21 | hear from Mr. Shore. |
| 02:47 | 22 | MR. CICCARELLI:  You're on mute, Michael. |
| 02:47 | 23 | MR. SHORE:  Interrogatory No. 5 is the |
| 02:47 | 24 | basic financial information that you get in every |
| 02:47 | 25 | single patent case.  They referred us to Rule 33(d), |

—44—

02:47   1   but they didn't provide a single Bates number.  They

02:47   2   didn't match any documents to any parts.  They didn't

02:48   3   answer.

02:48   4                   THE COURT:  Mr. Ciccarelli?

02:48   5                   MR. CICCARELLI:  Yes, Your Honor.

02:48   6                   So this is -- we were -- our goal was to

02:48   7   produce a sales report and then supplement with the

02:48   8   Bates numbers of the sales report.  As we were in the

02:48   9   process of doing that, we were having discussions with

02:48  10   Mr. Shore about the scope of the products.  It was

02:48  11   clear that he was not going to be happy with that

02:48  12   scope, and so we put a halt on that sales report.

02:48  13                   The sales report that we're working on

02:48  14   getting that should be ready next week, we will of

02:48  15   course supplement the rog to point him to that

02:48  16   spreadsheet.  And that would have the sales

02:48  17   information, the customer information, number of units,

02:48  18   revenue and things of that nature.

02:48  19                   MR. SHORE:  Your Honor, that doesn't even

02:48  20   come close to answering the interrogatory.  So what

02:48  21   he's saying is they're not going to give us the cost of

02:48  22   goods sold.  They're not going to give the royalty

02:48  23   burden.  They're not going to give us the gross margin.

02:48  24   They're not going to give the average selling price.

02:49  25   They're not going to give us the name of the product

02:49   1    corresponding to the product code.

02:49   2                They're not going to do it on a

02:49   3    product-by-product basis or part-by-part basis.

02:49   4    They're going to give us some sort of a global -- I

02:49   5    have no idea what the sales report's going to say, but

02:49   6    it's certainly -- I've never seen a sales report that

02:49   7    has the royalty burden, the gross margins, the cost of

02:49   8    goods sold.  They're just going to give us a report of

02:49   9    what they've sold.

02:49   10               THE COURT:  Got it.

02:49   11               Mr. Ciccarelli?

02:49   12               MR. CICCARELLI:  Yes.  Certainly.

02:49   13               So in terms of product-by-product, I've

02:49   14   told Mr. Shore it will be product-by-product so he has

02:49   15   that.  From that, obviously, he can figure out the

02:49   16   average selling price.

02:49   17               The cost of goods sold and royalty burden

02:49   18   are issues that we are working on collecting documents

02:49   19   on.  I've had calls trying to get to the right people.

02:49   20   And so we will, of course, produce that as soon as

02:49   21   possible, but the report should give him 95 percent of

02:49   22   what he's looking for.

02:49   23               And obviously the cost information is

02:49   24   information that we, ST, want to produce because it

02:50   25   would help us.  So we're incentivized to produce it.

—46—

| | | |
|---|---|---|
| 02:50 | 1 | And that's why -- one of the reasons we're looking for |
| 02:50 | 2 | it. |
| 02:50 | 3 | MR. SHORE:  The first I've heard they're |
| 02:50 | 4 | ever going to produce anything on that was just now. |
| 02:50 | 5 | First time. |
| 02:50 | 6 | THE COURT:  Okay.  Well, here's what |
| 02:50 | 7 | we're going to do:  You're going to get whatever you |
| 02:50 | 8 | get next week.  Whatever parts of the interrogatory are |
| 02:50 | 9 | not sufficiently covered by what you get, contact |
| 02:50 | 10 | Mr. Ciccarelli.  He can either tell you what's |
| 02:50 | 11 | remaining that will be coming and when.  If he can't do |
| 02:50 | 12 | that to your satisfaction, just let Regan know and |
| 02:50 | 13 | we'll get back together. |
| 02:50 | 14 | Sounds like this information is coming |
| 02:50 | 15 | towards you. |
| 02:50 | 16 | Interrogatory No. 6. |
| 02:50 | 17 | MR. SHORE:  Interrogatory No. 6 is -- it |
| 02:50 | 18 | also goes to is kind of the whole royalty burden |
| 02:50 | 19 | analysis as well.  Every one of these cases the expert |
| 02:50 | 20 | for the defendant gets up and says, well, if we paid |
| 02:50 | 21 | you 2 percent, we'd go bankrupt because hundreds of |
| 02:50 | 22 | patents cover these parts. |
| 02:51 | 23 | So we ask this in every case.  I've never |
| 02:51 | 24 | had it -- frankly, I've never had it objected to |
| 02:51 | 25 | before.  But -- that I can recall. |

02:51  1          But we're just saying, okay, if you're

02:51  2  going to claim that you can't pay us a royalty of what

02:51  3  we're asking for because there's so many other patents

02:51  4  cover these products, then you need to tell us what

02:51  5  patents cover the products.

02:51  6          And if you're going to say that no

02:51  7  patents cover the products or you're not aware of any

02:51  8  other patents cover the production, that's fine.  You

02:51  9  can say that.  But you have to answer the question.

02:51  10          If you contend that there is any other

02:51  11  patent that covers these products that you could

02:51  12  potentially be asked to pay royalties on, you got to

02:51  13  tell us.

02:51  14          THE COURT:  Mr. Ciccarelli?

02:51  15          MR. CICCARELLI:  Yes, Your Honor.  What

02:51  16  we explained to -- and also put in our rog response to

02:51  17  Mr. Shore is that ST does not track which of its

02:51  18  patents covers which of its products.  And so currently

02:51  19  we're not aware of any such patents.

02:52  20          We're obviously trying to explore the

02:52  21  issue, because to the extent that we want to argue that

02:52  22  at trial, we understand that we have to provide that

02:52  23  information.  We're just not aware of any patents right

02:52  24  now that as -- if and when we find them, we will of

02:52  25  course supplement timely to the interrogatory.

02:52    1                MR. SHORE:  Then that's all they got to

02:52    2   say then is we are currently unaware of any patents --

02:52    3   other patents that cover our products, period.

02:52    4                THE COURT:  Mr. Shore, if you would give

02:52    5   me a turn, please.

02:52    6                I was literally about to say,

02:52    7   Mr. Ciccarelli, it sounds to me like what you're saying

02:52    8   is you are currently unaware.  And if you do become

02:52    9   aware, then you'll supplement, correct?

02:52   10                MR. CICCARELLI:  Correct, Your Honor.

02:52   11   And our rog response says as much.

02:52   12                THE COURT:  Okay.  Then let's go to

02:52   13   Interrogatory No. 8.

02:52   14                MR. SHORE:  This is sort of the corollary

02:52   15   to the request for admission that the Court granted.

02:52   16   And we're saying if you contend that any of the

02:53   17   following products are not MOSFETs, and we actually

02:53   18   list the products, then tell us --

02:53   19                THE COURT:  Here's what I'm going to do

02:53   20   on that:  My guess is that we don't need to get to that

02:53   21   yet.  Let's see how they respond to the request for

02:53   22   admission.  And then if, depending on how they do that,

02:53   23   you can see how they supplement the interrogatory.

02:53   24                So I don't know that that's an issue

02:53   25   that's ripe yet.  I understand it, but let's see how

| | | |
|---|---|---|
| 02:53 | 1 | they respond to the RFA. |
| 02:53 | 2 | So let's turn to Rog No. 9. |
| 02:53 | 3 | MR. SHORE:  We can drop that one off. |
| 02:53 | 4 | THE COURT:  Okay.  I think that's all, |
| 02:53 | 5 | unless I missed something. |
| 02:53 | 6 | MR. SHORE:  We did miss something.  Back |
| 02:53 | 7 | in one of the requests for production you never ruled |
| 02:53 | 8 | on whether or not they had to produce their agreements |
| 02:53 | 9 | with Cree and Wolfspeed on the starting material, the |
| 02:53 | 10 | silicon carbide starting material that has been |
| 02:53 | 11 | supplied to them. |
| 02:53 | 12 | There was a press announcement of an |
| 02:53 | 13 | $800 million contract and another one of a $1.5 billion |
| 02:54 | 14 | contract.  And those should include forecasts.  They |
| 02:54 | 15 | will also have timing of when those products are going |
| 02:54 | 16 | to be provided, over how many years or quarters. |
| 02:54 | 17 | That information is clearly responsive to |
| 02:54 | 18 | the interrogatory.  It's clearly relevant.  There's no |
| 02:54 | 19 | excuse not to produce it that I can think of. |
| 02:54 | 20 | THE COURT:  If I could -- that must have |
| 02:54 | 21 | gone by me. |
| 02:54 | 22 | Mr. Ciccarelli? |
| 02:54 | 23 | MR. CICCARELLI:  Yeah, sorry, Your Honor. |
| 02:54 | 24 | We never went to that second point.  I divided it into |
| 02:54 | 25 | two areas and then I never brought you back.  I |

02:54   1    apologize.

02:54   2              So yeah.  So one -- earlier we were

02:54   3    talking about customer agreements.  Now Mr. Shore wants

02:54   4    a supplier agreement.

02:54   5              The interrogatory -- I have it up on the

02:54   6    screen right now.  It asks for things concerning

02:54   7    semiconductor products that would encompass SiC

02:54   8    MOSFETs, okay?  Silicon carbide MOSFETs.  So, for

02:54   9    example, if we were buying silicon carbide MOSFETs from

02:55   10   TSMC, a foundry, yes, an agreement with TSMC would be

02:55   11   relevant.

02:55   12             Here he's talking about a vendor from

02:55   13   whom we buy bare wafers.  There are no MOSFETs on those

02:55   14   wafers.  So it has nothing to do with the products at

02:55   15   issue here other than, yes, we may take some of those

02:55   16   wafers and use them to make MOSFETs, about which he's

02:55   17   going to get all the information.

02:55   18             So it actually falls outside the scope of

02:55   19   Interrogatory 1 because it is not an agreement for

02:55   20   semiconductor products that encompass MOSFETs.  It's

02:55   21   that simple.

02:55   22             If he really wants it, he can serve a

02:55   23   request.  But I really don't understand why he wants

02:55   24   the agreements, since he's going to get all the sales

02:55   25   information from ST.

| | | |
|---|---|---|
| 02:55 | 1 | MR. SHORE:  Your Honor, may I respond? |
| 02:55 | 2 | THE COURT:  Sure. |
| 02:55 | 3 | MR. SHORE:  I want this agreement because |
| 02:55 | 4 | he's going to give me past sales information.  What |
| 02:55 | 5 | this will give me is future projected sales.  So -- and |
| 02:56 | 6 | it will tell me exactly when these projected sales are |
| 02:56 | 7 | supposed to take place. |
| 02:56 | 8 | Because the way a $1.5 billion supply |
| 02:56 | 9 | agreement for silicon carbide substrates used in the |
| 02:56 | 10 | manufacture of silicon carbide MOSFETs, it will have a |
| 02:56 | 11 | call-off schedule, saying we get so many substrates in |
| 02:56 | 12 | this quarter, so many in the next quarter. |
| 02:56 | 13 | And that is very valuable information to |
| 02:56 | 14 | me and to Purdue, because it lets us know what their |
| 02:56 | 15 | forecast for the future is for sales.  So this all goes |
| 02:56 | 16 | to the future.  Their sales report goes to the past. |
| 02:56 | 17 | But you can't make and sell silicon |
| 02:56 | 18 | carbide MOSFETs unless you have starting material.  And |
| 02:56 | 19 | you have to have the starting material secured years in |
| 02:56 | 20 | advance so that you don't have any supply chain issues |
| 02:56 | 21 | when you have a customer who wants to buy. |
| 02:56 | 22 | And I believe, actually, that Wolfspeed |
| 02:56 | 23 | is not the only one they buy these from.  They buy |
| 02:56 | 24 | 6-inch and 8-inch silicon carbide substrates.  So it's |
| 02:57 | 25 | not just the Cree/Wolfspeed.  We believe they're also |

```
02:57   1    buying from another source.
02:57   2                    So this goes to forecast of future sales
02:57   3    which is a very important element of damages.  It
02:57   4    clearly concerns their supplying ST power SiC MOSFETs,
02:57   5    because they can't supply them without the substrates
02:57   6    to make them.
02:57   7                    THE COURT:  Mr. Ciccarelli, anything
02:57   8    else?
02:57   9                    MR. CICCARELLI:  English is not my first
02:57   10   language, but I think that falls outside the scope of
02:57   11   this request, since they're not -- they don't contain
02:57   12   any MOSFETs.  I think it's that simple, Your Honor.
02:57   13                   THE COURT:  Mr. Shore, any response to
02:57   14   that?
02:57   15                   MR. SHORE:  It definitely -- that
02:57   16   contract concerns the supply of ST power SiC MOSFETs,
02:57   17   because they cannot supply them without the starting
02:57   18   material.  And it also gives the forecasts for their
02:57   19   future sales.  So --
02:57   20                   THE COURT:  I don't think I -- I don't
02:58   21   think I agree with you.  Distribution of semiconductor
02:58   22   products, we've already -- we start going full circle
02:58   23   here what you got me to have them admit to is that the
02:58   24   products that they have -- let's see.  Give me a
02:58   25   moment.  Back up here.
```

02:58  1               So, Mr. Ciccarelli, why wouldn't

02:58  2    Mr. Shore be correct that these agreements have to do

02:58  3    with concerning the supply of what will ultimately

02:58  4    become MOSFETs manufactured by ST?  Maybe I don't know

02:58  5    enough about the connection between the agreement you

02:58  6    have acquiring just this silicon or silicon wafers and

02:58  7    the relationship between whether or not those are going

02:58  8    to be manufactured into MOSFETs.

02:58  9               MR. CICCARELLI:  So silicon wafers are

02:59  10   just bare wafers.  They don't have any FETs, any

02:59  11   transistors or anything on them.  They're just bare

02:59  12   wafers.  ST then processes those to create what becomes

02:59  13   a MOSFET.  So what we buy from, for example, Cree -- or

02:59  14   now they're called Wolfspeed, has no MOSFETs.

02:59  15               THE COURT:  I get that.  But it says --

02:59  16   but I don't understand why, if you're buying -- if

02:59  17   you've made arrangements from a company to buy the

02:59  18   wafers and the wafers are going to be turned into the

02:59  19   MOSFETs, why wouldn't that be information concerning

02:59  20   the supply of the MOSFETs?

02:59  21               This is how the MOSFETs are born, is it

02:59  22   not?

02:59  23               MR. CICCARELLI:  Yeah.  I guess

02:59  24   structurally we're looking at it differently.  It

02:59  25   doesn't concern semiconductor products that have

| | | |
|---|---|---|
| 02:59 | 1 | MOSFETs in them, right? |
| 02:59 | 2 | I see how Your Honor is viewing it.  I |
| 02:59 | 3 | guess I'm reading it differently. |
| 02:59 | 4 | THE COURT:  Yeah.  The way I read it, I |
| 03:00 | 5 | think it falls within the interrogatory. |
| 03:00 | 6 | Now, if you want to argue about whether |
| 03:00 | 7 | or not despite that it should still be produced, I'm |
| 03:00 | 8 | happy to hear an argument along those lines. |
| 03:00 | 9 | MR. CICCARELLI:  Certainly, Your Honor. |
| 03:00 | 10 | So the forecast, et cetera, wafers are used for |
| 03:00 | 11 | different types of products, right?  We -- ST makes |
| 03:00 | 12 | diodes which Mr. Shore is not interested in talking |
| 03:00 | 13 | about when it comes to silicon carbide.  And we make |
| 03:00 | 14 | MOSFETs.  So those wafers could be used for different |
| 03:00 | 15 | things. |
| 03:00 | 16 | Also even if those wafers were all being |
| 03:00 | 17 | used for silicon carbide MOSFETs, the forecast, |
| 03:00 | 18 | et cetera, is information that he can get from ST in |
| 03:00 | 19 | other ways.  And that he will likely want from ST in |
| 03:00 | 20 | other ways.  If what he's saying is I will take those |
| 03:00 | 21 | agreements instead of forecast information, then maybe |
| 03:00 | 22 | we'll give him the agreements.  That might be an easier |
| 03:00 | 23 | way to handle the issue. |
| 03:00 | 24 | It just doesn't seem to be needed |
| 03:00 | 25 | information.  I think he's trying to make sure that |

03:00  1    we're actually reporting all of our sales.  And I think

03:01  2    there's other ways to achieve that.

03:01  3                    MR. SHORE:  Your Honor, may I respond,

03:01  4    Your Honor?

03:01  5                    THE COURT:  Yes.

03:01  6                    MR. SHORE:  This has nothing to do with

03:01  7    past sales.  Nothing.  This has to do with future.  So

03:01  8    his sales report is not going to tell me anything.

03:01  9                    And by the way, he is just wrong when he

03:01  10   says that when you look at the agreement you won't be

03:01  11   able to tell whether or not these silicon carbide --

03:01  12   silicon carbide base regions are for MOSFETs or diodes.

03:01  13   That's not true.  You can tell.  Because they will have

03:01  14   different properties.  They will have different

03:01  15   parameters.  They will have different specifications

03:01  16   for a MOSFET than they would for a diode.

03:01  17                    So we will be able to look at these

03:01  18   contracts.  We'll be able to tell exactly how many

03:01  19   MOSFETs they're expecting to sell or supply.  Let's use

03:01  20   the word in the interrogatory.  We will be able to look

03:01  21   and see exactly how many MOSFETs that they are looking

03:01  22   to supply over the course of the next several years.

03:02  23                    And that is incredibly important

03:02  24   information for us.  Otherwise how are we supposed to

03:02  25   get that information?  Try to suss it out of thousands

03:02   1    of Italian and other documents and try to figure out

03:02   2    what it is?

03:02   3                    This will tell us.  Because you can't

03:02   4    make it without a substrate.  And if you have to have a

03:02   5    substrate, we know how many you're going to make

03:02   6    because that's how many you bought.

03:02   7                    So this is very straightforward.  It's

03:02   8    linear.  It's not -- it doesn't require us to go search

03:02   9    through some web and tangle of information and put

03:02   10   things together.  This is very linear information.

03:02   11                   THE COURT:  Mr. Ciccarelli, anything

03:02   12   else?

03:02   13                   MR. CICCARELLI:  No, Your Honor.

03:02   14                   THE COURT:  I'll be back in a second.

03:02   15                   (Pause in proceedings.)

03:03   16                   THE COURT:  If we can go back on the

03:03   17   record.

03:03   18                   The Court is going to deny the request

03:03   19   for this information related to the acquisition of

03:03   20   these wafers from a third party.

03:03   21                   I'm assuming ST has sufficient

03:03   22   information with respect to their forecasting for

03:03   23   production of the relevant MOSFETs going forward.  And

03:03   24   I think you can get the discovery from ST more directly

03:04   25   that way.

```
03:04    1                    Mr. Shore, I'll start with you.  Is there
03:04    2    anything else we needed to take up?
03:04    3                    MR. SHORE:  No, Your Honor.  I think
03:04    4    I'm -- I think I'm beat enough.
03:04    5                    (Laughter.)
03:04    6                    THE COURT:  Well, you know, you won --
03:04    7    you win some, you lose some.  You won the only trial
03:04    8    you've ever had in my court.  I mean, that's why I had
03:04    9    one win in the Federal Circuit and I quit there.  So...
03:04   10                    MR. SHORE:  Well, I'm not going to quit,
03:04   11    Your Honor.  I'm going to --
03:04   12                    THE COURT:  I understand.  My life would
03:04   13    be much more boring if I didn't have Michael Shore in
03:04   14    it.  So glad that you're in my court as often as you
03:04   15    are.  Obviously I'm glad to have Mr. Ciccarelli as
03:04   16    well.
03:04   17                    I look forward to hopefully seeing you
03:04   18    guys in person at some point in the near future.  Have
03:04   19    a good afternoon.  Take care.
03:04   20                    (Hearing adjourned.)
        21
        22
        23
        24
        25
```

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5    United States District Court, Western District of

6    Texas, do certify that the foregoing is a correct

7    transcript from the record of proceedings in the

8    above-entitled matter.

9      I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial

11   Conference of the United States.

12     Certified to by me this 16th day of July 2022.

13

14                              */s/ Kristie M. Davis*
                                KRISTIE M. DAVIS
15                              Official Court Reporter
                                800 Franklin Avenue
16                              Waco, Texas 76701
                                (254) 340-6114
17                              kmdaviscsr@yahoo.com

03:04

18

19

20

21

22

23

24

25