**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| THE TRUSTEES OF PURDUE UNIVERSITY,<br><br>        Plaintiff,<br><br>vs.<br><br>STMICROELECTRONICS INTERNATIONAL N.V., ET AL.,<br><br>        Defendants. | NO. 6:21–CV–727–ADA<br><br>JURY TRIAL DEMANDED |

### DEFENDANTS' MOTION TO COMPEL

Defendants move to compel production of communications and documents withheld by third-party Rembrandt IP Management, LLC ("Rembrandt") that are being improperly withheld under a claim of common interest privilege. The materials being withheld relate to discussions in 2015 with the former owner of the Patent-in-Suit, the Purdue Research Foundation ("PRF"). Rembrandt claims that the discussions with PRF were related to potentially asserting one of the two patents that was originally asserted in this litigation, namely the '112 Patent, which was also asserted against the same products accusing of infringing the lone remaining Patent-in-Suit.

Court today are understandably reluctant to require a patentee to produce communications with potential or actual litigation funders related to a present litigation.  But this is a different situation for multiple reasons. *First*, the communications at issue do not address this litigation. The discussions between PRF and Rembrandt occurred in 2015, which is six years before this lawsuit was filed and close to the date of the hypothetical negotiation, which would have been around 2014.[1] So these discussions are not tainted by rose-colored glasses of a party just about

---

[1] *See, e.g.*, https://blog.st.com/silicon-carbide/ and https://blog.st.com/sic-timeline/

1

to file suit. *Second*, Purdue likely discussed ST given that ST was selling the accused products in 2015. *Third*, Purdue's licenses to the patent-in-suit and technically comparable SiC patents were all negotiated and entered into in 2015 ▮▮▮▮▮▮▮▮▮▮. Thus Purdue's discussion of ST, ST's products, the future of the market for the Accused Products, these licenses, and how Purdue envisioned its licensing model going forward is highly relevant to the hypothetical negotiation. *Fourth*, as a non-competitor, these discussions disclose Purdue's business model of working with industry and licensing Purdue technology. *Fifth*, there is no common legal interest between PRF and Rembrandt that justifies withholding these materials. Defendants therefore request the Court order production of the documents and communications that Rembrandt is withholding.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed suit in July of 2021 asserting infringement of two patents directed to certain aspects of Silicon Carbide (SiC) MOSFETs, namely U.S. Patent No. 8,035,112 ("the '112 Patent") and U.S. Patent No. 7,498,633 ("the '633 Patent"). Both the '112 Patent and the '633 Patent share the same inventor: Dr. James Cooper. Both patents are directed to the exact same products, SiC MOSFETs.

Purdue produced a Confidential Non-Disclosure Agreement ("NDA") between Rembrandt IP Management, LLC ("Rembrandt") and Purdue Research Foundation dated October 21, 2015. Ex. A. Because the existence of the NDA suggested that Rembrandt and Purdue engaged in some sort of communications relating to the Patents-in-Suit, ST subpoenaed Rembrandt and requested the production of various categories of documents. Ex. B. In response to ST's subpoena, Rembrandt told ST that it would produce communications with PRF, and that there would only be 16 emails on a privilege log. Ex. C at 2. Rembrandt sent its documents to Purdue's counsel, who then "made a more thorough review of the docs" and decided that all of them were privileged. *Id.* at 1. Rembrandt, care of Purdue's counsel, then submitted a privilege

2

log that contains nearly every responsive document held by Rembrandt. Ex. D. These documents appear to concern Purdue's attempt in 2015-2016 to seek funding from Rembrandt to license one or more of Purdue's patents directed to SiC MOSFETs. Notably, although Purdue's privilege log runs from 2004 to 2021, none of these 2015 documents and communications with Rembrandt appear on Purdue's privilege log. Ex. E.

### ARGUMENT AND AUTHORITIES

**I. The Rembrandt documents are relevant.**

Just two years after the date of the hypothetical negotiation in this case, PRF was seeking funding from Rembrandt to help license one or more of PRF's patents directed to SiC MOSFETs. These discussions with Rembrandt would likely reveal Purdue's view on potential fair license rates, the value of the patented technology and technologically comparable patents, and PRF's view on the outlook of the future market for SiC MOSFETs. Notably, Purdue has sought similar information from ST, such as ST's past market forecasts for SiC MOSFETs, arguing that such material would be relevant to the hypothetical negotiation.

Further, this same 2015 time period is when PRF entered into the license agreements relating to the '633 Patent. For example, Purdue licensed the '633 Patent along with several of Dr. Cooper's other silicon carbide patents to ███████████ in 2015 in a ███ ███ license for ██████. Also in 2015, PRF granted ███ ████████ where ██ had ███████ license the '633 Patent for ██████. Purdue also entered into a royalty-bearing license agreement in 2015 with a start-up company called SemiQ (formerly the Global Power Technologies Group). Given the vastly disparate licensing rates, the fact that PRF's licenses include more than just the '633 Patent, Purdue's discussions with Rembrandt in 2015 will likely illuminate how Purdue viewed its licensing program, and what it viewed at that time as potentially fair licensing rates for the SiC

3

inventions to Dr. Cooper. Further, in 2015, the market for SiC MOSFETs was nascent. For example, ST began mass producing its SiC MOSFETts in 2014. So understanding how PRF (who would be the party negotiating the hypothetical license) viewed the future of the SiC MOSFET market is critically important.

Additionally, Purdue—through PRF—claims to partner with industry to commercialize their inventions. In fact. The 2015 SemiQ agreement included milestones for commercializing the licensed SiC technology. Further, Dr. Cooper has consulted with industry to commercialize SiC technology. The withheld Rembrandt materials may shed additional light on these issues, which as PRF's and Dr. Cooper's plans to work with particular companies to commercialize Dr. Cooper's alleged inventions. Such information PRF shared with Rembrandt is likely relevant to at least the following *Georgia Pacific* factors:

GP Factor 1 - royalties patentee receives for licensing the patent in suit;

GP Factor 4 - licensor's established policy and marketing program regarding patent licensing;

GP Factor 5 - commercial relationship between licensor and licensee (since PRF likely discussed ST);

GP Factor 8 - established profitability of the products made under the patent, its commercial success and its current popularity;

GP Factor 10 - the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and

GP Factor 13 - the portion of realizable profit attributable to the invention as distinguished from non- patented elements, significant features / improvements added by the infringer, the manufacturing process or business risks. *Georgia-Pacific Corp. v. United States Plywood Corp.*,

4

318 F. Supp. 1116, 1119–20 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.); *Unisplay, S.A. v. American Electronic Sign Co.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995).

Purdue cannot credibly argue that the Rembrandt materials are not relevant because it concerns the '112 Patent and not the '633 Patent. The '112 Patent is directed to the same products as the '633, specifically SiC MOSFETs. Indeed Purdue initially filed suit against ST alleging infringement of both the '112 Patent and the '633 Patent against the same products. Notwithstanding that the Court had dismissed the '112 Patent, it shares the same inventor as the '633 Patent—Dr. Cooper. Simply put, any discussions PRF and Rembrandt about the future marketplace of the products accused of infringement in this case, the market outlook, licensing rates, apportionment issues, valuations of the '112 Patent are all relevant because the '112 Patent and '633 Patent are technologically comparable. And because these discussions were in 2015 and in closer proximity to the date of the hypothetical negotiation than many of the available license agreements, this situation is quite unique as compared to many disputes where defendants attempt to uncover a patentee's discussion with litigation funders just before filing suit. Further, if PRF and Rembrandt discussed prior art for the '112 Patent, such prior art may also be relevant to the '633 Patent, whether as prior art, non-infringing alternatives, or an apportionment analysis.

## II. The Withheld Material is neither subject to the common-interest privilege nor work product.

Rembrandt bears the burden to establish that the materials are privileged or work product. *See In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1301 (Fed. Cir. 2016); *Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017); *Hodges, Grant & Kaufmann v. U.S. Gov't, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985). For the reasons below, Rembrandt has not met that burden, and the Court should order Rembrandt to produce the withheld materials.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Even assuming the underlying documents and legal analysis that were shared were once privileged, any such privilege was waived when shared with a third party like Rembrandt. *See Genentech, Inc. v. U.S. Int''l Trade Comm'n,* 122 F.3d 1409, 1415 (Fed. Cir. 1997) (noting that disclosure of communications or work product to a third party generally waives the protection).

Rembrandt cannot invoke the common-interest doctrine to avoid waiver of the privilege. The common-interest doctrine is "a narrow exception to the general rule that disclosing information to a third party constitutes waiver of privilege." Ex. F, *Thought, Inc. v. Oracle Corp.*, 2014 WL 3940294, at *2 (N.D. Cal. Aug. 11, 2014). To qualify for the protection, the interests between the parties must be **legal** and not commercial. *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 376 (D. Del. 2010). Additionally, the party claiming the privilege must demonstrate that "the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation." *Id.*

Multiple courts have addressed similar scenarios to that presented here and determined that the common-interest privilege does not apply. For example, in *Acceleration Bay LLC v. Activision Blizzard, Inc.*, a party sought to withhold documents and communications exchanged during negotiations regarding a litigation financing agreement on the basis of work product and the common-interest privilege. No. CV 16-453-RGA, 2018 WL 798731, at *1 (D. Del. Feb. 9, 2018). Specifically, the plaintiff stated that the communications were "for the purpose of funding to assert [the] patents." *Id.* In determining that documents were not privileged, the court noted that the communications were exchanged (1) before any substantive agreement was reached and (2) before any litigation was filed. *Id.*[2]

---

[2] The court in *Acceleration Bay* also determined the communications were not work product for two reasons. *Acceleration Bay*, 2018 WL 798731, at *1–2. *First*, the documents were not created for "primary purpose" of aiding future litigation, but rather to obtain funding. *Id.* at *2. *Second*, the documents were "prepared for a nonparty to the litigation," so "work production protection does not apply." *Id.* Both are true here as well.

6

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

The result here is the same. The withheld communications contain communications between two entities whose business it is to license patents, and these communications occurred before any formal agreement between Rembrandt and PRF was reached. Indeed, ultimately Rembrandt and PRF declined to enter into any business arrangement, making the current situation very different from those where discovery is sought regarding the funder that is funding the litigation in question. Further, these discussions took place before any litigation was filed. Accordingly, the withheld Rembrandt materials are not privileged. Further, there is no common interest privilege because Rembrandt and PRF did not have any shared legal interest. Instead, they were adverse to one another while trying to negotiate a business deal under their NDA.

Indeed, one court has determined that the very party withholding the documents here—Rembrandt—did not qualify for the common interest privilege. In *Thought, Inc. v. Oracle Corp.*, for example, the plaintiff sought to withhold communications with Rembrandt on the basis of privilege. No. 12-CV-05601-WHO MEJ, 2014 WL 3940294, at *1 (N.D. Cal. Aug. 11, 2014). The court noted that Rembrandt's business model is "directed at acquiring and licensing patents" and noted that the parties' communications were "primarily for business, not litigation, functions." *Id*. at *1, 3. Further, "evaluating patents to acquire and targets to assert those patents against are clearly business functions, and documents resulting from these functions cannot be categorized in sweeping assertions of privileges." *Id.* at *3 (quoting *Diagnostics Sys. Corp. v. Symantec Corp.*, No. SA CV 06-1211 DOC, 2008 WL 9396387, at *6 (C.D. Cal. Aug. 12, 2008))). Simply put, the dominant interests between Thought and [Rembrandt] were deciding whether to become business partners in monetizing the patent portfolio. As the negotiations were not made in an effort to formulate a joint defense, this is a non-privileged business decision." *Id.* Accordingly, the common-interest privilege did not apply.

7

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

The NDA between Rembrandt and PRF underscores these points. First, the NDA states that it was entered into merely to "define the rights and duties of the parties with respect to such Confidential Information as may be exchanged between the parties" while discussing a potential business arrangement. Rembrandt and PRF then stated that "[a]ny further or different business relationship between the parties shall be governed by a separate agreement." Ex. A at 1. The parties then defined "Confidential Material" as including information that could be considered privilege or attorney work product. "Confidential Information includes, but is not limited to . . . legal documents . . . license agreements, claim charts, documents regarding the scope and validity of patents and patent applications, an attorney's analysis or assessment of a party's position with respect to third parties in an anticipated or ongoing litigation." Ex. A at 1. However, while the agreement was negotiated between and among many lawyers, nothing in the NDA demonstrated an attempt to maintain these documents as privileged. For example, there is no mention in the NDA of any attempt to maintain privilege under any common interest privilege. Instead, the parties contemplated sharing any confidential material, including attorneys' notes, without any expectation that such materials would remain privileged. This makes sense given that under the NDA, there is no common legal interest between the parties in order to establish the common legal interest privilege.

\* \* \* \* \* \* \* \* \* \* \*

The Rembrandt materials are relevant to a damages analysis in this case and are not subject to the common-interest privilege or work product doctrine. The Court should reach the same conclusion as other courts, such as the court in *Thought, Inc. v. Oracle Corp.,* and order Rembrandt to produce the withheld documents and communications.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

October 28, 2022  Respectfully submitted:

By:    */s/ Justin S. Cohen*

**Bruce S. Sostek**
   SBN 18855700
   Bruce.Sostek@hklaw.com
**Richard L. Wynne, Jr.**
   SBN 24003214
   Richard.Wynne@hklaw.com
**Justin S. Cohen**
   SBN 24078356
   Justin.Cohen@hklaw.com
**Dina W. McKenney**
   SBN 24092809
   Dina.McKenney@hklaw.com
**Catherine L. Reynolds**
   SBN 24107599
   Cate.Reynolds@hklaw.com

**HOLLAND & KNIGHT LLP**
   One Arts Plaza
   1722 Routh St., Suite 1500
   Dallas, Texas 75201
   214.969.1700

**Max Ciccarelli**
   SBN 00787242
   max@ciccarellilawfirm.com

**CICCARELLI LAW FIRM**
   100 N. 6th Street, Suite 502
   Waco, Texas 76701
   214.444.8869

**Thomas N. Tarnay**
   SBN 24003032
   ttarnay@tarnaylaw.com

**THOMAS TARNAY PLLC**
   2103 Virginia Place
   Plano, Texas 75094
   214.395.8212

**ATTORNEYS FOR DEFENDANTS STMICROELECTRONICS, INC. AND STMICROELECTRONICS INTERNATIONAL N.V.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

## CERTIFICATE OF SERVICE

I certify that on October 28, 2022, the foregoing document was served via electronic mail on counsel of record for Plaintiff.

*/s/ Justin S. Cohen*
Justin Cohen

## CERTIFICATE OF CONFERENCE

The parties have conferred regarding the substance of the motion to compel. Rembrandt opposes the relief sought.

*/s/ Justin S. Cohen*
Justin Cohen