```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
                         WACO DIVISION

THE TRUSTEES OF PURDUE        )      Case No. 6:21-CV-727-ADA-DTG
UNIVERSITY,                   )
                             )
        Plaintiff,            )      **VIA ZOOM TELECONFERENCE**
                             )
    v.                        )
                             )
STMICROELECTRONICS, INC.,     )
et al.,                       )
                             )
        Defendants.           )
                             )      Tuesday, December 6, 2022
_____  )      1:30 P.M.
```

TRANSCRIPT OF DISCOVERY HEARING
**BEFORE THE HONORABLE DEREK T. GILLILAND**
**UNITED STATES MAGISTRATE JUDGE**

APPEARANCES ON NEXT PAGE.

```
Deputy Clerk:            Melissa Copp
                        U.S. District Court
                        800 Franklin Avenue, #140
                        Waco, Texas 76701


Transcription Service By:  Dipti Patel, CET-997
                        Liberty Transcripts
                        7306 Danwood Drive
                        Austin, Texas 78759
                        (847) 848-4907
                        www.libertytranscripts.com
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES VIA ZOOM TELECONFERENCE:

For the Plaintiff:          The Shore Firm
                            BY: MICHAEL W. SHORE, ESQUIRE
                                HALIMA SHUKRI NDAI, ESQUIRE
                            Bank of America Plaza
                            901 Main Street, Suite 3300
                            Dallas, Texas 75202

For Purdue University:      Susman Godfrey L.L.P.
                            BY:  ABBEY MCNAUGHTON, ESQUIRE
                            1000 Louisiana Street, Suite 5100
                            Houston, Texas 77002


For the Defendants:         Holland & Knight, LLP
                            BY: BRUCE S. SOSTEK, ESQUIRE
                            One Arts Plaza
                            1722 Routh Street
                            Suite 1500
                            Dallas, Texas 75201

                            Ciccarelli Law Firm
                            BY: MASSIMO CICCARELLI, ESQUIRE
                            750 North Street Paul Street
                            Suite 200
                            Dallas, Texas 75201

For X-Fab:                  Bracewell LLP
                            BY:  MIKE CHIBIB, ESQUIRE
                            111 Congress Avenue, Suite 2300
                            Austin, Texas 78701

                            Choate, Hall & Stewart LLP
                            BY:  MICHAEL MUNOZ, ESQUIRE
                                 JILLIAN GATELY, ESQUIRE
                            Two International Place
                            Boston, Massachusetts 02110

<u>INDEX</u>

<u>PAGE</u>

Case called                                              4

Court's Rulings on Discovery Dispute                     20
     Taken Under Advisement

End of Proceedings                                       22

Certificate of Transcriber                               22

|  | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|

<u>WITNESSES</u>

<u>FOR THE GOVERNMENT</u>:

(None)

<u>FOR THE DEFENDANT</u>:

(None)

| <u>EXHIBITS:</u> | <u>ID</u> | <u>EVD</u> |
|---|---|---|

<u>FOR THE GOVERNMENT</u>:

(None)

<u>FOR THE DEFENDANT</u>:

(None)

4

<u>Waco, Texas - Tuesday, December 6, 2022</u>                (1:30 p.m.)

## P R O C E E D I N G S

---O0O---

THE COURT:  All right.  Good afternoon, everybody.
We're here for a discovery dispute.  And I'm going to start by
asking Ms. Copp to call the case, please.

THE CLERK:  Yes, Your Honor.

Calling Case Number WA:21-CV-727, styled The Trustees
of Purdue University vs. STMicroelectronics, Inc., *et al.*, called
for a discovery hearing.

THE COURT:  And could I get announcements starting with
the plaintiff?

MR. SHORE:  Yes, Your Honor.  Good afternoon.  This is
Michael Shore, and with me today are Abbey McNaughton from the
Susman Godfrey firm representing Purdue University.

THE COURT:  Thank you, Mr. Shore, Ms. McNaughton.

And for defendant?

MR. CHIBIB:  Good afternoon, Your Honor.  Mike Chibib
at Bracewell on behalf of third-party subpoena recipient X-Fab.
With me are Michael Munoz and Jill Gately of the Choate Hall firm
also for X-Fab.

THE COURT:  Okay.  Very good.  Good to see you, Mr.
Chibib.

And then for -- do we have somebody on for STMicro?

MR. CICCARELLI:  Yes, Your Honor.  On behalf of STMicro

5

1    is Max Ciccareli and Bruce Sostek.

2              THE COURT:  All right.  Very good.  Good to see you,

3    Mr. Sostek and Mr. Ciccarelli.

4              All right.  So we've got the subpoena from Purdue to

5    X-Fab that looks like it's issued out of the Northern District of

6    Texas.  So I'm kind of inclined to just direct the parties to

7    address it with the Court in the Northern District, but I'm happy

8    to hear argument on it real quick.

9              So with that in mind, Mr. Shore, I don't know if you're

10   going to be addressing it or if Ms. McNaughton or who wants to

11   address the subpoena to X-Fab?

12             MR. SHORE:  I'll address it, Your Honor.

13             THE COURT:  Okay.

14             MR. SHORE:  First of all, it requires a little bit of

15   background explanation.  One of the past licensees of Purdue

16   University for the patent at issue in this case, the '633 patent,

17   was a license to GE Global Research.  That license also allowed

18   other GE entities acting through GE Global Research to enjoy the

19   benefits of the license.

20             That particular license does not include "have made"

21   rights.  It does not include foundry rights.  It is a research

22   and development license.  And the key to that is only $75,000 was

23   paid by GE for two reasons.  One, it's a research and development

24   license and, number two, there's 120 years of commercial

25   cooperation between GE and Purdue which Purdue takes into

6

1    consideration when it grants a license to somebody, especially

2    one for research and development purposes only, which is what

3    this was.

4         Now GE in discovery during a deposition admitted to

5    multiple violations of that research and development license.

6    They admitted that they were having products made by a third

7    party in violation of the license because the license does not

8    include "have made" rights or foundry rights.  And they

9    identified that party is X-Fab.

10        They also admitted to violating the marking provision

11   of the license.  They admitted to violating -- not paying the

12   payments for maintenance fees and maintaining the license under

13   the patent.  They admitted to several violations of the license.

14        Now why does that lead us to X-Fab?  Well, in the

15   middle of that deposition, of course, it was obstructed,

16   questions were refused to answer.  There's a whole other

17   proceeding on the GE deposition about how they ultimately just

18   got up and walked out because they refused to answer any

19   questions about the X-Fab relationship, about what was going on

20   at X-Fab, et cetera.

21        Why is that important?  Well, GE knows that now GE is

22   breaking up into three pieces.  There's going to be a GE

23   Aerospace, there's going to be a GE Energy, and then there's

24   going to be a GE Healthcare.  The research and development

25   license to GE Global Research is non-transferrable and not

1   assignable.

2        So that means that GE Aerospace who is selling products

3   covered by the patent, and which they pretty much admitted are

4   covered by the patent, will need a license upon the breakup of GE

5   this year or early 2023.  So GE has every incentive to align

6   itself with ST to try to claim that that $75,000 was not a

7   research and development license, that that was some sort of a

8   commercial license even though GE had no ability, none, to make

9   the parts independent of using a foundry or a third party.

10        So it is going to be a huge issue in the case, and ST

11   has already made it a huge issue in the case that they want to

12   tout this $75,000 license as a license that is commercial and

13   that is a market setter license for the technology.  GE Aerospace

14   and GE have a similar motivation to also show that this is a

15   commercial license and not a research and development license

16   despite the fact that the license literally says that it's

17   limited to actions taken through GE Global Research.

18        We learned in the GE deposition that GE only has one

19   four-inch wafer fab which is completely uneconomical for

20   commercial use.  They use that same four-inch fab to do all of

21   their research and development on all types of semiconductor

22   products.  So it's never been a commercial fab, and it is

23   incapable of being a commercial fab.

24        So what we have to do to rebut the arguments by ST and

25   its ally, GE, that the license is a commercial license is we have

8

1    to establish that GE never had the capacity to make silicon

2    carbide MOSFETs independent of using an outside third-party

3    foundry or an outside third-party manufacturing supplier.

4          For example, GE does not own implantation devices that

5    would allow it to implant into silicon carbide.  They have never

6    possessed that equipment.  In a subsequent deposition that was

7    taken a couple of weeks ago, we had deposed a former employee of

8    GE and he said that they were sending out -- even years before

9    the license, they had to send out wafers to third parties for

10   certain steps in the process because they did not have the

11   capability to do it.

12         So why is this X-Fab deposition and documents

13   important?  Well, first of all, GE has refused to provide any

14   documents, and there's a separate motion to compel on that.  So

15   X-Fab's argument that we should get these documents from GE is on

16   its face refuted by GE's refusal to provide any documents.  ST

17   has supported GE's refusal to provide any documents, and there is

18   a motion pending before the Court on that issue.

19         GE has also refused to continue the deposition to

20   answer the questions that need to be answered related to the GE

21   X-Fab relationship to prove that GE never had the capacity to

22   build products, certainly not on a commercial basis.  In fact,

23   they didn't even have the ability to produce prototypes.

24         So what do we want from X-Fab and why is that

25   important?  This is a $5-billion case.  Between the past sales

9

1   and the future projected sales, and this is public information

2   that you can get from analyst calls and other things, ST has sold

3   and expects to sell during the life of the patent $5 billion

4   worth of products.

5        The established licensing rate is 3-1/2 percent, and

6   there will be by the time we get to trial multiple licensees at

7   that rate.  So they're going to stand up at trial and they're

8   going to say, but wait a minute, there's a $75,000 license and

9   that's a commercial license and that's what you should really

10   consider, not all of these other licenses at 3-1/2 percent.

11        So what we have to do is we have to show that the

12   circumstances indicate, as a matter of fact, the only thing the

13   circumstances indicate is that it's a research and development

14   license.  So what we need to do is we need to show the

15   communications, all communications between X-Fab and GE showing

16   that GE needed X-Fab to make these parts because it could not

17   make them itself.

18        We need all those communications between X-Fab and GE

19   to show when they started the process with GE and how GE had no

20   ability to make these parts internally, at least not from

21   beginning to end.  We need to see from the X-Fab agreements with

22   GE that GE intended to use X-Fab long term and has reserved

23   capacity at X-Fab to make these parts, again showing that they

24   were never going to be made in GE and that GE didn't have the

25   capability to make them.

1      Now this is not a broad -- there's no evidence, no

2 declaration, nothing that this is unduly burdensome, overly

3 broad.  So in the Fifth Circuit, that ends it.  If you don't put

4 on evidence of burden, if you don't put on evidence of expense,

5 you cannot argue that.  Those objections are waived.  There's no

6 evidence.

7      Even if they -- and this only covers one product,

8 silicon carbide MOSFETs.  And we agreed if they would give us the

9 documents, to limit it to one customer, GE.  And they refused,

10 and so I thought it was kind of amusing that they said, oh, well,

11 cut off all their discovery because they didn't agree because

12 they want more than just GE when we made that offer and they

13 refused it.

14      The reason why other companies are important, and if

15 we're going to be there taking the deposition anyway on GE and if

16 we're going to get the documents on GE, the other companies are

17 important for validity.  Long-felt need.  The market, how the

18 market has expanded, how there's a huge demand for silicon

19 carbide capacity.  As a matter of fact, X-Fab also makes products

20 for another licensee of Purdue, SemiQ.  We believe they also make

21 products for other companies, again, their capacity limited.

22      They're one of the few fabs in the world who could

23 actually make these parts.  And they are under demand and they

24 are able to increase prices and other things related to this.

25 And all of that shows long-felt need and other validity concerns,

1  market acceptance, et cetera.

2            So we're willing to limit it to GE, GE material and

3  that was the original focus.  But we do believe that if we're

4  going to be there taking their deposition anyway and, again,

5  we're only talking about one product, silicon carbide MOSFETs.

6  And we think that who else they may be making it for is also

7  relevant and discoverable on validity concerns or for validity

8  reasons.

9            But the primary reason, a critically important reason

10  to my client is we need to be able to show that GE did not, never

11  had, never thought they had, never expected to have a commercial

12  license for $75,000 because they had zero ability to make a

13  commercial product in their four-inch fab and they were

14  completely dependent upon X-Fab to do it.

15            So this is not a minor issue.  It is a major issue.  It

16  is probably the issue that ST wants to try to use to tell the

17  jury that this technology is not worth very much.  And if ST's

18  going to try to make the argument that this technology is only

19  worth $75,000, Purdue must be able to go down the two paths that

20  show that that is incorrect.  It is incorrect factually, and it's

21  incorrect technologically.  And as far as the license terms, it's

22  incorrect legally.

23            So that's our position.  This is -- you know, third

24  parties in the federal court system, we have subpoenas for third

25  parties.  They don't just get to ignore subpoenas.  They don't

1   get to just say we don't want to play in the legal system.  If

2   witnesses can just refuse to participate in the legal system,

3   then we don't have a legal system anymore and what we have is an

4   arbitration system where you don't get the evidence you need to

5   put on your case even whereas here everyone agrees it's

6   important.

7          This is the first discovery hearing Bruce Sostek has

8   attended in this entire case.  Why do you think he's here?

9   Because this is a critical, critical issue.  It's a critical

10  issue for my client.  It's a critical issue for ST.  And at the

11  end of the day, all the facts need to be on the table.  We can

12  argue about what they mean, but all the facts should be on the

13  table so that each side has a fair opportunity before the jury to

14  make their case.  And that is what this is about.

15         THE COURT:  All right.  Let me ask you, Mr. Shore, I

16  mean the place of compliance for the subpoenas is the Northern

17  District of Texas.  And the way I see Rule 45, any issues doing

18  or concerning the subpoenas should be first taken up in that

19  district.  How does it get to me?  Why shouldn't it just be sent

20  to the Northern District to resolve?

21         MR. SHORE:  Well, Your Honor, I think the parties had

22  agreed to put it in front of this Court because the Northern

23  District of Texas is going to transfer it down here anyway most

24  likely.  And so if the other side refuses to agree to this

25  process, they agree -- they filled out their side of the chart.

1    Now it's all done.

2            If they want us to go and waste several weeks going to

3    the Northern District of Texas and waste more of their client's

4    money to do that, I suppose they can make that argument.  But I

5    imagine just like the other cases was referred to this Court, I

6    believe it was from Colorado or some other place that sent the

7    other dispute here, this one's going to be here, too, most

8    likely.

9            So I thought that the parties had kind of agreed to

10   short-circuit that process and abide by whatever ruling comes out

11   of this Court.

12            THE COURT:  Okay.

13            All right.  Let me -- I guess, Mr. Chibib, will you be

14   responding for X-Fab?

15            MR. CHIBIB:  Yes, Your Honor.  I will.  Thank you.

16            I mean, first of all, Your Honor, clearly, we object to

17   the subpoena that it is entirely overburdensome, overbroad, and

18   it's completely duplicative with the requests that Purdue has

19   made to GE.  I want to lay that out first.  But I think it's

20   important for us to set the scene a little bit, keeping in mind

21   Mr. Shore's comments that they want to prove that GE did not have

22   certain capabilities.

23            First of all, my client, X-Fab, is not a party to this

24   case.  My client's products are not implicated in this case

25   whatsoever.  None of the defendants, the ST entities, buy

14

1    products from us.  We are completely outside of this lawsuit.

2           GE is not a party to this case.  So what we're talking

3    about here is a third-party subpoena to get documents from

4    another third party.  This is how removed from this case X-Fab

5    is.  And then you tack on the notion that what Purdue is trying

6    to obtain and the types of documents they're trying to obtain all

7    relate to a contract that Purdue has with GE, right, a contract

8    that they're trying to interpret.

9           And, Your Honor, I mean I don't need to tell you,

10   that's your job to completely interpret a contract within the

11   four corners of that document.  I don't see how X-Fab's documents

12   not only how they're relevant to the interpretation of that

13   document but how they're not completely duplicative with the

14   identical documents that they're seeking from GE.

15          You had mentioned, Your Honor, the Northern District,

16   and I wanted to just interject.  We are fine with Your Honor

17   punting this to the Northern District.  We do think, though, that

18   after hearing our position that Your Honor will be able to quash

19   the subpoena and remove any production obligation on behalf of

20   X-Fab.

21          So let's again, let's talk about where we are.  Purdue

22   has subpoenaed GE.  Purdue has already taken a deposition of GE

23   regarding these identical issues.  They weren't happy with what

24   they got in the deposition.  They filed a motion with Your Honor

25   where they briefed a motion to compel discovery from GE.  GE has

15

1    responded to that.  ST has even responded to that.  So three

2    different parties have briefed this up and teed it up for Your

3    Honor.

4            We think that X-Fab again is so far removed that all

5    those issues can be resolved by Your Honor by addressing the GE

6    motion itself.  If Your Honor orders production from GE, great.

7    X-Fab doesn't need to do anything.  If Your Honor says the

8    production from GE is not appropriate, great.  The discovery from

9    X-Fab is similarly not appropriate.

10           So we feel like this is completely unnecessary and that

11   we are being dragged in to a dispute that Purdue has with GE.

12   And I'll also note as Mr. Shore explained at the very beginning

13   of his presentation, it sounds like they have breach of contract

14   claims against GE.  But keep in mind, they don't have a case

15   against GE.

16           So, again, they could bring GE in as a party to

17   whatever lawsuit they want to bring relating to that agreement

18   and get all the documents that they want from that party, again,

19   keeping X-Fab out of this because, under Rule 26, they're asking

20   us for an insane amount of documents that would take months of

21   man hours to gather and produce.  And we think, Your Honor,

22   again, there is no reason to go to plan C and get documents from

23   X-Fab when they have plan A against GE and plan B against GE in a

24   separate lawsuit.

25           So that's where we stand on it, Your Honor.  I'm happy

16

1    to talk about any other issues.  And also know that X-Fab has

2    third-party confidentiality obligations to GE.  So even if we had

3    to produce documents, we would still have to get permission from

4    GE to produce those documents.  So it just seems incredibly

5    wasteful of your time and our time in order to address this.

6          THE COURT:  Okay.  And to make sure I follow, the

7    contract that sort of caused all this to come about is a contract

8    between plaintiff Purdue and GE, and then GE and X-Fab have

9    further relationship that's related to that contract?

10         MR. CHIBIB:  We don't have anything that's related to

11   that contract, Your Honor.  There's nothing -- I mean we

12   definitely -- they're a customer of ours.  GE is a customer of X-

13   Fab, but that's separate and apart from any agreement that they

14   have with Purdue.

15         THE COURT:  Okay.  Okay.

16         Thank you, Mr. Chibib.

17         I'm going to give you just a little bit longer, Mr.

18   Shore, but go ahead and respond.  It really does sound like X-Fab

19   is getting extremely tangential to the real crux of the case.  So

20   I'll give you just a couple of more minutes to convince me

21   otherwise.

22         You're on mute.

23         MR. SHORE:  They're not tangential at all.

24         Purdue did not subpoena GE.  ST subpoenaed GE.  Purdue

25   did a cross-notice asking for the same documents that were called

1  for in the ST subpoena, and what ended up happening is ST and GE

2  got together collusively, collusively and ST told GE I guess

3  after they were told that maybe these documents won't be good for

4  you, ST and GE decided they weren't going to make anybody produce

5  any documents.

6         So GE just did not produce a single document, did not

7  object to anything in the subpoena or in the cross-subpoena.

8  They just didn't produce the document.  Then when we got to the

9  deposition, GE refused to answer questions about X-Fab.  Just

10  refused to answer them, not based on privilege, just instructed

11  the witness not to answer in violation of the rules because GE

12  and ST are colluding to try to turn a research and development

13  license into a commercial license because ST is infringing and GE

14  is infringing and GE Aerospace needs a license.

15        So they had a common interest in denigrating the IP and

16  in trying to show that the IP can be licensed cheaply.  The way

17  that we can refute that and the only way that we can refute that

18  is to show that that license was not a commercial license but a

19  research and development license.

20        How do you prove that?  You prove that by showing that

21  GE had to go to X-Fab to build the products.  They had no ability

22  internally to build them themselves.  That refutes any claim that

23  it was a commercial license.  That kills it.  So that is why we

24  need the documents from X-Fab.  These documents go back about

25  seven years.

1        So there is no guarantee that what GE has is going to

2   be the same as what X-Fab has.  There is -- he just said that it

3   would take months of man hours.  That is completely nonsense.

4        THE COURT:  All right.  Let me ask you, Mr. Shore,

5   where does discovery stand with regard to GE?

6        MR. SHORE:  They're refusing.  They're just flat out

7   refusing to provide any documents, not a single document.

8   They're flat out refusing that they walked out of the deposition,

9   they instructed the witness not to answer any questions about

10  X-Fab despite there being no privilege or any other limitation

11  involved.

12       And so, again, we offered to limit the subpoena topics

13  to documents exchanged between X-Fab and GE, okay.  That's one

14  customer, one product.  It could be retrieved in a day.  There is

15  no evidence, none, about burden.  There is no evidence in the

16  record.

17       THE COURT:  As far as GE goes, is there pending -- I

18  was trying to skim the docket here.  There's a pending motion to

19  compel against GE and a motion to quash.  Is that still pending

20  before the Court?

21       MR. SHORE:  It's been fully briefed, and I don't

22  believe it's been set for hearing.

23       MR. CHIBIB:  It's Docket Item 163, Your Honor.

24       THE COURT:  Okay, thank you.

25       MR. SHORE:  But it's been fully briefed for a while.

1   And for whatever reason, I don't think that a hearing has been

2   set.

3          THE COURT:  Okay.

4          MR. SHORE:  But even if a hearing was set, it still

5   doesn't change the dynamic that we have a legitimate need for the

6   evidence and a $5-billion lawsuit for documents related to this

7   license or documents related to the relationship between X-Fab

8   and GE.  There is no evidence from X-Fab of any burden, none,

9   zero.  No  declaration, nothing.  It's one customer, one product.

10          And there is no reason that I can see why a third party

11   can just say we refuse to participate because -- they're not

12   saying the information we're seeking is not relevant.  It is

13   clearly relevant.  I've explained why it's relevant.  They're

14   just saying they don't want to participate in it because they're

15   a third party.  If that's how it works, then throw Rule 45 out

16   the window.

17          THE COURT:  All right.  I am going to go off the record

18   just briefly.

19      (Off the record from 1:54 p.m. to 2:00 p.m.)

20          THE COURT:  We're back on the record.

21          One thing I wanted to get a clarification on, Mr.

22   Chibib, is X-Fab consenting I guess to this Court determining the

23   subpoena for all purposes or is there some qualification to that?

24          MR. CHIBIB:  No qualification, Your Honor.  We're happy

25   with you deciding.

1       THE COURT:  Okay.  So what I'm going to do is that it

2  looks like X-Fab as well as looking back at the docket some of

3  these other third parties are sort of dominoes that are in line

4  after the GE domino needs to be sorted out.  And I see that

5  that's been fully briefed.

6       So what I'm going to do at least as far as X-Fab goes

7  today I'm going to take this under advisement.  We're going to

8  move the GE briefing to the top of the pile.  It would seem like

9  we'd be taking things, I'd be taking things out of order to rule

10  that X-Fab has to produce documents now before we've fully

11  evaluated and ruled on the GE subpoena and the GE motion to

12  compel.

13       So that's what I'm going to do for today is take this

14  under advisement.  We'll get a -- we'll look at the GE documents.

15  We'll see about whether Judge Albright refers that to me for a

16  decision or keeps it, but we'll get that decided quickly and then

17  this and the other third party ones will kind of domino after

18  that.

19       I know we've checked.  I think fact discovery runs in

20  February, so we'll get an answer on this as quick as we possibly

21  can.  I won't go quite so far as to say this week, but we'll do

22  it as fast as possible so we'll have it out in time to make use

23  of it before that fact discovery cutoff.

24       But I don't think it's prudent to require X-Fab to

25  produce documents before we've decide what GE is going to be

1    required to do since they are the vehicle by which X-Fab finds

2    itself before the Court.

3           So with that, we'll take it under advisement.  And I

4    was really happy to see Mr. Sostek.  I thought he was here just

5    because he hadn't seen the Court in a while and I hadn't seen him

6    in a while.

7           MR. SOSTEK:  Your Honor, I was here because I thought

8    Mr. Ciccarelli was in a time zone that might not have permitted

9    him to attend, but you got both of us instead.  But it's great to

10   see you --

11          THE COURT:  I know.  It's a great day.  Great day.

12          MR. SOSTEK:  Thank you.

13          THE COURT:  Well, it was great to see you, Mr. Sostek.

14          Okay.  So is there anything else?  Mr. Shore, you're in

15   the middle of my screen so I'll start with you.  Anything else

16   that we need to take up today for Purdue?

17          MR. SHORE:  No, I think the Court's sequencing is

18   exactly what should be done.  And, frankly, when we had this

19   dispute with X-Fab, we were kind of hoping that these would be

20   combined with the GE for one hearing.  That was sort of our hope,

21   and then we could figure out who is going to give up the

22   information.  But somebody needs to give it up.

23          THE COURT:  Okay.  Okay.  I understand.  And part of it

24   is I think having this hearing helped identify for the Court how

25   all these pieces fit together in a way that makes it easier for

22

1    us to address.

2            So is there anything else, let me ask Mr. Chibib,

3    anything else to take up for X-Fab?

4            MR. CHIBIB:  No, Your Honor.

5            THE COURT:  All right.  Thank you, Mr. Chibib.

6            Mr. Sostek, anything for STMicro?

7            MR. SOSTEK:  Thank you.  Nothing more for today.  We

8    appreciate it.

9            THE COURT:  All right.  I appreciate everybody's

10   attendance, and y'all have a great day.

11           MR. SOSTEK:  Take care.

12           THE COURT:  We'll be adjourned.

13       (Proceedings adjourned at 2:03 p.m.)

14                          ---oOo---

15                    **C E R T I F I C A T E**

16       I, DIPTI PATEL, court approved transcriber, certify that the

17   foregoing is a correct transcript from the official electronic

18   sound recording of the proceedings in the above-entitled matter.

19

20   *Dipti Patel*

21   _____

22   DIPTI PATEL, CET-997

23   LIBERTY TRANSCRIPTS              Date: December 13, 2022

24

25