# EXHIBIT 8

```
                                                                    1

              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
                         WACO DIVISION

THE TRUSTEES OF PURDUE    *
   UNIVERSITY             *      July 11, 2022
                          *
VS.                       *
                          * CIVIL ACTION NO. W-21-CV-727
STMICROELECTRONICS N.V.   *
   ET AL                  *

         BEFORE THE HONORABLE ALAN D ALBRIGHT
              DISCOVERY HEARING (via Zoom)

APPEARANCES:

For the Plaintiff:   Michael W. Shore, Esq.
                     Raphael Chabaneix, Esq.
                     Mu Lin Hsu, Esq.
                     Shore Chan DePumpo LLP
                     901 Main Street, Suite 3300
                     Dallas, TX 75202

For the Defendant:   Justin S. Cohen, Esq.
                     Dina W. McKenney, Esq.
                     Bruce S. Sostek, Esq.
                     Nadia Elena Haghighatian, Esq.
                     Thompson & Knight, LLP
                     1722 Routh Street, Suite 1500
                     Dallas, TX 75201

                     Massimo Ciccarelli, Esq.
                     Ciccarelli Law Firm
                     750 N. St. Paul St., Suite 200
                     Dallas, TX 75201

Court Reporter:      Kristie M. Davis, CRR, RMR
                     PO Box 20994
                     Waco, Texas 76702-0994
                     (254) 340-6114

   Proceedings recorded by mechanical stenography,
transcript produced by computer-aided transcription.
```

24

```
02:15   1              So for these, unfortunately, as we told
02:15   2   him and as I think our dispute chart sets forth, we
02:16   3   don't have any of the documents.  We're continuing to
02:16   4   look, but when you have stuff that's 22-plus years old,
02:16   5   it's hard.
02:16   6              THE COURT:  Mr. Ciccarelli, when a lawyer
02:16   7   says we produced everything we have, I usually turn to
02:16   8   the other side and ask what they would like me to do.
02:16   9              MR. SHORE:  Your Honor, if that's all
02:16  10   they have, then they can't prove their invalidity case,
02:16  11   and I guess there's nothing else we can do.  Because
02:16  12   what they've produced definitely does not invalidate
02:16  13   anything.  You can't even understand it.  So okay.
02:16  14              THE COURT:  Okay.  Now I have in front of
02:16  15   me -- that exhausts the list I have.
02:16  16              But, Mr. Shore, you just mentioned an
02:16  17   interrogatory.  Is that on a -- maybe on a different
02:16  18   piece of paper.  Let me look.  Give me one second.
02:16  19              MR. SHORE:  Yeah.  There's a different
02:16  20   dispute chart, Your Honor.
02:16  21              THE COURT:  Got it.  Here we go.  It's
02:17  22   coming up.
02:17  23              Okay.  I'll take up Interrogatory No. 1.
02:17  24              MR. SHORE:  In Interrogatory No. 1 we're
02:17  25   asking for all agreements that are related to or
```

|       |    |                                                                         |
|-------|----|-------------------------------------------------------------------------|
| 02:17 | 1  | concerning ST supplying of silicon carbide ST power                     |
| 02:17 | 2  | parts, MOSFETs.                                                         |
| 02:17 | 3  | They have produced only -- they produced                                |
| 02:17 | 4  | two internal agreements between ST NV and ST, Inc. from                 |
| 02:17 | 5  | the 1980s. They've also produced four distributor                       |
| 02:17 | 6  | agreements with four distributors. That's it.                           |
| 02:17 | 7  | So they haven't produced any purchase                                   |
| 02:17 | 8  | orders. They haven't produced any master supply                         |
| 02:17 | 9  | agreements of customers. There's not a single                           |
| 02:17 | 10 | agreement with customers that has been produced.                        |
| 02:17 | 11 | So, again, we don't know what the terms                                 |
| 02:18 | 12 | and conditions of sale are. The reason why this is                      |
| 02:18 | 13 | important is many times these agreements or purchase                    |
| 02:18 | 14 | orders will have a delivery location. And if that's                     |
| 02:18 | 15 | the United States, obviously that's important as to who                 |
| 02:18 | 16 | was the importer.                                                       |
| 02:18 | 17 | You can also have things about where                                    |
| 02:18 | 18 | payments are to be made. Are they to be made in the                     |
| 02:18 | 19 | United States? To or from the United States? There's                    |
| 02:18 | 20 | all kinds of things in these agreements that you can                    |
| 02:18 | 21 | use to establish a U.S. sale or a nexus to the United                   |
| 02:18 | 22 | States.                                                                 |
| 02:18 | 23 | It also gives terms and conditions for                                  |
| 02:18 | 24 | the sale and returns and things like that. These are                    |
| 02:18 | 25 | very fundamental agreements.                                            |

02:18  1          What we asked them for was to give us, by
02:18  2  a date certain which we don't have, to ask them to give
02:18  3  us at least one version of every purchase order with
02:18  4  every customer, every supply agreement where there is a
02:18  5  supply agreement with any customer.  As well as the
02:18  6  other -- I think the bigger issue is that we also asked
02:18  7  them for their agreements with Wolfspeed.
02:19  8          Wolfspeed is another defendant on these
02:19  9  same patents in North Carolina.  Wolfspeed has a
02:19  10 agreement where they have supplied ST.  Well, there's
02:19  11 one press release saying $800 million supply agreement
02:19  12 for silicon carbide wafers, substrates.  And another
02:19  13 one says that agreement has been expanded to
02:19  14 $1.5 billion.
02:19  15         So those -- obviously those agreements
02:19  16 are critically important because they tell us how much
02:19  17 capacity and forecast ST is buying starting material
02:19  18 for.  So if you go to your supplier and you say I need
02:19  19 $1.5 billion worth of starting material, that probably
02:19  20 means that you're going to use $1.5 billion of starting
02:19  21 material to create parts that are probably in the five
02:19  22 to $7 billion range of sales.
02:19  23         So we think that those agreements -- any
02:19  24 agreement concerning their supply of silicon carbide
02:20  25 MOSFETs should be produced.  Including agreements with

```
02:20  1   Cree/Wolfspeed and agreements with their customers.
02:20  2                 And I think Mr. Ciccarelli did agree that
02:20  3   they would provide example purchase orders.  He has not
02:20  4   agreed -- or at least I think he's -- he's either not
02:20  5   agreed or says he can't find any agreements with
02:20  6   customers.
02:20  7                 No customer supply agreements.  Which is
02:20  8   very weird in this industry, which I'm very familiar
02:20  9   with.  Because no customer is going to use a supplier
02:20  10  where they don't have certainty of supply over a
02:20  11  certain period of time.  Because you can't have your
02:20  12  supply chain be not secure as far as supply.
02:20  13                 But to me, this is very simple.  We want
02:20  14  at least one exemplar purchase order for every
02:20  15  customer.  We want any contracts between them and
02:20  16  customers.  And we want their supply agreements with
02:20  17  Cree/Wolfspeed because that's going to tell us a lot
02:20  18  about what their forecasts are going forward for future
02:20  19  sales.
02:21  20                 THE COURT:  Response?
02:21  21                 MR. CICCARELLI:  Certainly, Your Honor.
02:21  22                 So there's two different issues here and
02:21  23  if I could break them up that way.  One is the
02:21  24  agreements with the customers which is what the request
02:21  25  is directed to.  And then the other is this agreement
```

```
02:21  1   with the suppliers which is not covered.  And I'll
02:21  2   address that second.
02:21  3                Talking about our customer agreements,
02:21  4   again, we already, as he acknowledges, have given him
02:21  5   already four agreements with our customers, our
02:21  6   distributor customers, who were for the accused
02:21  7   products, the largest, if not -- one of, if not the
02:21  8   largest customers for these products.  So we already
02:21  9   gave him customer agreements for the products that were
02:21  10  accused.
02:21  11               What I offered to Mr. Shore is we're now
02:21  12  broadening out the scope of the discovery to all
02:21  13  silicon carbide MOSFETs.  We're going to get him a
02:21  14  sales report that identifies all those products sold
02:21  15  during the damages period.  We're going to -- and it's
02:21  16  also going to identify the customers for those
02:22  17  products.
02:22  18               We're going to get him contracts, if we
02:22  19  have them, with those customers.  And if we don't have
02:22  20  a contract with a customer, as Mr. Shore and I were
02:22  21  discussing, we will get him a purchase order so he can
02:22  22  see what the purchase orders for that customer
02:22  23  generally look like.
02:22  24               What we -- what I'd asked Mr. Shore was,
02:22  25  let's put some kind of cap so we're not running around
```

02:22  1   chasing the insignificant customers.  So I offered to
02:22  2   get him agreements for the top 99.9 percent of the
02:22  3   revenue -- customers for the top 99.9 percent of the
02:22  4   revenue.
02:22  5                  So we're agreeing to give him those
02:22  6   contracts if they exist.  And if they -- an agreement
02:22  7   does not exist, then we'll get him the -- a purchase
02:22  8   order so he can see what those terms and conditions
02:22  9   look like.
02:22  10                 That's where we are on that.  And as soon
02:22  11  as we generate the sales report, we'll know who the
02:22  12  customers are and we'll start pulling those agreements
02:22  13  and get them to Mr. Shore.
02:22  14                 MR. SHORE:  Your Honor, let me again give
02:23  15  you a little background information.  I'm very familiar
02:23  16  with this industry.  This silicon carbide is a
02:23  17  replacement technology.  It is a relatively new
02:23  18  technology.  It is a technology that is in an -- in
02:23  19  what we would call an adoption phase.  And it can take
02:23  20  two or three years to get a customer to design your
02:23  21  product into their end product device.
02:23  22                 So during that two to three years that
02:23  23  you may be working with someone to try to get designed
02:23  24  into a device, you will supply them samples for very
02:23  25  low quantities of products, probably in the

30

02:23  1   .1 percent -- these customers would probably be the
02:23  2   smallest customers you would have because they are
02:23  3   buying in small quantities as they qualify your
02:23  4   products.
02:23  5             However, once you get the design win, the
02:23  6   design win can result in hundreds of millions of
02:23  7   dollars in sales.  For example, if you are providing
02:24  8   Apple with 100 parts that they're buying as samples to
02:24  9   analyze whether or not they're going into the next
02:24  10  iPhone or the next iPad or iMac, that is incredibly
02:24  11  important information to us.  Because we can look and
02:24  12  see, oh, they're supplying small quantities to Apple.
02:24  13  They're supplying small quantities to Samsung or IBM or
02:24  14  whoever it might be.
02:24  15            That is incredibly important information.
02:24  16  That is critically important information in determining
02:24  17  how successful their product roll-out is going to be.
02:24  18            It also allows you to go and subpoena
02:24  19  those customers or to ask in depositions of ST.
02:24  20  Because generally when you're giving people samples or
02:24  21  you're supplying them with samples or low quantities,
02:24  22  you're doing that with the understanding and knowledge
02:24  23  that this will lead to a significant piece of business.
02:24  24  Again, very relevant to the future.
02:24  25            I don't understand why, if he's going to

31

02:24  1  run a sales report, why would you cut it off at the
02:24  2  smallest customers.  There's no reason to.
02:24  3                MR. CICCARELLI:  Let me --
02:25  4                MR. SHORE:  Hang on.  Mr. Ciccarelli, can
02:25  5  you hang on?
02:25  6                So what we're talking about is a report
02:25  7  from an ERP system where they simply plug in the part
02:25  8  numbers and they print out a report of all the
02:25  9  customers, which he's been promising me for two weeks
02:25  10 which I've seen nothing.
02:25  11               So every single customer should be
02:25  12 disclosed, because those small customers can often end
02:25  13 up being the biggest customers you will ever have.
02:25  14               MR. CICCARELLI:  Your Honor, what I
02:25  15 explained to Mr. Shore is the sales report will have
02:25  16 all sales and all customers.  The issue with the limit
02:25  17 was to avoid chasing down small agreements or purchase
02:25  18 orders with small clients.  But what I also told
02:25  19 Mr. Shore, and it's reflected in our dispute chart, is
02:25  20 once he sees the list of all the customers, if there
02:25  21 are some customers that fall below that threshold that
02:25  22 he thinks may be relevant, if he sees an Apple on there
02:25  23 or whatever, I said, come back to us and we'll go get
02:25  24 that agreement for you.
02:26  25               So it's a nonissue.  The report will have

```
02:26  1   all customers.  We're going to get -- we're going to
02:26  2   pull all the agreements, hopefully down to some
02:26  3   threshold.  And if after he sees them, he needs the
02:26  4   ones below the threshold, we're willing to go get those
02:26  5   as well.
02:26  6                THE COURT:  Anything else?
02:26  7                MR. SHORE:  Just that discovery closes in
02:26  8   November, and we're taking depositions in Sicily in
02:26  9   September.  And I'm not sure I'm going to have time to
02:26  10  come back.
02:26  11               THE COURT:  I'll be back in a second.
02:26  12               (Pause in proceedings.)
02:28  13               THE COURT:  If we can go back on the
02:28  14  record.
02:28  15               The Court is not going to grant any
02:28  16  additional relief at this time under Interrogatory
02:28  17  No. 1.
02:28  18               Mr. Shore, I'm happy to hear from you
02:28  19  with respect to Interrogatory No. 2.
02:28  20               MR. SHORE:  Your Honor, as a
02:28  21  clarification, you are going to enforce the agreement
02:28  22  that he made to produce everything related to silicon
02:28  23  carbide MOSFETs?
02:28  24               THE COURT:  He made the agreement.  I
02:28  25  don't think I'm going to need to.  If you find he
```

```
02:28    1    doesn't, certainly come back to me and I will get
02:28    2    involved.
02:28    3              MR. SHORE:  Okay.  And then the only
02:28    4    other thing I'd ask is that we get some kind of date by
02:28    5    which this is going to happen, because again, we've
02:28    6    been waiting for two weeks and we have final
02:28    7    infringement contentions and other things coming up.
02:29    8    But...
02:29    9              Okay.  Let's -- moving to Interrogatory
02:29   10    No. 2, they just didn't answer it.  Just flat out
02:29   11    didn't answer it.
02:29   12              They -- the meaning -- we asked for the
02:29   13    meaning of the letters, numbers and symbols used in the
02:29   14    product codes.  They just didn't answer it.
02:29   15              The approximate date, day, month and year
02:29   16    each product became available for distribution or sale
02:29   17    in the United States.  They just didn't answer it.
02:29   18              And matching the data sheets to the
02:29   19    product numbers.  They didn't answer it.
02:29   20              So what they did was they gave us a list
02:29   21    of products that they -- and of course they limited it
02:29   22    again to only those that share die.  So his agreement
02:29   23    that they're now going to give us for all SiC MOSFETs,
02:29   24    I would like to make sure that that is somewhere in the
02:29   25    record that that agreement was made and will be
```

```
                                                                    58
 1   UNITED STATES DISTRICT COURT )
 2   WESTERN DISTRICT OF TEXAS    )
 3
 4      I, Kristie M. Davis, Official Court Reporter for the
 5   United States District Court, Western District of
 6   Texas, do certify that the foregoing is a correct
 7   transcript from the record of proceedings in the
 8   above-entitled matter.
 9      I certify that the transcript fees and format comply
10   with those prescribed by the Court and Judicial
11   Conference of the United States.
12      Certified to by me this 16th day of July 2022.
13
14                        /s/ Kristie M. Davis
                          KRISTIE M. DAVIS
15                        Official Court Reporter
                          800 Franklin Avenue
16                        Waco, Texas 76701
                          (254) 340-6114
17                        kmdaviscsr@yahoo.com
```