RACHEL APPLEGATE, PH.D.
July 28, 2023

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION
CASE NO. 6:21-cv-00727-ADA

THE TRUSTEES OF PURDUE UNIVERSITY, )
                                   )
                    Plaintiff,     )
                                   )
         -vs-                      )
                                   )
STMICROELECTRONICS INTERNATIONAL   )
N.V., ET AL.,                      )
                                   )
                    Defendants.    )

    The videotaped deposition upon oral examination of RACHEL APPLEGATE, PH.D., a witness produced and sworn before me, Dianne Lockhart, RMR, CRR, a Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Defendants STMicroelectronics, Inc. and STMicroelectronics International N.V. at the Conrad Hotel Indianapolis, 50 West Washington Street, Indianapolis, Marion County, Indiana, on the 28th day of July, 2023, commencing at 9:32 a.m. pursuant to the Federal Rules of Civil Procedure.

```
                                                    Page 38
1   Q   Okay.  Let's mark, then, as Exhibit 6 -- and you
2       thought by clicking on SpringerLink would give
3       you information about whether the book was
4       relevant today?
5           MR. OFFOR:  Object to form.
6   Q   Did I get that right?
7   A   No.  What I said was I did not click on it
8       because I was not being asked whether it was
9       available for sale today.
10  Q   Okay.  Let's mark as Exhibit 6 -- here you go,
11      give you the right one -- a document
12      SpringerLink, ST-Purdue_00121651 through 59.
13  A   Uh-huh, thank you.
14  Q   Have you seen Exhibit 6 before?
15  A   I sat in on a deposition yesterday, and I saw it
16      then.
17  Q   And if you go to page 8 of 9.
18  A   Yes.
19  Q   Well, first of all, do you recognize this
20      "Silicon Carbide, Recent Major Advances" as the
21      book in question?  This is what this is talking
22      about?
23          MR. OFFOR:  Object to form.
24  A   It is the Choyke book.
25  Q   Yes.  And do you see on page 8 of 9 the Choyke
```

```
                                                    Page 39
1       book was published on October 8, 2003?
2           MR. OFFOR:  Object to form.
3   A   I see that the publisher says it was published.
4   Q   So you do see that it says it was published on
5       October 8, 2003?
6           MR. OFFOR:  Object to form.
7   A   That the publisher on this website has listed
8       that date.  There's -- it says "Hardcover,
9       ISBN" --
10  Q   Yeah.
11  A   -- "Published 08," that's -- that's the -- what
12      the publisher has put on there.
13  Q   Right.  Do you know how long Springer has been in
14      the business of publishing books?
15  A   A long time.  I don't know exactly.
16  Q   Are they well respected as a publisher?
17  A   Medium.
18  Q   Why -- why medium?
19  A   I'm -- I'm used to scientific hierarchy, and so
20      they're sort of a midlevel scientific publisher.
21      I mean -- anyway, they are.
22  Q   Do you know if they're based in Germany?
23  A   I don't have a reason to think they're not.  I
24      think they are, but I --
25  Q   Do you know that they have offices in New York?
```

```
                                                    Page 40
1   A   I would suppose so.  I think every publisher has
2       offices in New York.
3   Q   But you did not see -- in forming -- in providing
4       your opinion in this case, you had not seen this
5       document; correct?
6   A   No, because, again -- and -- I see publisher's
7       dates that are not accurate.  I have experienced
8       before publisher's dates that are not accurate to
9       the actual time a physical thing was produced.
10  Q   Yeah, I take it you've also seen where it is
11      accurate; right?
12  A   Yes, but it's -- it is an unreliable, it has too
13      much wiggle room for me.
14  Q   So is it your view that you -- you wouldn't trust
15      a publisher saying when a publisher published a
16      book?
17  A   I am probably influenced by the fact that I was
18      emailing an editor in April of 2023 about the
19      final edits for an article I wrote that they
20      published and said was published in 2022, and it
21      wasn't.
22  Q   So you have reason to believe that Springer on
23      its website is not telling the truth when it says
24      it published in October 8, 2003?
25  A   I think it's aspirational and I think nobody
```

```
                                                    Page 41
1       cares anymore from their end.
2           MR. OFFOR:  I think whenever you find a good
3       breaking point.
4           MR. BETTINGER:  Yeah, now is good.  Yeah.
5           THE VIDEOGRAPHER:  The time is 10:21 a.m. --
6           MR. BETTINGER:  Just to let you know, I --
7       I'll try to get this done before lunch.  We'll
8       see.  It might be a late lunch, but I'll try to
9       get it done, okay, so from a timing standpoint.
10          THE VIDEOGRAPHER:  The time is 10:22 a.m.
11      and we are going off record.
12          (At this time a recess was taken.)
13          THE VIDEOGRAPHER:  The time is 10:41 a.m.
14      and we are back on record.
15  BY MR. BETTINGER:
16  Q   All right.  Thank you, Doctor.  You had an
17      opportunity in reviewing Dr. Hall-Ellis's report
18      to see her Exhibit 1, which was the -- the cover
19      page, the verso page and the article; do you
20      recall that?
21  A   I believe so.
22  Q   Yeah.  And did you -- well, let me do this.  Let
23      me just mark as Exhibit 7 a document bearing
24      Bates number ST-Purdue_00118795 as Exhibit 7.
25          I'll represent to you that's the page from
```

Page 42

1  her report, if you want to see it, but do you
2  recognize this as the verso page of the book that
3  we're talking about, the Choyke book?
4       MR. OFFOR:  Object to form.
5  A  I -- I recognize it as part of her report.
6  Q  Okay.  And do you see the stamp on this?
7  A  Yeah, fuzzy.
8  Q  Library of Congress, November 10, 2003?
9  A  Correct.
10 Q  Okay.  Do you understand that this was a document
11    that was obtained from the Library of Congress?
12      MR. OFFOR:  Object to form.
13 A  I don't know that.
14 Q  Did you ever ask where -- where it was obtained
15    from?
16      MR. OFFOR:  Object to form.
17 A  I don't see that in -- in my report where I went
18    back and forth on asking that.
19 Q  Yeah.  Would it surprise you to learn that it was
20    obtained from the Library of Congress?
21      MR. OFFOR:  Object to form.
22 Q  Exhibit 7.
23 A  I don't know.  I mean, I wouldn't either be
24    surprised one way or the other.
25 Q  Okay.  Well, I'll take one of the ways, I guess.

Page 43

1     Which -- why not?
2  A  Because I buy a lot of used books.
3  Q  Okay.  What does that -- I don't understand the
4     correlation.
5  A  That have stamps from libraries that I myself
6     have not visited.
7  Q  Right, but did -- did you ever inquire as to
8     where Dr. Hall-Ellis got the -- the copy that
9     she's referring to?
10 A  So where does she say she got it from, because I
11    could find where I wrote about that, in her
12    report?
13 Q  I -- I can't give you a specific reference, but
14    the stamp here is the Library of Congress.
15      Do you recognize -- let me ask you this.
16    Let me withdraw the last question.
17 A  Sure.
18 Q  Do you recognize this as a Library of Congress
19    stamp?
20 A  As close as I can read it.
21 Q  Yeah.  So does this have any impact on your
22    analysis of whether the book was published?
23 A  Okay, my analysis is about -- not about -- is
24    about the accessibility of the book, so let me --
25    hang on.  I know it's here somewhere.

Page 44

1     So I -- I'm sorry, could you restate the
2     question?
3       MR. BETTINGER:  I lost it at this point.
4     I'm sorry, would you mind reading it back, ma'am.
5       (The pending question was read back by the
6     reporter.)
7  A  My analysis on page 9 and 10 -- 8, 9 and 10 of my
8     report is an analysis of when it was publicly
9     available, not when it was published.
10 Q  Yes.  And I'm asking you does this have any
11    impact on your analysis as to when it was
12    published?
13 A  It -- it has an impact.
14 Q  And what is that, ma'am?
15 A  That -- that there was something in existence
16    that they stamped.
17 Q  And do you recognize this as the verso page from
18    the book, the Choyke book?
19 A  I recognize that she represents that and, excuse
20    me, it was in her report.
21 Q  Have you looked at the verso page from the actual
22    book?
23 A  No.
24 Q  You haven't?  So you don't know?
25 A  I do not have a copy of the actual book.

Page 45

1  Q  Did you ever ask for it?
2  A  No.
3  Q  We have three copies.  I think we produced them.
4     Okay.  So you don't know that this -- whether or
5     not this is the verso page?
6  A  I can't say.  That -- I mean, if you want me to
7     be totally certain, I can't be totally certain.
8  Q  Hold on.  Maybe you mentioned it.
9       I'll come back at a break.  I thought you --
10    do you recall mentioning the verso page in your
11    report?  I thought I had seen it.
12 A  ==I believe I mentioned it in connection with the==
13    ==Cataloging in Publication data being present==
14    ==indicating that it was MARC -- a MARC record==
15    ==would have been opened before the -- the book==
16    ==existed.==
17 Q  Okay.  And just --
18      MR. OFFOR:  Counsel, just -- it's on page 7
19    of her report, I think.
20      MR. BETTINGER:  Okay.  Thank you, sir.  I
21    appreciate it.
22      THE WITNESS:  Oh, yes.  I was on the next
23    page, sorry.
24      MR. OFFOR:  Where it says first, I think
25    that's maybe a screenshot of what you're talking

RACHEL APPLEGATE, PH.D.
July 28, 2023

Page 78
1   MR. OFFOR: Just for clarity, I think we're
2   on the -- she's on the wrong page. So 282.
3 Q  282.
4 A  Oh, okay.
5 Q  Sorry. We're on "b".
6 A  I couldn't see it, okay.
7 Q  "Subfield "b" contains a statement of the number
8   of copies of the resource the Library of Congress
9   has decided to retain. It is mandatory when
10  subfield "a" has an acquire decision," which is
11  what we have here.
12 A Yes. Yes.
13 Q "And is absent when subfield "a" has do not
14  acquire or undetermined. The statement is in the
15  form shown in the following examples."
16 A Right.
17 Q You see that?
18 A I do see that.
19 Q Okay. So they have decided to retain two copies,
20  two shelf copies; right?
21 A Eventually. I just don't know when they would
22  have two copies.
23 Q Well, what we do know is the Library of Congress
24  had a copy on November 10, 2003, from the file
25  stamp; right?

Page 79
1 A Well, why don't --
2   MR. OFFOR: Object to form.
3 A -- they have two copies.
4 Q Maybe they do. This is just one of them.
5 A I don't think you can have it both ways. I think
6   this is a plan to acquire two copies, one of
7   which will be this one, maybe, some day.
8 Q Well, we have one we know of at this November 10,
9   2003 -- is it 18 -- November of 2003, we know is
10  a Library of Congress stamp, it has -- that
11  indicates it has a copy; correct?
12 A A copy, yes.
13 Q Yes. And then we know that in -- on December 3,
14  2003, a copy was received and was sent to CIP for
15  verification; right?
16  MR. OFFOR: Object to form.
17 A All that does is raise questions in my head.
18 Q So that doesn't indicate to you as an expert,
19  just being independent looking at this --
20 A Yes.
21 Q -- that doesn't indicate to you that the Library
22  of Congress had a copy by November of 2003, it
23  had acquired two shelf copies and at least one of
24  those copies had been provided on December 3?
25 A In that case how can it have a stamp of November?

Page 80
1 Q Because that's when it actually received the
2   book.
3 A Then why does this say 12-03?
4 Q Because that's when it sent -- it had the book
5   and it sent one to CIP to verify. I just -- I
6   mean, it just makes sense to me that's what
7   they're saying here, doesn't it?
8   MR. OFFOR: Object to form.
9 A What I am saying is that in 925 where it says
10  this is their plan, I believe that this is their
11  plan, and if you notice, it says policy default,
12  and they have some big default things. They
13  acquire or they don't acquire. And this is a
14  standard two shelf copies, policy default,
15  eventually this is what they plan to do. I don't
16  know when this -- that 925 was filled in.
17 Q Right, but by 7 we know they have at least one
18  copy. We know because it's a file stamped copy;
19  right? That's what Exhibit 7 shows us.
20  MR. OFFOR: Object to form.
21 A I -- I think I've already described that I see
22  that that stamp's on there.
23 Q Okay. So that would indicate the Library of
24  Congress has a -- has the book November of 2003,
25  and by December of 2003 it's actually sending a

Page 81
1   copy of that book to CIP for verification. Isn't
2   that a fair reading of what these documents show?
3   MR. OFFOR: Object to form.
4 A I read 955 as being a record of processing, and I
5   don't know when it was actually shelved --
6 Q Right, we're not talking --
7 A -- from this.
8 Q Yeah, but we're not talking shelving. We're
9   talking about having the book.
10 A I'm reading the same thing you're reading.
11 Q Yeah. Now, shelving could be different; right?
12  You got to put it on a shelf.
13 A Uh-huh.
14 Q Right. But what we're trying to determine is
15  public accessibility, whether someone can find
16  the book. And isn't it a fair reading of these
17  documents that by November the Library of
18  Congress had the book, and in December it was
19  actually sending it around within the -- after
20  having gone through the 955 process, was sending
21  it around so that the book was there, it was
22  available?
23  MR. OFFOR: Object to form.
24 Q Isn't that a fair reading?
25 A So if we go back to my report. Okay, so on

RACHEL APPLEGATE, PH.D.
July 28, 2023

Page 90
1  Q   Okay.  And if you look at -- let's -- let's use
2      your Exhibit 14 because it's yours.  It makes
3      it -- you say -- do you see in line 40 there it's
4      UMI UMI?
5  A   I see that.
6  Q   Okay.  And do you recall that from our previous
7      discussion, 40 was the publisher?
8  A   Yes.
9  Q   Okay.  And do you know --
10 A   No, no.  Okay.  Wasn't 40 the cataloging entry,
11     cataloger?
12         It's a long day and sometimes I might get --
13     I want to make sure I'm correct.
14 Q   Yeah, yeah, yeah, sure.  Fair enough.
15         Let me get that number for you, see if I can
16     help you.
17 A   Record source.
18 Q   Yeah.  So it's on page 170 --
19 A   Yes.
20 Q   -- of your --
21 A   I see that.
22 Q   Yeah.  Mark coder, name of organizations that
23     created the original classification record.
24 A   Right.  You had said publisher.
25 Q   Oh, did I?

Page 91
1  A   Yeah.
2  Q   I'm sorry, you're -- well, it's the record
3      source, 40 is the record source; correct?
4  A   Correct.
5  Q   And UMI is the record source?
6  A   Yes.
7  Q   What is UMI?
8          MR. OFFOR:  Object to form.
9  A   What is -- if I'm correct, it stands for
10     University Microfilms International.
11 Q   Okay.  And is that an outfit that publishes
12     dissertations?
13         MR. OFFOR:  Object to form.
14 A   They provide access and indexing.  They provide
15     indexing to many dissertations and theses and
16     access to some.
17 Q   Right.  And you -- and then they -- you pay for
18     those.  If you -- if you want a copy --
19 A   If you want a copy.
20 Q   -- you have to pay UMI; right?
21 A   Well, UMI would sell you a copy of some, not all.
22 Q   So UMI -- is it your understanding UMI is in the
23     business of -- of collecting and selling Ph.D.
24     theses?
25         MR. OFFOR:  Object to form.

Page 92
1  Q   Or dissertations I guess is a better word.
2  A   If you look at page 245, I'm -- not -- I'm sorry,
3      not 245; 500, the line for 500.
4  Q   Yes.
5  A   One of their core businesses is the -- is the
6      production of this thing called Dissertation
7      Abstracts International.
8  Q   Yes.
9  A   It's an indexing service for abstracts.
10 Q   And if you go on that Dissertation Abstracts
11     International and click on an abstract, you can
12     get then sent to buy the underlying thesis;
13     right?
14 A   Sometimes.
15 Q   Right.  That's their business model.
16 A   Yes.
17 Q   And here if you look at line 300 on Exhibit 14,
18     the line 300 --
19 A   Uh-huh.
20 Q   -- that's -- that's telling us the number of
21     pages in the thesis; correct?
22 A   I believe it's meant to indicate that.  What I
23     see, though, is that the source of the
24     information is the Dissertation Abstracts
25     International.

Page 93
1  Q   Sure, but it's telling you about the -- the
2      abstract isn't 139 pages.  It's the actual
3      thesis; right?
4  A   No.  Probably somebody filled out a form that
5      said how many pages is the thesis and they put
6      down 139.
7  Q   Right.  So that you could go onto the UMI
8      website, get that abstract and then say yeah, I
9      want to purchase a copy; right?
10 A   If it's available.
11 Q   Well, you -- do you have any evidence that it
12     wasn't available?
13 A   I know that some are not.  Some are embargoed.  I
14     would have expected to see like royalty payments.
15     My own dissertation sold seven copies and I got
16     all of like $50 for it, because they -- they pay
17     royalties to the -- to the authors when they sell
18     copies of it.  And I thought that -- I did not
19     see any of that information.
20 Q   Well -- okay.  But so then in your mind you drew
21     the conclusion it was not available?
22 A   No, I -- I cannot be certain one way or the
23     other.
24 Q   Okay.
25 A   Especially I don't know what happened in 2004.